# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

CHISHOLM'S VILLAGE PLAZA, LLC,

       Plaintiff,

vs.                                                                                    No. CIV 20-0920 JB/JHR

TRAVELERS COMMERCIAL INSURANCE
COMPANY; THE CINCINNATI INSURANCE
COMPANY; WILL BURKE and BURKE
INSURANCE GROUP,

       Defendants.

## MEMORANDUM OPINION AND AMENDED ORDER[1]

**THIS MATTER** comes before the Court on: (i) Defendant Fidelity and Guaranty Insurance

Underwriter's Motion for Summary Judgment on the Duty to Defend, filed September 21, 2021

(Doc. 42)("Fidelity MSJ Motion");[2] (ii) Defendant Cincinnati Insurance Company's Memorandum

---

[1]This Memorandum Opinion and Amended Order supplements and amends the Court's Order, filed March 31, 2022 (Doc. 48), disposing of: (i) Defendant Fidelity and Guaranty Insurance Underwriter's Motion for Summary Judgment on the Duty to Defend, filed September 21, 2021 (Doc. 42); (ii) Defendant Cincinnati Insurance Company's Memorandum of Law in Support of its Motion for Summary Judgment, filed February 26, 2021 (Doc. 28); and (iii) Plaintiff Chisholm's Village Plaza, LLC's Motion for Summary Judgment on Breach of Duty to Defend, filed March 19, 2021 (Doc. 30). In the Order, the Court: (i) granted Defendant Fidelity and Guaranty Insurance Underwriter's Motion for Summary Judgment on the Duty to Defend; (ii) denied Defendant Cincinnati Insurance's Motion for Summary Judgment; and (iii) granted in part and denied in part Plaintiff Chisholm's Village Plaza, LLC's Motion for Summary Judgment on Breach of Duty to Defend. In the Order, the Court indicates that it will, at a later date, issue a Memorandum Opinion more fully detailing its rationale for its decision. See Order at 1. This Memorandum Opinion and Amended Order is the promised Opinion.

[2]Defendant Fidelity Insurance and Guaranty Insurance Underwriters states that Plaintiff Chisholm's Village Plaza, LLC, erroneously names Fidelity Insurance "Travelers Commercial Insurance Company." Fidelity MSJ Motion at 1. Defendant Fidelity and Guaranty Insurance Underwriter's Motion for Summary Judgment on the Duty to Defend was filed originally on February 26, 2021 (Doc. 25), then withdrawn, see Fidelity and Guaranty Insurance Underwriters, Inc.'s Notice of Withdrawal of Motion Without Prejudice and Subject to Refiling, filed September

of Law in Support of its Motion for Summary Judgment, filed February 26, 2021 (Doc. 28)("Cincinnati MSJ");[3] and (iii) Plaintiff Chisholm's Village Plaza, LLC's Motion for Summary Judgment on Breach of Duty to Defend, filed March 19, 2021 (Doc. 30).  The Court held a hearing on November 3, 2021.  See Clerk's Minutes at 1, filed November 3, 2021 (Doc. 46).  The primary issue is whether Plaintiff Chisholm's Village Plaza, LLC ("Chisholm's Village"), is entitled to judgment as a matter of law, because Defendants Fidelity and Guaranty Insurance Underwriters ("Fidelity Insurance") and Cincinnati Insurance Company ("Cincinnati Insurance") have a duty to defend their Chisholm's Village in City of Las Cruces, et al. v. United States of America, No. CIV 17-0809 JCH/GW ("CERCLA Lawsuit"), in which the City of Las Cruces and Doña Ana County brought Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601-9675 ("CERCLA"), claims against Chisholm's Village, see Amended Complaint for Damages and Declaratory Relief at 14-31, filed March 19, 2021 (Doc. 26-1)("CERCLA Complaint"), and where the insurance policies the Defendants issued to Chisholm's Village contain an absolute pollution exclusion.  The Court concludes that Chisholm's Village is entitled to judgment as a matter of law, because the Court predicts that the Supreme Court of New Mexico would follow the approach to the absolute pollution exclusion that is most protective of the insured, and under that approach, the absolute pollution exclusion is ambiguous per se and as applied to this

---

21, 2021 (Doc. 41), and refiled on September 21, 2021 (Doc. 42).

[3]Defendant Cincinnati Insurance Company filed a Memorandum of Law in Support of its Motion for Summary Judgment on February 26, 2021, see Cincinnati's Memorandum of Law in Support of its Motion for Summary Judgment, filed February 26, 2021 (Doc. 28)(Cincinnati MSJ"), but Cincinnati Insurance did not file a motion for summary judgment.  The Court will treat Cincinnati's Memorandum of Law in Support of its Motion for Summary Judgment as a motion for summary judgment, because it asks the Court to grant a motion for summary judgment.  See Cincinnati MSJ at 12.

case's facts, creating the potential for coverage and triggering the duty to defend.

## FACTUAL BACKGROUND

The Court draws the factual background from the parties' assertions of undisputed material fact in their summary judgment motion papers.  See Fidelity and Guaranty Insurance Underwriters, Inc.'s Memorandum of Law in Support of its Motion for Summary Judgment on the Duty to Defend ¶¶ 1-10, at 2-5, filed February 26, 2021 (Doc. 26), and September 21, 2021 (Doc. 43)("Fidelity MSJ"); Cincinnati MSJ ¶¶ A-H, 1-9, at 1-3; Plaintiff Chisholm's Village Plaza, LLC's Memorandum in Support of Motion for Summary Judgment on Breach of the Duty to Defend ¶¶ 1-10, at 5-8, filed March 19, 2021 (Doc. 31)("Chisholm MSJ"); Plaintiff Chisholm's Village Plaza, LLC's Consolidated Response in Opposition to Defendants' Motions for Summary Judgment ¶¶ A-B, at 4-5, ¶¶ A-H, at 5-6, filed March 19, 2021 (Doc. 32), and filed September 28, 2021 (Doc. 44)("Chisholm Response"); Fidelity and Guaranty Insurance Underwriters, Inc.'s Consolidated Reply Brief in Further Support of its Motion for Summary Judgment/Opposition Brief to Plaintiff's Cross-Motion for Summary Judgment ¶¶ A-H, at 2-4, ¶¶ 1-10, at 5-7, filed April 2, 2021 (Doc. 33) and filed September 30, 2021 (Doc. 45)("Fidelity Reply/Response"); Defendant Cincinnati Insurance Company's Consolidated Reply in Support of its Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment ¶¶ A-H, at 1-2, ¶¶ 1-9, at 3, filed April 2, 2021 (Doc. 34)("Cincinnati Reply/Response"); Plaintiff Chisholm's Village Plaza, LLC's Reply in Support of Motion for Summary Judgment on Duty to Defend, filed April 21, 2021 (Doc. 36)("Chisholm Reply").  Most of the facts in this case are undisputed.  The Court states the undisputed material facts in the text.  The Court specifically discusses facts that are purportedly disputed or actually disputed in the footnotes.

1.      **The CERCLA Lawsuit.**

On August 23, 2018, the City of Las Cruces and Doña Ana County filed an Amended

Complaint for Damages and Declaratory Relief against Chisholm's Village and other parties[4] in

the CERCLA Lawsuit.  See Fidelity MSJ ¶ A.1, at 2 (asserting this fact); Cincinnati MSJ ¶ A.1, at

2 (asserting this fact); Chisholm Response ¶ B.1, at 4 (admitting this fact); id. ¶ B.1, at 5 (admitting

this fact).  Las Cruces and Doña Ana County brought claims pursuant to CERCLA, alleging that

"groundwater and land have been contaminated by maintenance operations at a former National

Guard Armory and by dry cleaning operations at various locations in Las Cruces, including one

that [Chisholm's Village] currently owns."  Fidelity MSJ ¶¶ A.1-2, at 2  (asserting this fact);

Cincinnati MSJ ¶¶ A.1-2, at 2 (asserting this fact).  See Chisholm Response ¶ A.1, at 4 (admitting

this fact).[5]  The CERCLA Lawsuit alleges specifically that Chisholm's Village and others

"'released substances that are hazardous to human health and the environment into the soil and

groundwater in Las Cruces,' and that such releases contributed to a plume of contaminated

groundwater that the U.S. Environmental Protection Agency ('EPA') has designated as a federal

---

[4]Chisholm's Village's co-defendants in the CERCLA Lawsuit are: the United States of America, the United Stated States Department of Defense, the National Guard Bureau, The Lofts at Alameda, LLC, American Linen Supply of New Mexico, Inc., Rawson Leasing Limited Liability Company Co., Jose and Yvonne Coronado, and Does 1-5.  See CERCLA Complaint at 5.

[5]Chisholm's Village disputes Cincinnati MSJ ¶ A.2, at 2, "to the extent that it suggests Chisholm's 'currently owns' a dry-cleaning operation and to the extent it characterizes the [CERCLA] complaint as asserting that Chisholm's released substances.  The [CERCLA] complaint alleges that a dry-cleaning operation formerly occupying a site owned by Chisholm's released hazardous substances."  Chisholm Response ¶ B.2, at 5 (quoting and citing Cincinnati MSJ ¶ A.2, at 2).  Chisholm's Village does not dispute, however, identical language in the Fidelity MSJ.  Because the language in the Fidelity MSJ and Cincinnati MSJ does not suggest that Chisholm's Village itself released hazardous substances, the Court concludes that Fidelity Insurance and Cincinnati Insurance's summary of the CERCLA Complaint is accurate.

Superfund site (the 'Site')."  Fidelity MSJ ¶ A.2, at 2 (quoting CERCLA Complaint ¶¶ 6, 48, at 6, 14-15)(asserting this fact); Cincinnati MSJ ¶ A.2, at 2  (quoting CERCLA Complaint ¶¶ 6, 48, at 6, 14-15)(asserting this fact).  See Chisholm Response ¶ A.1, at 4 (admitting this fact); id. ¶ B.1, at 5 (admitting this fact).

The CERCLA Lawsuit alleges that Las Cruces and Doña Ana County have "spent millions of dollars in investigating and remediating the contamination of the Site in response to EPA demands."  Fidelity MSJ ¶ A.3, at 2-3 (citing CERCLA Complaint ¶¶ 8, 50, at 6-7, 15)(asserting this fact); Cincinnati MSJ ¶ A.3, at 3 (citing CERCLA Complaint ¶¶ 8, 50, at 6-7, 15)(asserting this fact).  See Chisholm Response ¶ A.1, at 4 (admitting this fact); id. ¶ B.1, at 5 (admitting this fact).  The CERCLA Lawsuit further alleges that Chisholm's Village and its co-defendants "have not contributed to the investigation or remediation efforts and thus, the Plaintiffs 'seek a declaration of responsibility and payment from Defendants for past, present, and future response costs incurred in response to Defendants' release of hazardous substances at and to the Site.'"  Fidelity MSJ ¶ A.3, at 2-3 (quoting CERCLA Complaint ¶ 10, at 7)(asserting this fact); Cincinnati MSJ ¶ A.3, at 3 (quoting CERCLA Complaint ¶ 10, at 7)(asserting this fact).  See Chisholm Response ¶ A.1, at 4 (admitting this fact); id. ¶ B.1, at 5 (admitting this fact).  In the CERCLA Lawsuit, Las Cruces and Doña Ana County assert three main causes of action against Chisholm's Village: "(a) Cost Recovery Under CERCLA; (b) Contribution Under CERCLA; and (c) Declaratory Relief."  Fidelity MSJ ¶ A.4, at 3 (citing CERCLA Complaint ¶¶ 52-73, at 15-19)(asserting this fact); Cincinnati MSJ ¶ A.4, at 3 (citing CERCLA Complaint ¶¶ 52-73, at 15-19)(asserting this fact).  See Chisholm Response ¶ A.1, at 4 (admitting this fact); id. ¶ B.1, at 5

(admitting this fact).   In the CERCLA Lawsuit, Las Cruces and Doña Ana County seek the

following relief against Chisholm's Village:

> (a) an award of damages reflecting the costs that Plaintiffs have incurred and will
> incur in response to the release or threat of release of hazardous substances; (b) a
> declaration that CVP is strictly, jointly and severally liable for environmental
> response costs incurred and to be incurred; (c) a declaration that [Chisholm's
> Village] is liable for costs "that Plaintiffs may incur as a result of the claims brought
> under 42. U.S.C. § 9609(a) and 42 U.S.C. § 9607(a) on behalf of EPA"; and (d)
> prejudgment interest.

Fidelity MSJ ¶ A.5, at 3 (citing CERCLA Complaint ¶¶ 52-73, at 15-19)(asserting this fact);

Cincinnati MSJ ¶ A.5, at 3 (citing CERCLA Complaint ¶¶ 52-73, at 15-19)(asserting this fact).

See Chisholm Response ¶ A.1, at 4 (admitting this fact); id. ¶ B.1, at 5 (admitting this fact).  The

CERCLA Complaint "sought to impose joint and several liability on Chisholm's for an

approximately 3.5 billion gallon subterranean plume."  Chisholm Response ¶ B, at 5 (asserting this

fact).  See Fidelity Reply/Response ¶ B, at 2 (admitting this fact); Cincinnati Reply/Response ¶ B,

at 1 (admitting this fact).   "In addition to seeking damages for [tetrachloroethylene ('PCE')]

contamination, the [CERCLA] Complaint also sought damages against Chisholm's for the release

of unidentified 'hazardous substances.'"  Chisholm Response ¶ D, at 6 (asserting this fact)(citing

CERCLA Complaint ¶ 33, at 7-8).  See Fidelity Reply/Response ¶ D, at 3 (admitting this fact);

Cincinnati Reply/Response ¶ D, at 1 (admitting this fact).

## 2.   **The Fidelity Policy.**

Fidelity Insurance issued the following liability insurance policies to Chisholm's Village's

"alleged predecessors": Policy No. 1MP30107954800, from October 10, 1994 to November 1,

1995; Policy No. 1MP30107954801, from November 1, 1995 to December 31, 1995; Policy No.

1MP30107954802, from December 31, 1995 to December 31, 1996; Policy No.

1MP30107954803, from December 31, 1996 to December 31, 1997; Policy No. 1MP30107954804, from December 31, 1997 to December 31, 1998; Policy No. BFS00000221056, from December 31, 1998 to December 31, 1999; Policy No. BFS00000508313, from December 31, 1999 to December 31, 2000; and Policy No. BK00758177, from December 31, 2000 to December 31, 2001.  Fidelity MSJ ¶ 8, at 3-4 (citing Declaration of Robert J. Harris at 24-25 (executed February 26, 2021), filed February 26, 2021 (Doc. 26-1)("Harris Decl.")(asserting this fact).  See Chisholm Response ¶ A.1, at 4 (admitting this fact).   In relevant part, Fidelity Insurance's Commercial General Liability Coverage Form at 28-38, filed February 26, 2021 (Doc. 26-1)("Fidelity Policy"),[6] contains the following insuring agreement:

"SECTION 1 -- COVERAGES

COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1.      Insuring Agreement

       a.      We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies.  We will have the right and duty to defend the insured against any 'suit' seeking those damages."

Fidelity MSJ ¶ 9, at 4 (quoting Fidelity Policy at 28, filed February 26, 2021 (Doc. 26-1))(asserting this fact).  See Chisholm Response ¶ A.1, at 4 (admitting this fact).  The Fidelity Policy contains an "'Absolute Pollution Exclusion'" that provides, in pertinent part:

"**Exclusions**

This insurance does not apply to:

---

[6]Because the Fidelity Policies contain the same provisions, the Court refers to the "Fidelity Policy" in the singular.

**Pollution**

> (1)    "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:
>
>> (a)    At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;
>>
>>        . . . .
>
> (2)    Any loss, cost or expense arising out of any:
>
>> (a)    Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.
>>
>>        . . . .
>
> Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, petroleum, petroleum products and petroleum by-products, and waste. Waste includes materials to be recycled, reconditioned or reclaimed."

Fidelity MSJ ¶ 10, at 4-5 (quoting Harris Decl. at 25-26 (quoting Fidelity Policy at 28-29))(asserting this fact).  See Chisholm Response ¶ A.1, at 4 (admitting this fact).

**3.    The Cincinnati Policy.**

Cincinnati Insurance issued the following liability insurance policies to Chisholm's Village's predecessors:  Policy No. CPP1070353, from December 31, 2009, to December 31, 2012; and Policy No. EPP0172787, from December 31, 2012, to December 31, 2017.  See Cincinnati MSJ ¶ 7, at 3-4 (asserting this fact); Chisholm Response ¶ A.1, at 4 (admitting this fact). The Cincinnati Insurance Policy Number CPP1070353 at 43-45, 60, filed February 26, 2021 (Doc.

28-1)("Cincinnati Policy")[7] contains a pollution exclusion that provides, in relevant part:

**Exclusions**

This insurance does not apply to:

**Pollution**

    **(1)**     "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape or emission of pollutants:

        (a)     At or from any premises, site or location which is or was at any time owned or occupied by . . . any insured.

        . . . .

    **(2)**     Any loss, cost or expense arising out of any:

        (a)     Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

        (b)     Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

"Pollutant" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, petroleum, petroleum products and petroleum by-products, and waste. Waste includes materials to be recycled, reconditioned or reclaimed. Pollutants include but are not limited to substances which are generally recognized in industry or government to be harmful or toxic to persons, property or the environment regardless of whether the injury or damage is caused directly or indirectly by the pollutants and whether:

---

[7]Because the Cincinnati Policies contain the same provisions, the Court refers to the "Cincinnati Policy" in the singular.

        a.       The insured is regularly or otherwise engaged in activities
which taint or degrade the environment; or

        b.       The insured uses, generates or produces the pollutant.

Cincinnati MSJ ¶ 8, at 4-5 (citing Cincinnati Policy at 43-45, 60)(no citation for

quotations)(asserting this fact).  See Chisholm Response ¶ B.1, at 5 (admitting this fact).

### 4. Fidelity Insurance's and Cincinnati Insurance's Responses to Chisholm's Village's Tender of Claims.

Chisholm's Village notified Fidelity Insurance about the CERCLA Lawsuit in August,

2019.  See Fidelity MSJ ¶ 7, at 3 (citing Amended Complaint for Breach of Contract, Violations

of the New Mexico Insurance Practices Act, Breach of the Covenant of Good Faith and Fair

Dealing, Negligence and for Declaratory Judgment ¶ 27, at 12, filed September 14, 2020 (Doc.

4)("Complaint"))(asserting this fact).[8]  Neither Fidelity Insurance nor Cincinnati Insurance "took

---

[8]Chisholm's Village does not dispute the truth of the alleged undisputed fact, but it disputes
the relevance of the alleged undisputed fact.  See Chisholm Response ¶ 2, at 5 (citing Fidelity MSJ
¶ 7, at 3).  Chisholm's Village contends:

> With respect to paragraph 7, it is immaterial to Fidelity's Motion when Chisholm's
> tendered the claim to Fidelity and Fidelity does not argue in the Motion that the
> timing of the tender is a basis for summary judgment.  Chisholm's asserts that it
> tendered the claim to Fidelity as soon as the insurer was identified through the
> exercise of ordinary diligence and that Fidelity was not harmed in any way by the
> timing of the tender.

Chisholm Response ¶ 2, at 5 (citing Fidelity MSJ ¶ 7, at 3).  "The Court has previously held that a
'relevance argument . . . does not dispute the fact' and that 'relevance is a legal argument that is
best left for the Analysis Section' of this opinion."  Gallegos v. Bernalillo Cty. Bd. of Cty.
Comm'rs, No. CIV 16-0127 JB/JHR, 2018 U.S. Dist. LEXIS 109621, 2018 WL 3210531, at *1
(D.N.M. June 29, 2018)(Browning, J.)(quoting SEC v. Goldstone, No. CIV 12-0257, 2015 U.S.
Dist. LEXIS 116847, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.)).
Because the Defendants do not controvert the fact's truth, the Court deems this fact undisputed.
See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed
undisputed unless specifically controverted.").  Because Chisholm's Village does not dispute that

any action to independently investigate the allegations contained in the [CERCLA] Complaint,"

beyond comparing the CERCLA Complaint to the Fidelity Policy and the Cincinnati Policy,

respectively.   Chisholm Response ¶ G, at 6 (asserting this fact).[9]   Fidelity Insurance denied

---

it notified Fidelity Insurance about the CERCLA Lawsuit in August, 2019, the Court includes this
fact in the Factual Background as an undisputed fact.

     No party directly asserts when Chisholm's Village first tendered its claim to Cincinnati
Insurance.  The Court determines, however, that Chisholm's Village notified Cincinnati Insurance
about the CERCLA Lawsuit some time before March 6, 2019.  See Letter from Robert C. Evans
to Thomas H. Hnasko at 6 (dated November 1, 2019), filed March 19, 2021 (Doc. 30-
3)("Cincinnati Nov. 2019 Letter")(stating that Cincinnati Insurance received a letter from
Chisholm's Village dated March 6, 2021, in which Chisholm's Village contests Cincinnati
Insurance's denial of coverage and retenders its claim); Cincinnati Reply/Response ¶ F, at 2
(asserting that the Cincinnati Nov. 2019 Letter "speaks for itself").

     [9]Fidelity Insurance and Cincinnati Insurance dispute that they did not investigate the
allegations in the CERCLA Complaint, because they maintain that they compared the CERCLA
Complaint with the Fidelity Policy and the Cincinnati Policy.  See Fidelity Reply/Response ¶ G,
at 4 ("Disputed, as Fidelity properly compared the allegations of the CERCLA Suit with the terms
of the Fidelity Policies in forming its coverage position, including its position that no duty to
defend is owed."); Cincinnati Reply/Response ¶ G, at 2 ("Disputed, as Cincinnati compared the
allegations of the CERCLA Suit with the terms of the Fidelity Policies in forming its coverage
position.").  Fidelity Insurance also contends that "its position letters are immaterial and irrelevant
to the Court's determination of its duty to defend (or lack thereof)," because "[t]he Court's
assessment of the duty to defend . . . should be based exclusively upon the 'eight corners' of the
Fidelity Policies and the CERCLA Suit."  Fidelity Reply/Response ¶ G, at 4.  "The Court has
previously held that a 'relevance argument . . . does not dispute the fact' and that 'relevance is a
legal argument that is best left for the Analysis Section' of this opinion." Gallegos v. Bernalillo
Cnty. Bd. of Cnty. Comm'rs, 2018 U.S. Dist. LEXIS 109621, 2018 WL 3210531, at *1 (quoting
SEC v. Goldstone, 2015 U.S. Dist. LEXIS 116847, 2015 WL 5138242, at *27 n.95. Because the
Defendants do not controvert the fact's truth, the Court deems this fact undisputed.  See D.N.M.
LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless
specifically controverted.").  Because Fidelity Insurance and Cincinnati Insurance do not contest
Chisholm's Village's assertion that they did not undertake any factual investigation beyond
comparing the CERCLA Complaint to the Fidelity Policy and the Cincinnati Policy, the Court
agrees with Chisholm's Village that "[b]oth insurers contend that they compared the allegations in
the complaint to the policies, but they have not provided any evidence of an additional
investigation," and the Court thus considers this fact to be undisputed.  Chisholm Reply at 3.

coverage for the CERCLA Lawsuit.  See Fidelity MSJ ¶ 7, at 3 (asserting this fact).[10]  Fidelity

Insurance and Cincinnati Insurance denied coverage "on numerous bases not set forth in their

motions for summary judgment and refused to provide any defense to Chisholm's."  Chisholm

MSJ ¶ 6, at 7 (asserting this fact); Fidelity Reply/Response ¶ 6, at 6 (admitting this fact).[11]  Neither

Fidelity Insurance nor Cincinnati Insurance "filed a declaratory judgment action [to] seek

resolution of the coverage issue."  Chisholm Response ¶ H, at 6 (asserting this fact).[12]  See

Cincinnati Reply/Response ¶ H, at 2 (admitting this fact).  Chisholm's Village "'ultimately

established that it was not a responsible party within the meaning of Section 107 of CERCLA and

secured an agreement from Plaintiffs to dismiss all claims asserted against [Chisholm's Village],

---

[10]Chisholm's Village does not admit this fact: "All facts, except for paragraph 7, are undisputed."  Chisholm Response ¶ 1, at 4.  See Fidelity MSJ ¶ 7, at 3.  The Court deems this fact undisputed, however, because Chisholm's Village states in its Complaint that "Travelers [aka Fidelity Insurance] and Cincinnati, have refused to honor their duty to defend Chisholm's," Complaint ¶ 5, at 7, and also states in the Chisholm Response that "Cincinnati and Fidelity breached the duty to defend by not defending Chisholm's," Chisholm Response at 1.

[11]Cincinnati Insurance does not admit this fact, nor does it specifically dispute this fact.  Referring to the Cincinnati Nov. 2019 Letter, Cincinnati Insurance states that "[t]he document referenced in paragraph F speaks for itself."  Cincinnati Reply/Response ¶ 6, at 3.  Because Cincinnati Insurance does not specifically controvert this fact, the Court deems this fact undisputed.  See D.N.M. LR-Civ. 56-1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[12]Fidelity Insurance does not dispute the truth of the alleged undisputed fact, but it questions the relevance and materiality of the alleged undisputed fact.  See Fidelity Reply/Response ¶ H, at 4 ("Immaterial and irrelevant to the Court's determination of Fidelity's duty to defend (or lack thereof).").  "The Court has previously held that a 'relevance argument . . . does not dispute the fact' and that 'relevance is a legal argument that is best left for the Analysis Section' of this opinion."  Gallegos v. Bernalillo Cnty. Bd. of Cnty. Comm'rs, 2018 U.S. Dist. LEXIS 109621, 2018 WL 3210531, at *1 (quoting SEC v. Goldstone, 2015 U.S. Dist. LEXIS 116847, 2015 WL 5138242, at *27 n.95).  Because Fidelity Insurance does not controvert the fact's truth, the Court deems this fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

with no liability for response costs on the part of [Chisholm's Village].'" Fidelity MSJ ¶ 6, at 3 (quoting Complaint ¶ 4, at 7)(asserting this fact); Cincinnati MSJ ¶ 4, at 3 (quoting Complaint ¶ 4, at 7)(asserting this fact). See Chisholm Response ¶ A.1, at 4 (admitting this fact); id. ¶ B.1, at 5 (admitting this fact).

## PROCEDURAL BACKGROUND

On September 9, 2020, Chisholm's Village filed its Complaint for Breach of Contract, Violations of the New Mexico Insurance Practices Act, Breach of the Covenant of Good Faith and Fair Dealing, Negligence and for Declaratory Judgment, filed September 9, 2020 (Doc. 1), and, on September 14, 2020, filed its Amended Complaint for Breach of Contract, Violations of the New Mexico Insurance Practices Act, Breach of the Covenant of Good Faith and Fair Dealing, Negligence and for Declaratory Judgment at 1, filed September 14, 2020 (Doc. 4)("Complaint"). On October 13, 2020, Cincinnati Insurance filed the Cincinnati Insurance Company's Answer to Chisholm's Amended Complaint for Breach of Contract, Violations of the New Mexico Insurance Practices Act, Breach of the Covenant of Good Faith and Fair Dealing, Negligence and for Declaratory Judgment, filed October 13, 2020 (Doc. 7). On October 29, 2020, Fidelity Insurance filed Fidelity and Guaranty Insurance Underwriters, Inc.'s Answer and Additional Defenses to Plaintiff's Amended Complaint at 1, filed October 29, 2020 (Doc. 11). On February 26, 2021, Fidelity Insurance and Cincinnati Insurance filed the Fidelity MSJ and the Cincinnati MSJ, and, on March 19, 2021, Chisholm's Village filed a consolidated response and a cross motion for

summary judgment, <u>see</u> Chisholm Response at 1; Chisholm MSJ at 1.

      **1.**     **<u>The Complaint</u>.**

      In Count I of the Complaint, Chisholm's Village brings claims against Fidelity Insurance and Cincinnati Insurance for Breach of Contract.  <u>See</u> Complaint ¶¶ 34-44, at 9-11.  Chisholm's Village alleges that Fidelity Insurance and Cincinnati Insurance have a duty to defend their insured under the Fidelity Policy and Cincinnati Policy, and that they breach their contract by failing to pay for defense costs.  <u>See</u> Complaint ¶¶ 36-41, at 10.  In Count II, Chisholm's Village brings claims for violation of the New Mexico Insurance Practices Act, N.M.S.A. §§ 59A-1-1 to 59A-62-11 ("NMIPA"); in particular, Chisholm's Village alleges a violation of N.M.S.A. § 59A-16-3 for insurance bad faith.  <u>See</u> Complaint ¶¶ 45-61, at 11-15.  In Count III, Chisholm's Village alleges that Cincinnati Insurance and Fidelity Insurance breached the Covenant of Good Faith and Fair Dealing by not defending Chisholm's Village in the CERCLA Lawsuit.  <u>See</u> Complaint ¶¶ 62-70, at 15-16.  In Count IV, Chisholm's Village requests a declaratory judgment that the allegations in the CERCLA Lawsuit triggered Fidelity Insurance's and Cincinnati Insurance's duty to defend Chisholm's Village, and that each insurer is obligated to reimburse Chisholm's Village for its defense costs.  <u>See</u> Complaint ¶¶ 71-73, at 16-17.

      **2.**     **<u>The Fidelity MSJ</u>.**

      Fidelity Insurance argues in its MSJ that the "Absolute Pollution Exclusion" in the Fidelity Policy bars coverage for the CERCLA Lawsuit.  <u>See</u> Fidelity MSJ at 6.  Fidelity Insurance argues that, because the "allegations of the CERCLA Suit fall ***directly and completely*** within the parameters" of the absolute pollution exclusion, "Fidelity owes no duty to defend or indemnify."  Fidelity MSJ at 7 (emphasis in original).  Fidelity Insurance notes the lack of New Mexico caselaw

on the absolute pollution exclusion.  See Fidelity MSJ at 7 (citing <u>Blackhawk-Central City</u> <u>Sanitation Dist. v. Am Guarantee and Liab. Ins. Co.</u>, 214 F.3d 1183 (10th Cir. 2000)(applying Colorado law and ruling that an insurer did not have a duty to defend, because of an absolute pollution exclusion); <u>Mesa Oil, Inc. v. Ins. Co. of N. Am.</u>, 123 F.3d 1333, 1338-39 (10th Cir. 1997)(ruling that a pollution exclusion applied to an underlying CERCLA action); <u>Bituminous</u> <u>Cas. Corp. v. Basin Disposal, Inc.,</u> No. CIV 87-1019 JP, 1989 U.S. Dist. LEXIS 19174 (D.N.M. April 20, 1989)(Parker, J.)(ruling that an insurer had no duty to defend, because of application of an absolute pollution exclusion)).

Fidelity Insurance argues that the Absolute Pollution Exclusion bars coverage for the CERCLA Lawsuit, because it states that the insurance "does not apply to":

> (2)     Any loss, cost or expense arising out of any:
>
>> (a)     Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or   in any way respond to, or assess the effects of pollutants . . . .

Fidelity MSJ at 8 (quoting Fidelity Policy at 28-29).  Fidelity Insurance asserts that, "[u]nder New Mexico law, Courts construe the phrase, 'arising out of' according to its plain meaning to mean 'originating from,' 'having its origin in,' 'growing out of' or 'flowing from.'"  Fidelity MSJ at 8 (quoting <u>Am. Nat'l Prop. & Cas. Co. v. United Specialty Ins. Co.</u>, 592 F. App'x 730, 742 (10th Cir. 2014)(unpublished)[13]).  Fidelity Insurance argues that the CERCLA Lawsuit "obviously

---

[13]<u>Am. Nat'l Prop. & Cas. Co. v. United Specialty Ins. Co.</u> is an unpublished opinion, but the Court can rely on a Tenth Circuit unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . [a]nd we have

- 15 -

'originates from,' 'has its origin in,' 'grows out of' and/or 'flows from' a 'request, demand or order'" that Chisholm's Village "respond to contamination."  Fidelity MSJ at 8-9 (quoting Am. Nat'l Prop. & Cas. Co. v. United Specialty Ins. Co., 592 F. App'x at 742).  Fidelity Insurance argues, further, that the pollution's location is irrelevant, because "this portion of the Exclusion is **not** site-specific -- it applies to '**any** loss, cost or expense arising out of **any** request, demand or order that any insured or others' 'clean up, remove . . . or in any way respond to' pollution." Fidelity MSJ at 9 (quoting Fidelity Policy at 27-28)(emphasis in Fidelity MSJ).  Fidelity Insurance contends that the CERCLA Lawsuit "unquestionably" arises out of a "'request, demand or order'" that the City of Las Cruces and the County of Doña Ana -- "i.e., 'others' as used in this Exclusion" -- respond to contamination, because the EPA named the City of Las Cruces and the County of Doña Ana "as potentially responsible parties for the contamination."  Fidelity MSJ at 9 (quoting Fidelity Policy at 27-28).  Finally, Fidelity Insurance argues that, because it does not owe Chisholm's Village a duty to defend the CERCLA Lawsuit, Chisholm's Village's Unfair Insurance

---

generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Am. Nat'l Prop. & Cas. Co. v. United Specialty Ins. Co., Robinson v. Cavalry Portfolio Servs., LLC, 365 F. App'x 104 (10th Cir. 2010)(unpublished), Held v. Ferrellgas, Inc., 505 F. App'x 687 (10th Cir. 2012)(unpublished), Cordova v. PNM Elec. And Gas Servs., 72 F. App'x 789 (10th Cir. 2003)(unpublished), Lymon v. Aramark Corp., 499 F. App'x 771 (10th Cir. 2012)(unpublished), and United States v. United Park City Mines Co., 827 F. App'x 871 (10th Cir. 2020)(unpublished), Union Ins. Co. v. Mendoza, 374 F. App'x 796 (10th Cir. 2010)(unpublished), MJH Props. LLC v. Westchester Surplus Lines Ins. Co., 814 F. App'x 421 (10th Cir. 2020)(unpublished), and Mount Vernon Fire Ins. Co. v. Okmulgee Inn Venture, LLC, 451 F. App'x 745 (10th Cir. 2011)(unpublished), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Amended Order.

Practices and Breach of the Covenant of Good Faith and Fair Dealing claims "fail as a matter of law." Fidelity MSJ at 10 (citing <u>Dockery v. Allstate Ins. Co.</u>, 431 F. Supp. 3d 1307, 1314 (D.N.M. 2020)(Brack, J.)).

**3.      The Cincinnati MSJ.**

Cincinnati Insurance argues that it has no duty to reimburse Chisholm's Village for costs and expenses it incurred defending the CERCLA Lawsuit, because the allegations in the CERCLA Lawsuit "fall squarely within the applicable absolute pollution exclusion."  Cincinnati MSJ at 6-7.  Cincinnati Insurance states that, in <u>Bituminous Cas. Corp. v. Basin Disposal, Inc.</u>, 1989 U.S. Dist. LEXIS 19174, "the court considered an absolute pollutant exclusion in a commercial general liability policy similar to the one found in the Cincinnati policies and held that clean-up costs damages were excluded by the policy."  Cincinnati MSJ at 7 (citing <u>Bituminous Cas. Corp. v. Basin Disposal, Inc.</u>, 1989 U.S. Dist. LEXIS 19174, at *1-11).  Cincinnati Insurance asserts that "the majority of courts that have addressed the issue have held that an absolute pollutant exclusion such as is present here exclude losses arising from pollutants."  Cincinnati MSJ at 7-8 (citing <u>Doe Run Res. Corp. v. Lexington Ins. Co.</u>, 719 F.3d 868 (8th Cir. 2013);  <u>Blackhawk-Central City Sanitation Dist. v. Am Guarantee and Liab. Ins. Co.</u>, 214 F.3d at 1183; <u>Mesa Oil, Inc. v. Ins. Co. of N. Am.</u>, 123 F.3d at 1338-39; <u>Am. States Ins. Co. v. Nethery</u>, 79 F.3d 473 (5th Cir. 1996); <u>U.S. Liability Ins. Co. v. Bourbeau</u>, 49 F.3d 786 (1st Cir. 1995); <u>Monarch Greenback, LLC v. Monticello Ins. Co.</u>, 118 F. Supp. 2d 1068 (D. Idaho November 29, 1999)(Lodge, J.); <u>Montana Refining Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh</u>, 918 F. Supp. 1395 (D. Nev. 1996)(Reed, J.); <u>Cincinnati Ins. Co. v. Becker Warehouse, Inc.</u>, 635 N.W. 2d 112 (Neb. 2001)).

Cincinnati Insurance argues that "courts which have held the absolute pollution exclusion

inapplicable have done so by distinguishing . . . the pollutants at issue in those cases from 'traditional' environmental pollution."  Cincinnati MSJ at 8 (citing Montana Refinery Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 918 F. Supp. at 1395; Federated Mut. Ins. Co. v. Abston Petroleum, Inc., 967 So. 2d 705 (Ala. 2007); Porterfield v. Audubon Indem. Co., 856 So. 2d 789 (Ala. 2002); MacKinnon v. Truck Ins. Exchange, 73 P.3d 1205 (Cal. 2003); Century Sur. Co. v. Casino West, Inc., 329 P.3d 614 (Nev. 2014)).  Cincinnati Insurance also argues that, in Dolsen Companies v. Bedivere Insurance Company, 264 F. Supp. 3d 1083 (E.D. Wash. 2017)(Rice, J.), "the court held in favor of denial of coverage under the pollutant exclusion," and explained that "the pollution exclusion arose out of the desire of insurance companies to mitigate losses related to contaminated land and water resulting in massive liability for cleanup under environmental regulations," Cincinnati MSJ at 9 (citing Dolsen Companies v. Bedivere Ins. Co., 264 F. Supp. 3d at 1086-96).  Cincinnati Insurance compares this case -- where "the insured is seeking coverage for 'superfund response costs'" -- to Grisham v. Commercial Union Insurance Company, 927 F.2d 1039 (8th Cir. 1991), where the United States Court of Appeals for the Eighth Circuit affirms the district court's holding that superfund response costs are not damages covered by commercial general liability policies which have an absolute pollution exclusion.  Cincinnati MSJ at 9 (no citation for quotation)(citing Grisham v. Comm. Union Ins. Co., 927 F.2d at 104-42).

Cincinnati Insurance emphasizes that its policy's absolute pollution exclusion excludes damages "'arising out of the actual, alleged or threatened discharge . . . or emission of pollutants . . . [a]t or from any premises, site or location which is or was at any time owned or occupied by . . . any insured.'"  Cincinnati MSJ at 9 (quoting Cincinnati Policy at 44-45)(emphasis in Cincinnati MSJ but not in Cincinnati Policy)).  Cincinnati Insurance argues that the CERCLA

Lawsuit "expressly alleges" that Chisholm's Village "owns a facility that 'released substances that are hazardous to human health and the environment into the soil and groundwater,'" that contributed to the Griggs and Walnut Ground Water plume.  Cincinnati MSJ at 9 (quoting CERCLA Complaint ¶ 6, at 6, and citing id. ¶¶ 33, 46, 48, 56-57, at 11, 14-16).  Cincinnati Insurance contends that Chisholm's Village "openly concedes" that Las Cruces and Doña Ana County allege that Chisholm's Village is liable under CERCLA as the "'present owner of the property from which hazardous substances were released.'"  Cincinnati MSJ at 9-10 (quoting CERCLA Complaint ¶ 11, at 7).

Cincinnati Insurance argues that CERCLA's joint and several liability provision, which makes Chisholm's Village jointly and severally liable for "100% of the costs of responses," does not render its absolute pollution exclusion inapplicable, because the absolute pollution exclusion includes a provision that the Cincinnati Policy "'does not apply to . . . [a]ny loss, cost or expense arising out of any . . . [r]equest, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects o[f] pollutants.'"  Cincinnati MSJ  at 10 (quoting Cincinnati Policy at 43-44)(emphasis in Cincinnati MSJ, but not in Cincinnati Policy)(Court adds alterations).  Cincinnati Insurance contends that New Mexico courts construe the phrase "'arising out of' broadly[,] to mean 'originating from,' having its origin in,' 'growing out of' or 'flowing from.'"  Cincinnati MSJ at 10 (quoting Evanston Ins. Co. v. Desert State Life Mgmt., 434 F. Supp. 3d 1051, 1090 (D.N.M. 2020)(Browning, J.);  Am. Nat'l Prop. & Cas. Co. v. United Specialty Ins. Co., 592 F. App'x at 742).  Cincinnati Insurance asserts that the CERCLA Lawsuit "unquestionably" arises out of a request, demand, or order that Las Cruces and Doña Ana County respond to contamination.

Cincinnati MSJ at 11.  Cincinnati Insurance argues that the absolute pollution exclusion "bars coverage for '[a]ny loss, cost or expense arising out of any . . . claim or suit by or on behalf of a governmental authority for damages because of cleaning up, removing, containing, treating . . . or in any way responding to, or assessing the effects of pollutants,'" and "unambiguously applies" to Chisholm's Village's claims, because the CERCLA Lawsuit brought claims for CERCLA contribution on the EPA's behalf.  Cincinnati MSJ at 11 (quoting Cincinnati Policy at 43-44).  Finally, Cincinnati Insurance argues that Chisholm's Village's "extra-contractual" claims fail, because, if Cincinnati Insurance has no duty to defend Chisholm's Village, then Cincinnati Insurance did not exercise bad faith, breach the covenant of good faith and fair dealing, or violate the NMIPA.  See Cincinnati MSJ at 12 (citing Dockery v. Allstate Ins. Co., 431 F. Supp. at 1314).

### 4.  The Chisholm MSJ.

On March 19, 2021, Chisholm's Village filed a cross-motion for summary judgment on the duty to defend.  See Chisholm MSJ at 1.  Chisholm's Village argues that the duty to defend is "distinct from and broader than the duty to indemnify."  Chisholm MSJ at 9 (citing Knowles v. United Servs. Auto Ass'n, 1992-NMSC-030, ¶ 2, 113 N.M. 703, 832 P.2d 394).  Chisholm's Village asserts that the duty to defend "can be triggered by a complaint stating facts that *potentially* fall within the coverage of the policy and when the facts are not stated with sufficient clarity to make a coverage determination based solely on the face of the complaint."  Chisholm MSJ at 9 (citing State Farm Fire & Cas. Co. v. Price, 1984-NMCA-036, ¶ 18, 101 N.M. 438, 442, 399 P.3d 400, 528; American Empl'rs Ins. Co. v. Cont'l Cas. Co., 1973-NMSC-073, ¶ 9, 85 N.M. 346, 349, 512 P.2d 674, 677).  Chisholm's Village contends that an insurer also has "a duty to investigate the facts and circumstances underlying the complaint when it would be reasonable to do so in order

to determine its duty to defend."  Chisholm MSJ at 10 (citing G & G Servs., Inc. v. Agora Syndicate, Inc., 2000-NMCA-003, ¶ 23, 128 N.M. 434, 440, 993 P.2d 751, 757).  Chisholm's Village argues that, "where the complaint is ambiguous or raises some question of coverage, all doubts are 'resolved in the insured's favor,'"  Chisholm MSJ at 9 (quoting State Farm Fire & Cas. Co. v. Price, 1984-NMCA-036, ¶ 18, 101 N.M. at 442, 399 P.3d at 528), and that "insureds have a reasonable expectation that an insurer 'though denying coverage and liability, must nonetheless defend its insured unless and until it receives a judicial ruling in favor of relieving it of any further obligations,'" Chisholm MSJ at 10 (quoting Loya v. Guitierrez, 2015-NMSC-017, ¶ 42, 350 P.3d 1155, 1166).  Chisholm's Village suggests that this procedure is "'the norm,'" rather than "flatly denying coverage and forcing the insured to file suit."  Chisholm MSJ at 10 (quoting Loya v. Guitierrez, 2015-NMSC-017, ¶ 42, 350 P.3d at 1166).  Chisholm's Village asserts that New Mexico courts construe ambiguities in the insured's favor, see Chisholm MSJ at 10 (citing United Nuclear Corp. v. Allstate Ins. Co., 2012-NMSC-032, ¶ 11, 285 P.3d 644 ("United Nuclear")), and construes exceptions and exclusions against the insurer, see Chisholm MSJ at 10 (citing Pecos Val. Flying Service, Inc. v. Brayley, 1957-NMSC-064, ¶ 9, 63 N.M. 96, 99, 313 P.2d 1062, 1065).

Chisholm's Village argues that Cincinnati Insurance and Fidelity Insurance should have defended Chisholm's Village "pursuant to a reservation of rights unless and until a court ruled that the complaint states no theory of liability potentially within the policy," and that, by not doing so, they breached their duty to defend.  Chisholm MSJ at 13.  More specifically, Chisholm's Village contends that, because the CERCLA Lawsuit sought to impose liability for the release of "unidentified 'hazardous substances'" as well as PCEs, there was a potential for coverage within the Cincinnati Policy and the Fidelity Policy.  Chisholm MSJ at 13-14 (quoting CERCLA

Complaint ¶ 33, at 11).  Chisholm's Village asserts that "courts virtually uniformly have held that when the term 'pollutant' is ambiguous, the duty to defend is triggered."  Chisholm MSJ at 14 (citing Builders Mut. Ins. Co. v. Parallel Design and Development, LLC, 785 F.Supp.2d 535, 550 (E.D. Va. 2011)(Davis, J.); St. Paul Fire & Marine Ins. Co. v. City of Kokomo, No. CIV 13-1573 JMS/DML, 2015 U.S. Dist. LEXIS 82465, at *15 (S.D. Ind. June 25 2015)(Magnus-Stinson, J.)). Chisholm's Village asserts that courts have resolved any "ambiguity regarding whether the substance at issue meets the definition of 'pollutant' in the policy" by resolving the ambiguity in favor of the insured, and that "an insurer can only escape the obligation to provide a defense if the complaint solely seeks damages for actions clearly excluded from the policy."  Chisholm MSJ at 14-15 (citing Seymour Mfg. Co., Inc. v. Commercial Union Ins. Co., 665 N.E.2d 891, 892 (Ind. 1996); Am. States Ins. Co. v. Kiger, 662 N.E.2d 945, 949 (Ind. 1996)("Kiger")).  Chisholm's Village argues that, in this case, the phrase "'hazardous substances'" creates more ambiguity than single-substance cases,  because the term "'hazardous substances'" could include "any number of myriad substances that courts have held to be outside of the absolute pollution exclusion clause." Chisholm MSJ at 15 (quoting CERCLA Complaint ¶ 33, at 11).

Chisholm's Village argues that courts have concluded that similar pollution exclusion clauses do not exclude from coverage "ammonia, carbon monoxide, asbestos, paint, sealant, solvent, pesticides, natural gas, sewage, scrap metal, and radioactive materials."  Chisholm MSJ at 15-16 (citing Nautilus Ins. Co. v. Jabar, 188 F.3d 27 (1st Cir. 1999)(sealant); Regional Bank of Colorado, N.A. v. St. Paul Fire and Marine Ins. Co., 35 F.3d 494 (10th Cir. 1994)(carbon monoxide); Insurance Co. of Illinois v. Stringfield, 292 Ill. App. 3d 471, 226 Ill. Dec. 525, 685 N.E. 2d 980 (1st Dist. 1997)(paint); Regent Ins. Co. v. Holmes, 835 F. Supp. 579 (D. Kan.

1993)(Vratil, J.)(solvents); <u>Maryland Cas. Co. v. W.R. Grace & Co.</u>, 794 F. Supp. 1206 (S.D.N.Y. 1991)(Bernikow, J.)(asbestos); <u>Westchester Fire Ins. Co. v. City of Pittsburg, Kan.</u>, 768 F. Supp. 1463 (D. Kan. 1991)(O'Connor, J.)(pesticides); <u>In re Hub Recycling, Inc.</u>, 106 B.R. 372 (D.N.J. 1989)(Sarokin, J.)(scrap metal); <u>Minerva Enter., Inc. v. Bituminous Cas. Corp.</u>, 312 Ark. 128, 851 S.W.2d 403 (1993)(sewage); <u>Minnesota Mining and Mfg. Co. v. Walbrook Ins. Co.</u>, C1-95-1775, 1996 Minn. App. LEXIS 36 (Ct. App. Jan. 9, 1996)(radioactive materials); <u>Ekleberry, Inc. v. Motorist Mut. Ins. Co.</u>, No. 3-91-39, 1992 Ohio App. LEXIS 3778 (Ct. App. July 17, 1992)(ammonia); <u>Municipality of Mt. Lebanon v. Reliance Ins. Co.</u>, 2001 Pa. Super Ct. 177, 778 A.2d 1228 (Pa. Super. Ct. 2001)(natural gas).  Chisholm's Village notes that, because CERCLA's definition of "'hazardous substances'" is "exceedingly broad and expressly includes substances that courts have held to be outside of the absolute pollution exclusion clause, such as ammonia and asbestos," the CERCLA Complaint alleges facts "potentially falling within the coverage of the policies," thus triggering a duty to defend.  Chisholm MSJ at 16 (citing 42 U.S.C. § 9601(14)). Chisholm's Village argues that the first prong of the absolute pollution exclusion does not bar coverage, because Chisholm's Village is liable for one-hundred percent of the response costs, even though the CERCLA Complaint alleges that the location Chisholm's Village currently owns is responsible for only two percent of the response costs.  <u>See</u> Chisholm MSJ at 17.

Next, Chisholm's Village argues that the second clause of both policies' absolute pollution exclusion does not bar coverage, because the CERCLA Lawsuit is "an action for contribution and cost recovery pursuant to CERCLA" by Las Cruces and Doña Ana County, and because the EPA "never designated Chisholm's Village as a responsible party under CERCLA."  Chisholm MSJ at 18.  Chisholm's Village asserts that the underlying suit "was thus not an action by a governmental

authority seeking to impose an environmental response at a site, but rather was a suit seeking only money damages."  Chisholm MSJ at 18.  Chisholm's Village contends that, "had Fidelity or Cincinnati conducted any reasonable investigation into the Litigation, they would have readily discovered the cross claim [for contribution] by American Linen," which "raises a question of coverage for the same reasons that the plaintiffs' claims do -- the claim was not brought by a governmental authority nor was it a request that Chisholm's provide an environmental response." Chisholm MSJ at 18.

Chisholm's Village argues that the CERCLA Complaint "states facts that arguably give rise to liability in the absence of the CERCLA suit" under an exception to the Cincinnati Policy's absolute pollution exclusion.  Chisholm MSJ at 19.  Chisholm's Village characterizes the exception to the exclusion as follows:  "'However, [the second prong of the exclusion does] not apply to liability for damages because of "property damage" [that the insured] would have in the absence of such demand . . . by . . . a governmental authority.'"  Chisholm MSJ at 19 (quoting Cincinnati Policy at 45)[14](first alteration in Chisholm MSJ but not in Cincinnati Policy; second alteration the Court added).  Chisholm MSJ at 19.  Chisholm's Village contends that it could be liable in a common law action for "nuisance or trespass" under that exception, thus triggering Cincinnati Insurance's duty to defend Chisholm's Village.   Chisholm MSJ at 19.  Chisholm's

---

[14]The exact wording of this exception in Cincinnati Policy Number CPP1070353 is: "However, Paragraphs (2)(a) and (b) do not apply to liability for damages because of 'property damage' that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or 'suit' by or on behalf of a governmental authority." Cincinnati Policy at 45 (no citation for quotation). The exact wording of this exception in Cincinnati Policy Number EPP0172787 is: "However, this Paragraph c. does not apply to liability for damages because of 'property damage' that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or 'suit' by or on behalf of a governmental authority." Cincinnati Policy at 551 (no citation for quotation).

Village urges the Court to follow the reasoning of <u>Clean Harbors Environmental Services, Inc. v.</u> <u>Boston Basement Technologies, Inc.</u>, 75 Mass. App. Ct. 709, 916 N.E. 2d 406 (Mass. Ct. App. 2009)("<u>Clean Harbors</u>"), "which appears to be the only published American decision directly examining the scope and meaning of this exception." Chisholm MSJ at 19. Chisholm's Village cites <u>Clean Harbors</u> for the proposition that exclusion of coverage for an "'insured's statutory obligations to assess, contain, and remove the pollutants'" does not preclude coverage of the "insured's liability for common-law damages for the cost of restoring the damaged property to its precontamination value.'" Chisholm MSJ at 20 (quoting <u>Clean Harbors Envtl. Servs., Inc. v.</u> <u>Boston Basement Tech., Inc.</u>, 75 Mass. App. Ct. at 719, 916 N.E. 2d at 414-15).

Finally, Chisholm's Village argues that Fidelity Insurance does not deny coverage on the basis of the pollution exclusion in its initial denial letter, which "did not contain any discussion of the pollution exclusion clauses and merely noted that the clauses 'could' operate to exclude coverage." Chisholm MSJ at 20-21 (quoting Letter from Brenna Adams to Tatt Everhart at 4 (dated October 1, 2019), filed March 19, 2021 (Doc. 30-3)("Oct. Letter")). Chisholm's Village asserts that this denial letter "evidences Fidelity's complete lack of good faith with respect to its insured," and "demonstrates that as of October 1, 2019, a month and half after Fidelity received notice of the claim, it retained at least some doubt regarding the applicability of the pollution exclusion clause," which it did not resolve in Chisholm's Village's favor. Chisholm MSJ at 20-21.

5.   **The Chisholm Response**.

On March 19, 2021, Chisholm's Village filed a consolidated response to the Fidelity MSJ and the Cincinnati MSJ. <u>See</u> Chisholm Response at 1. Chisholm's Village asserts the same

arguments in the Chisholm Response as in the Chisholm MSJ.  See Chisholm Response at 1-19; Procedural Background § 4, supra at 20-24.  Chisholm's Village requests that the Court deny the Fidelity MSJ and the Cincinnati MSJ.  See Chisholm Response at 17.

      **6.**       **The Fidelity Reply/Response.**

Fidelity Insurance argues that the CERCLA Lawsuit "presents the ***exact*** situation that the Absolute Pollution Exclusion is designed to address."  Fidelity Reply/Response at 1 (emphasis in original).  Fidelity Insurance asserts that it did not "breach its duty to defend by standing on its coverage position, instead of agreeing to defend" under a reservation of rights and seek a judicial determination of coverage.  Fidelity Reply/Response at 7.  Fidelity Insurance asserts that it is justified to stand on its coverage position "'where the allegations of the complaint fall completely outside the policy.'"  Fidelity Reply/Response at 8 (quoting Servants of the Paraclete, Inc. v. Great Am. Ins. Co., 857 F. Supp. 822, 831 (D.N.M. 1994)(Burciaga, J.)("Servants of the Paraclete").  Fidelity Insurance contends that Chisholm's Village's notification of the CERCLA Lawsuit was untimely, because Chisholm's Village did not notify Fidelity Insurance for "***more than one year***" after Chisholm's Village was named in the CERCLA Lawsuit.  Fidelity Reply/Response at 8 (emphasis in original).

Next, Fidelity Insurance argues that the first provision of the absolute pollution exclusion bars coverage, because the provision excludes coverage for "'property damage' arising out of the actual . . . discharge . . . of pollutants . . . [a]t or from any premises, site or location which is or was at any time owned or occupied by, . . . any insured,'" Fidelity Reply/Response at 9 (quoting Fidelity Policy at 28-29), and it is "beyond dispute that the CERCLA Suit alleges that CVP owns a facility that 'released substances that are hazardous to human health and the environment into

the soil and groundwater,'" Fidelity Reply/Response at 9 (quoting and citing CERCLA Complaint ¶¶ 6, 33, 46, at 6, 11-12, 14).   Fidelity Insurance contends that Chisholm's Village "effectively concedes" that the Absolute Pollution Exclusion's first provision bars coverage.   Fidelity Reply/Response at 9 (citing Chisholm MSJ at 17).

Fidelity Insurance argues that the second provision's plain terms "bar[] coverage for CVP's alleged joint and several liability for costs attributable to releases from properties owned/operated by other entities," because it states that "'[*a*]*ny* loss, cost or expense *arising out of any* . . . [*r*]*equest, demand or order that any insured or others* test for, monitor, clean up, remove, . . . or in any way respond to, or assess the effects o[f] pollutants.'"   Fidelity Reply/Response at 10-11 (quoting Fidelity Policy at 28-29)(emphasis in Fidelity Reply/Response, but not in Fidelity Policy). Fidelity Insurance asserts that the CERCLA Lawsuit arises out of a "'request, demand or order'" that Las Cruces and Doña Ana County respond to pollutants, because, "[u]nder New Mexico law, courts construe the phrase 'arising out of' to mean 'originating from,' 'having its origin in,' 'growing out of' or 'flowing from.'"   Fidelity Reply/Response at 11 (quoting Fidelity Policy at 29; Evanston Ins. Co. v. Desert State Life Mgmt., 434 F. Supp. 3d at 1090; Am. Nat'l Prop. & Cas. Co. v. United Specialty Ins. Co., 592 F. App'x. at 742).   Fidelity Insurance argues that this provision is "*not* site-specific," and that "the location of the pollution . . . is entirely irrelevant to the provision's application."   Fidelity Reply/Response at 11 (emphasis in original).   Furthermore, Fidelity Insurance argues that this provision applies to bar coverage, not just where Chisholm's Village is asked to respond to pollutants, but it also bars coverage where Chisholm's Village is asked for contribution under CERCLA.   See Fidelity Reply/Response at 12.

Fidelity Insurance next argues that the Absolute Pollution Exclusion's third provision bars

coverage for the CERCLA Lawsuit, because the costs that Las Cruces and Doña Ana County seek arise from a "'claim or suit by or on behalf of a governmental authority'" -- namely, the EPA. Fidelity Reply/Response at 13 (quoting Fidelity Policy at 29).  Fidelity Insurance asserts that the third provision

> does **not** require that a governmental entity initiate a claim or suit against CVP directly, nor is its application limited to claims or suits "seeking to impose an environmental response at a site."  Instead, it encompasses "any loss, cost or expense" that **arise out of** "a claim or suit by or on behalf of a governmental authority for damages" incurred in responding to environmental contamination.

Fidelity Reply/Response at 13 (quoting Fidelity Policy at 29).

Fidelity Insurance argues that the "hazardous substances" mentioned in the CERCLA Lawsuit are "obviously" pollutants within the Fidelity Policy's definition of pollutants, because the hazardous substances "contributed to . . . environmental contamination."  Fidelity Reply/Response at 14.  Fidelity Insurance asserts that "any 'unidentified hazardous substances' obviously constitute 'pollutants' . . . 'that are hazardous to human health and the environment'" as contemplated by the Absolute Pollution Exclusion.  Fidelity Reply/Response at 15 (quoting CERCLA Complaint ¶¶ 6, 33, at 6, 11).  Fidelity Insurance notes that Chisholm's Village "has not cited a single New Mexico case" supporting its position, but, instead, "resorts to citing foreign cases that did not involve traditional environmental pollution of soil and groundwater like that at issue here."  Fidelity Reply/Response at 15.

Fidelity Insurance states that Absolute Pollution Exclusions "'were incorporated into insurance policies in the wake of expanded liability under federal law,'" and that those exclusions "'were **clearly intended to exculpate insurance companies from liability for massive environmental cleanups required by . . . CERCLA** and similar legislation.'"  Fidelity

Reply/Response at 16 (quoting <u>Quadrant Corp. v. Am. State Ins. Co.</u>, 154 Wash. 2d 165, 177, 110 P.3d 733, 740 (2005))(emphasis in Fidelity Reply/Response but not in <u>Quadrant Corp. v. Am. State Ins. Co.</u>).  Fidelity Insurance opposes Chisholm's Village's request for the Court to "consider the parties' coverage communications in its assessment of the duty to defend," arguing that the Court's assessment should be "based exclusively upon the 'eight corners' of the Fidelity Policies and the CERCLA Suit."  Fidelity Reply/Response at 17 (quoting <u>W. Am. Ins. Co. v. Atyani</u>, 366 F. Supp. 3d 1270, 1273 (D.N.M. February 14, 2019)(Brack, J.)).  Finally, Fidelity Insurance asserts that Chisholm's Village's "purported Extra-Contractual Claims necessarily fail as a matter of law" if Fidelity Insurance does not owe it a duty to defend; Fidelity Insurance notes that Chisholm's Village does not dispute this.  Fidelity Reply/Response at 18 (citing <u>Dockery v. Allstate Ins. Co</u>. 431 F. Supp. 3d at 1314).

        7.      **<u>The Cincinnati Reply/Response</u>.**

        In the Cincinnati Reply/Response, Cincinnati Insurance asserts broadly the same arguments as Fidelity Insurance does in the Fidelity Reply/Response.  <u>See</u> Cincinnati Reply/Response at 1-11; Fidelity Reply/Response at 1-20.   Cincinnati Insurance also repeats its arguments from the Cincinnati MSJ.  <u>See</u> Cincinnati MSJ at 1-13; Cincinnati Reply/Response at 1-11.  Additionally, Cincinnati Insurance argues that the Cincinnati Policy's Absolute Pollution Exclusion is "clear and unambiguous," and, therefore, that "the court must look to the policy itself and the allegations on the face of the CERCLA Suit."  Cincinnati Reply/Response at 4.  Cincinnati Insurance contends that "'[m]erely because the parties differ on the proper construction does not establish an ambiguity,'" and that insurance policy exclusions "'are to be enforced so long as their meanings are clear and they do not conflict with the statutory law.'"  Cincinnati Reply/Response at 5 (quoting

Trujillo v. CS Cattle Co., 1990-NMSC-037, ¶ 14, 109 N.M. 705, 709, 790 P.2d 502, 506).

**8.    The Chisholm Reply.**

In the Chisholm Reply, Chisholm's Village reiterates that Fidelity Insurance and Cincinnati Insurance "conflate the question of coverage with whether the duty to defend was triggered by the allegations in the complaint."  Chisholm Reply at 1.  Chisholm's Village contends that the

> Defendants ignore the fact that Chisholm's was sued not only for response costs incurred by the underlying plaintiffs in response to the Environmental Protection Agency's . . . determination that they were [Potentially Responsible Parties ("PRP")], but that the complaint also included a claim for reimbursement of costs independently incurred by the . . . EPA, which were separate and unrelated to the contribution claim asserted under CERCLA.

Chisholm Reply at 1-2.  Chisholm's Village argues that the duty to defend is triggered, because the "latter claim did not originate from a governmental request that the underlying plaintiffs respond to the effects of pollutants -- but rather for reimbursement of the U.S. EPA's previously incurred costs."  Chisholm Reply at 2.  Chisholm's Village asserts that "[t]he material facts are not in dispute," and that "the Court can and should determine whether Defendants breached their duty to defend Chisholm's based solely on the allegations contained in the complaint and the terms of the policies."  Chisholm Reply at 3.  More specifically, Chisholm's Village notes that Fidelity Insurance and Cincinnati Insurance dispute only Chisholm's Village's "contention that Defendants did not perform any investigation into the facts underlying the complaint."  Chisholm Reply at 3.  Chisholm's Village notes that Fidelity Insurance and Cincinnati Insurance "contend that they compared the allegations in the complaint to the policies, but they have not provided any evidence of an additional investigation," and argues, therefore, that this fact should be deemed undisputed.  Chisholm Reply at 3.  Chisholm's Village reiterates New Mexico law that the duty to defend is triggered "when any claim *arguably* or *potentially* falls within the coverage."  Chisholm Reply at

- 30 -

5 (citing <u>Servants of the Paraclete</u>, 857 F. Supp. at 829)(emphasis in original).

Chisholm's Village argues that neither Fidelity Insurance nor Cincinnati Insurance "cite[] any New Mexico law . . . interpret[ing] the phrase 'arise out of' in the context of an exclusion to an insurance policy," noting that exclusion clauses are construed narrowly against the insurer. Chisholm Reply at 5 n.4.  Chisholm's Village alleges that the absolute pollution exclusion does not exclude the CERCLA Lawsuit's claim for "reimbursement of funds provided directly to the U.S. EPA by the underlying plaintiffs prior to any request, demand or order to address or assess pollutants." Chisholm Reply at 6.  Chisholm's Village contends that the costs that the EPA accrued for "the remedial investigation and the feasibility study ('RI/FS')" are not excluded from coverage, because they do not "'arise from' a request, demand or order that any insured or others . . . respond to or assess the effects of pollutants."  Chisholm Reply at 7 (no citation for quotation).

Chisholm's Village argues that "the insurers were obligated to conduct an investigation regarding the timing of any purported governmental request, demand or order that required any person or entity to respond to or assess the effects of pollutants," and that, "[e]ven a cursory investigation would have revealed that the RI/FS costs identified in the underlying complaint were incurred well before the first U.S. EPA administrative order requiring" Las Cruces and Doña Ana County to implement the clean-up process.  Chisholm Reply at 8.  Chisholm's Village states that the "Consent Decree entered in the underlying case clearly demonstrates that the costs for the RI/FS were primarily incurred by the U.S. EPA between 2002 and 2006, while the first U.S. EPA administrative order was not entered until 2009."  Chisholm Reply at 8 (citing Consent Decree ¶¶ G, J, at 4, filed April 21, 2021 (Doc. 36-2)).  Chisholm's Village compares this case to <u>Charles E. Thomas Co. v. Transamerica Insurance Group</u>, 62 Cal. App. 4th 379, 72 Cal. Rptr. 2d 577

(1998), where "the court held that the client's claim for damages over and above the costs expended in complying with the Fire Department's orders . . . were not excluded under the policies and the defendant insurer had thus breached the duty to defend." Chisholm Reply at 9 (citing Charles E. Thomas Co. v. Transamerica Ins. Grp., 62 Cal. App. 4th at 383, 72 Cal. Rptr. 2d at 580). Next, Chisholm's Village argues that "[n]either Defendant provides any explanation for how it could have determined that releases of undefined 'hazardous substances' are clearly and unambiguously excluded as 'pollutants,'" and asserts that neither insurer "performed any investigation into the complaint's allegations beyond a comparison with the terms of the policy." Chisholm Reply at 10 (no citation for quotation). Chisholm's Village asserts that the CERCLA Lawsuit "*potentially* alleged liability for releases of substances that have been held to not be pollutants" such as carbon monoxide and gasoline, and contends that "it is not difficult to conceive of a National Guard Armory, one of the sites identified in the [CERCLA] Complaint, releasing gasoline, carbon monoxide, or virtually any other substance over the course of decades of operations." Chisholm Reply at 10-11 (emphasis in original). Chisholm's Village contends that this ambiguity triggers the duty to defend. See Chisholm Reply at 13. Chisholm's Village argues that New Mexico's lack of caselaw interpreting the Absolute Pollution Exclusion "supports Chisholm's position that the complaint and policies are sufficiently ambiguous to trigger Defendants' duty to defend." Chisholm Reply at 12 (citing Servants of the Paraclete, 857 F. Supp. at 830). Chisholm's Village speculates that "New Mexico's Supreme Court could well determine that the absolute pollution exclusion is *per se* ambiguous, as other states have." Chisholm Reply at 12 (citing American Kiger, 662 N.E. 2d at 948).

9.      **The Hearing**.

At the hearing, the parties agreed that there is no genuine dispute as to any material fact, and that they seek a determination of the legal issue whether Fidelity Insurance or Cincinnati Insurance have a duty to defend Chisholm's Village.  See Draft Transcript of Hearing at 5:8-7:4, taken November 3, 2021 (Court, Feinberg, Hnasko, Evans)("Tr.").[15]  The Court first asked Fidelity Insurance and Cincinnati Insurance whether there is "any material difference between the pollution exclusion in the two policies," Tr. at 7:22-23 (Court), and Fidelity Insurance responded that, "[f]or the most part, they're the same," but "there is an exception, perhaps, in one of Cincinnati's exclusions that Fidelity's policy does not have," Tr. at 8:2-5 (Feinberg).  The Court asked why there are multiple policies at issue, and Cincinnati Insurance responded that they are sequential policies.  See Tr. at 8:6-11 (Court, Evans).  Cincinnati Insurance stated that there are three main issues in dispute.  See Tr. at 8:14-17 (Evans).  Cincinnati Insurance asserted that the first issue is "whether the use of 'hazardous substances' in the complaint . . . is materially different from the use of the word 'pollution' in the pollution . . . exclusion."  Tr. at 8:18-23 (Evans)(no citation for quotation).  Cincinnati Insurance contended that "hazardous substances and pollution are the same."  Tr. at 9:2-3 (Evans).  The Court asked whether there is "any Court that's looked at this that's come out the other way from what the insurance company's position is," Tr. 9:6-10 (Court), and Cincinnati Insurance responded, "I'm not aware of any," Tr. at 9:11 (Evans).

Regarding the second issue, Cincinnati Insurance asserted that the Absolute Pollution Exclusion is the result of the insurance industry's fifty-year struggle to come up with an exclusion

---

[15]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

that excludes "long tail, long-term, and potentially disastrous . . . exposures," and is "the result of many pieces of litigation which contested the pollution exclusion, occasionally successfully."  Tr. at 11:14-22 (Evans).   Cincinnati Insurance argued that "finding the pollution exclusion [ambiguous] as written in its . . . fifth or sixth iteration over the last 50 years . . . would make for a very lonely position on that exclusion."  Tr. at 10:1-4 (Evans).   Third, Cincinnati Insurance argued that Dove v. State Farm Fire & Casualty Co., 2017-NMCA-051, 399 P.3d 400, has not changed New Mexico law to require that "when an insurer finds itself in a position of having what is a legal[ly] defensible appropriate denial," that "issuing a denial letter is . . . insufficient by itself," and the insurer must "initiate declaratory proceedings."  Tr. at 10:8-12 (Evans).  The Court asked whether Cincinnati Insurance is aware of any jurisdictions that have "gone so far as to require -- anytime there is a denial of coverage, to require the insurance company to file a [declaratory] action?"  Tr. at 10:23-11:1 (Court).  Cincinnati Insurance responded that it is not aware of a case that requires a declaratory judgment action in all situations in which there is a denial of coverage.  See Tr. at 11:4-5 (Evans).  Fidelity Insurance added that, in Illinois and Wisconsin, "in instances where it's a close call, in order to protect themselves, insurers are best served by filing DJs," but, "under those states' laws, carriers are entitled to stand on their coverage denials when there is no uncertainty as to coverage."  Tr. at 12:16-24 (Feinberg).  Fidelity Insurance asserted "that's what we feel is the situation here."  Tr. at 12:22-24 (Feinberg).  Fidelity Insurance argued that New Mexico courts construe the phrase "arising out of" broadly, and two of the Absolute Pollution Exclusion's provisions include that phrase.  Tr. at 13:4-6 (Feinberg).

Chisholm's Village responded that it is not asking the Court to go as far as requiring an insurer to file a declaratory judgment action "in all instances where coverage is denied," but is

asking the Court "to look at the four corners of the complaint, the four corners of the policies, and make a[] determination whether there is a potential for coverage under any allegations of the complaint." Tr. at 13:22-14:5 (Hnasko). The Court asked Chisholm's Village whether, when it writes its opinion, it should first determine coverage, and then make a call as to how close of a question it is. <u>See</u> Tr. at 14:10-18 (Court). Chisholm's Village responded that it would not recommend that the Court write the opinion that way, but encouraged the Court to "place itself in the position of the insured and these insurers at the time the claim is made for the defense, and determine at that time . . . is there any potential for coverage under these allegations?" Tr. at 14:20-15:1 (Hnasko). Chisholm's Village cited <u>Servants of the Paraclete</u>, 857 F. Supp. at 822, for the proposition that a "'unilateral determination that there is no duty [to] defend is not an acceptable remedy for the insurer,'" but added that this rule was in the context of "a situation where the allegations of the complaint may potentially -- potentially -- trigger coverage." Tr. at 15:3-8 (Hnasko)(quoting <u>Servants of the Paraclete</u>, 857 F. Supp. at 830). Fidelity Insurance asserted that <u>Compass Insurance Company v. City of Littleton</u>, 984 P.2d 606 (Colo. 1999), answers the Court's question:

> "The actual liability of the insured to the claimant is not the criterion which places upon the insurance company the obligation to defend." And the Court goes on to state, but if "the allegations do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage has been pleaded, the insured must accept the defense of the claim."

Tr. at 16:8-16 (Hnasko)(quoting <u>Compass Ins. Co. v. City of Littleton</u>, 984 P.2d at 613-14). Chisholm's Village encouraged the Court to "go back and look at the matter when it was submitted to the insured, because indemnity obligations are not at issue in this case, because Chisholm's was successful in its defense, and was able to resolve the matter with a finding of no liability." Tr. at

16:17-23 (Hnasko).  The Court asked Chisholm's Village whether there is a case "from any jurisdiction which says that these policies would cover the claim that Doña Ana County and the City of Las Cruces brought?  Is there anybody that's gone as far as you want as far as coverage?" Tr. at 17:8-11 (Court).  Chisholm's Village responded that there was not such a case, and that "[t]his particular case is unique, in that there is a Section 107 claim under CERCLA," but "there are also joint and several liability claims with the contamination of others, including the armory" which might have "additional issues" beyond PCE contamination.  Tr. at 17:12-24 (Hnasko). Chisholm's Village argued that courts have found a "multitude of hazardous substances" not to be "pollutants under the policies" and that "there is a divergence of authority in the country as to what constitutes a pollutant and what does not."  Tr. at 18:17-21 (Hnasko).  Chisholm's Village asserted that, where "there is a divergence of legal authority, it is not appropriate for the insurer at that point to simply make a unilateral determination of no duty to defend."  Tr. at 19:6-9 (Hnasko).

Chisholm's Village summarized "the three prongs in this pollution exclusion that we're . . . dealing with her[e]."  Tr. at 19:17-8 (Hnasko).  Chisholm's Village stated that the first prong "prevents coverage for when [there is] a release of pollutants at or from the premises occupied by the insured."  Tr. at 19:20-20:24 (Hnasko).  Chisholm's Village asserted that, of "the vast cases litigated under CERCLA, there has never been a determination as to whether a Section 107 claim, where plaintiff is suggesting that a defendant . . . is responsible for pollution that occurred somewhere other than premises that the insured owned or occupied" "would fall within the pollution exclusion clause."  Tr. at 20:1-7 (Hnasko).

Regarding the second prong, Chisholm's Village conceded that it excludes costs "that one incurs as a result of a demand or order from a governmental authority," and costs that arise out of

such a demand or order.  Tr. at 21:2-8 (Hnasko).  Chisholm's Village conceded that the costs that Las Cruces and Doña Ana County seek in CERCLA Complaint ¶ 65, at 26, therefore, are excluded. See Tr. at 21:19-22:5 (Hnasko).  Chisholm's Village asserts that the costs sought in the CERCLA Complaint ¶ 63, at 13, however, are not, because it "seeks 'funds apart from the costs incurred as a result of the EPA claims.'"  Tr.at 22:13-14 (Hnasko)(quoting CERCLA Complaint ¶ 63, at 13). Chisholm's Village contends that these are costs that the EPA "incurred separately and apart from that," Tr. at 22:17-18 (Hnasko), such as "from the remedial investigation and the feasibility study incurred from 2002 to 2006, long before the administrative order requiring clean up was entered." Tr. at 22:18-21 (Hnasko).   Chisholm's Village urged the Court to study Charles E. Thomas Co. v. Transamerica Insurance Group, 62 Cal. App. 4th 379, 72 Cal. Rptr. 2d 577 (1998), where "the contractor faced two different types of liability," because there was "an additional claim for relief above and beyond the cleanup costs, as there is in this case"; accordingly, the Court of Appeal of California concluded that the pollution exclusion did not exclude the additional claim.  Tr. at 23:7-22 (Hnasko).  Chisholm's Village asserted that Charles E. Thomas Co. v. Transamerica Insurance Group "establishes as a matter of law that there was sufficient doubt in the current circumstances for Fidelity and Cincinnati to . . . go forward and defend the insured, and if they so deemed it to be appropriate, file a declaratory judgment action."  Tr. at 24:6-11 (Hnasko).  Chisholm's Village stated: "I don't know if I'm right; I think I am, but I don't have to be right.  All I have to [do] is . . . present a potential claim for coverage."  Tr. at 24:14-15 (Hnasko).

Next, Chisholm's Village argued that the Cincinnati Policy is different than the Fidelity Policy, because it "has a provision that obliterates the pollution exclusion clause"; Chisholm's Village argued that the provision "states that [the] pollution exclusion does not apply, period --

any prong -- if there is an independent basis for liability for the insured."  Tr. at 24:22-26:2 (Hnasko).  Chisholm's Village noted that, "[u]nder New Mexico law, the Public Nuisance Statute, [N.M.S.A.] section 30-8-1, it's a public nuisance to pollute groundwater" and "the Environment Department itself typically takes that position, and asserts common law claims."  Tr. at 26:4-8 (Hnasko).  Chisholm's Village asserted that Cincinnati Insurance, therefore, has "no defense whatsoever to this claim" and noted that Cincinnati Insurance does not respond to this issue in "any of its filings."  Tr. at 26:12-14 (Hnasko).  Chisholm's Village asserted that, "when an exclusion is obliterated by some other language that resurrects the coverage, . . . there is a strict construction applied, and all the ambiguities are resolved in favor of the insured."  Tr. at 26:18-22 (Hnasko).  Chisholm's Village contended that New Mexico law is "very, very, very protective of the insured" and cited Knowles v. United Services Auto Association, 1992-NMSC-030, ¶ 2, 113 N.M. 703, 832 P.2d 394, for the proposition that, "if there is a potential for coverage based on the four corners of the complaint, you [have] got to defend."  Tr. at 27:7-9 (Hnasko).  Chisholm's Village clarified that it is not seeking from "the Court any rule that would require an insurance company to always file a declaratory judgment action if it believed there was a good basis for lack of coverage," but that "under the circumstances of this case where there is a potential for coverage . . . there is an absolute duty to defend as a matter of law."  Tr. at 27:14-24 (Hnasko).

The Court then invited Cincinnati Insurance to respond.  See Tr. at 28:19-22 (Court). Cincinnati Insurance stated:

> With respect to the additional language in the Cincinnati pollution exclusion, I believe that that is an attempt to deal with concurrent causation, which has been an issue with respect to, I guess, the flood exclusion versus the wind coverage for homeowners and commercial property.  And the imaginable concurrent causation of a claim against this particular insured isn't borne out by the language of the complaint when the language of the complaint is understood with the language in

the pollution exclusion that excludes exposures arising out of the pollution event.

Tr. at 29:8-19 (Evans).  Cincinnati Insurance asserted that it has distinguished in its briefing this case from cases where courts have found various hazardous substances to not be pollution.  See Tr. at 29:20-24 (Evans).  Discussing how the Court should approach writing the opinion, Cincinnati Insurance added that it "can't see how Your Honor could possibly approach the duty to defend except via the lens of the . . . complaint, the policy, and extraneous evidence, . . . and looking for -- within those -- the potential for an indemnity exposure."  Tr. at 30:24-31:4 (Evans).

The Court next invited Fidelity Insurance to respond.  See Tr. at 31:9-11 (Court).  Fidelity Insurance urged the Court "to focus on paragraphs 6 and 33 of the amended complaint, which makes it pretty clear that any substances at issue here (a) contributed to environmental contamination; and (b) were hazardous to human health and the environment, clearly pollutants within the exclusion."  Tr. at 31:15-20 (Feinberg).  Fidelity Insurance stated that the cases which Cincinnati Insurance and Chisholm's Village cite, "where courts in other jurisdictions have ruled that certain substances are not pollutants," "are not the type of cases . . . that we have here, which is traditional environmental contamination of the soil and groundwater."  Tr. at 32:3-9 (Feinberg).  Fidelity Insurance noted that "[t]here is only one jurisdiction" -- Indiana -- where "a substance does not qualify as a pollutant within the confines of a pollution exclusion unless it's specifically and expressly identified in the policy."  Tr. at 32:9-15 (Feinberg).  Fidelity Insurance asserted that "[n]o other state . . . has followed Indiana in that respect" and asked the Court "to likewise . . . sway away from that."  Tr. at 32:16-19 (Feinberg).

The Court asked: "[W]e've got a very liberal New Mexico Supreme Court.  Tell me why they wouldn't follow what Indiana has done?"  Tr. at 32:22-24 (Court).  Fidelity Insurance

responded that New Mexico construes contracts and even exclusions according to their plain meaning, and that New Mexico would "choose to follow the vast majority of other jurisdictions in rejecting" Indiana's approach.  Tr. at 33:1-6 (Feinberg).   The Court then gave Chisholm's Village the last word on the Chisholm MSJ.  See Tr. at 33:14-16 (Court).

Chisholm's Village responded to Fidelity Insurance's last point by stating that other courts have determined that the phrase "pollutants" is ambiguous and that the Supreme Court of New Mexico has "spoke[n] very clearly about . . . how ambiguities are to be construed."  Tr. at 34:6-10 (Hnasko).  Chisholm's Village remarked that it "appreciates [Mr. Feinberg] appearing here in our jurisdiction," but that

> this is not the way our court has operated in terms of construing insurance contracts[;] . . . under United Nuclear, [2012-NMSC-032, 285 P.3d 644] it would be very difficult, I believe, for an insurance company to say . . . that the term 'pollutant' is unambiguous, and as a result we're going to deny the duty to defend, even though in this case, the armory is alleged to have released numerous hazardous substances, and we don't even know what they all are yet.

Tr. at 34: 21-35:5 (Hnasko).  Chisholm's Village reiterated that, under these circumstances, "there is an absolute duty to defend."  Tr. at 35:6-7 (Hnasko).  When the Court asked if there were any other remarks, Cincinnati Insurance reminded the Court that "there is a pathway to the New Mexico Supreme Court if this is a matter [on] which it seems there need to weigh in."  Tr. at 36:17-19 (Evans).   The Court replied that it "[p]robably won't use it at this point," but will "give it the best shot," and if

> somebody on appeal wants to talk to the Tenth Circuit about that, they're a little bit more quick to certify things over than the district court, which has just, as you can imagine as a trial court in diversity . . . a host of state issues that I have to do my best to decide.

Tr. at 36:20-37:2 (Court).

- 40 -

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Schs., 956  F. Supp. 2d  1191, 1221  (D.N.M. 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(alteration in Herrera v. Santa Fe Pub. Schs.)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323-25.  On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment."  *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets omitted).

Plustwik v. Voss of Nor. ASA, No. 11-CV-0757 DS, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.)(emphasis added).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."  Celotex, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[16]  Once the movant meets this burden,

---

[16]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court, dissented in Celotex, this sentence is widely understood to be an accurate statement of the

rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)("Liberty Lobby").  In American Mechanical Solutions, LLC v. Northland Piping, Inc., 184 F. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court granted summary judgment for the defendant when the plaintiff did not offer expert evidence supporting causation or proximate causation in its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims.  184 F. 3d at 1075-78.  The Court reasoned that the plaintiff could prove neither the breach-of-contract claim's causation requirement nor the breach-of-the-implied-warranty-of-merchantability claim's proximate-causation requirement with mere common knowledge, and so New Mexico law required that the plaintiff bolster its arguments with expert testimony, which the plaintiff had not provided.  See 184 F. Supp. 3d at 1067, 1073, 1075, 1079.  The Court determined that, without the requisite evidence, the plaintiff failed to prove "an essential element of the nonmoving party's case," rendering "all other facts immaterial."  184 F. Supp. 3d at 1075 (internal quotation marks omitted)(quoting Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1).

Thus, if a plaintiff has the burden of proof, and the plaintiff has no competent evidence, the defendant, even without any competent evidence itself, may secure summary judgment by pointing out the plaintiff's lack of competent evidence.  See Celotex, 477 U.S. at 323-25 (providing that summary judgment is proper where a plaintiff lacks evidence on an essential element of its case); Am. Mech. Sols., LLC v. Northland Piping, Inc., 184 F. Supp. 3d at 1075 (granting summary

---

law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

judgment because plaintiff lacked evidence on causation); Morales v. E.D. Entyre & Co., 382 F. Supp. 2d 1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence that the defendants defectively manufactured an oil distributor).  A conclusory assertion that the plaintiff lacks evidence is insufficient, however, to secure summary judgment; the defendant must make some evidentiary showing that the plaintiff lacks competent evidence.  See Halley v. Huckaby, 902 F.3d 1136, 1143 (10th Cir. 2018)(stating that summary judgment may be warranted if the movant notes a lack of evidence for an essential element of the claim).  See also 11 James Wm. Moore et al., Moore's Federal Practice § 56.40[1][b][iv], at 56-109 to -111 (3d ed. 2018).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  (internal quotation marks omitted)).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1)(A).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Liberty Lobby, 477 U.S. at 259.  See Abercrombie v. City of Catoosa,

896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (quoting Coleman v. Darden, 595 F.2d 533, 536 (10th Cir. 1979)).

A party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. v. Omer, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(McConnell, J.)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)). To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)("Schuylkill")); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. [First Nat. Bank of Ariz. v.] Cities Service,[] 391 U.S. [253], 288-[89] . . . . If the evidence

is merely colorable, Dombrowski v. Eastland, 387 U.S. 82, 87 . . . (per curiam), or is not significantly probative, Cities Service, . . . at 290 . . . summary judgment may be granted." Liberty Lobby, 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, "there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Liberty Lobby, 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."  Liberty Lobby, 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).  Fourth, the court cannot decide any credibility issues.  See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified-immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the United States Supreme Court concluded that summary

judgment is appropriate where video evidence clearly contradicted the plaintiff's version of the

facts.  See 550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. [at] 247-248 . . . .  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.
>
> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (alterations in Scott v. Harris)(emphasis in Liberty Lobby).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir.

2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]'" York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (second alteration in Thomson v. Salt Lake Cty.,

third and fourth alterations in York v. City of Las Cruces).  "The Tenth Circuit, in *Rhoads v. Miller*,

[352 F. App'x 289 (10th Cir. 2009),] explained that the blatant contradictions of the record must be supported by more than other witnesses' testimony." Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012)(unpublished).

Parties may allege new claims in motions for summary judgment. See Evans v. McDonald's Corp., 936 F.2d 1087, 1090-91 (10th Cir. 1991). When a party raises a new claim in a motion for summary judgment, a court treats the motion for summary judgment as a request to amend the complaint pursuant to rule 15 of the Federal Rules of Civil Procedure. See Viernow v. Euripides Dev. Corp., 157 F.3d 790 n.9 (10th Cir. 1998). The Tenth Circuit has stated:

> [a]s a general rule, a plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover, "provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits."

Evans v. McDonald's Corp., 936 F.2d at 1090-91 (quoting 4 Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 1219, at 94 (4th ed. 2021)("Wright & Miller")). While the purpose of "fact pleading" is to give defendants fair notice of claims against them "without requiring the plaintiff to have every legal theory or fact developed in detail before the complaint is filed and the parties have opportunity for discovery," plaintiffs may not "wait until the last minute to ascertain and refine the theories on which they intend to build their case." Evans v. McDonald's Corp., 936 F.2d at 1091.

## LAW REGARDING ERIE AND THE RULES ENABLING ACT

"In diversity cases, the Erie [R. Co. v. Tompkins, 304 U.S. 64 (1983)('Erie')] doctrine instructs that federal courts must apply state substantive law and federal procedural law." Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d 1152, 1162 (10th Cir. 2017). "If a federal rule of civil procedure answers the question in dispute, that rule governs our decision so long as it does

not 'exceed[ ] statutory authorization or Congress's rulemaking power.'" <u>Racher v. Westlake Nursing Home Ltd. P'ship</u>, 871 F.3d at 1162 (quoting <u>Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins.</u>, 559 U.S. 393, 398 (2010)("<u>Shady Grove</u>")).   "When faced with a choice between a state law and an allegedly conflicting federal rule," the Tenth Circuit "follow[s] the framework described by the Supreme Court in [<u>Shady Grove</u>], as laid out by Justice Stevens in his concurring opinion." <u>Racher v. Westlake Nursing Home Ltd. P'ship</u>, 871 F.3d at 1162.   "First, the court must decide whether the scope of the federal rule is sufficiently broad to control the issue before the court, thereby leaving no room for the operation of seemingly conflicting state law." <u>Racher v. Westlake Nursing Home Ltd. P'ship</u>, 871 F.3d at 1162 (citations and quotations omitted).   There is a conflict between federal and state law if there is a "direct collision" that is "unavoidable," but there is no collision if the state and federal rules "can exist side by side . . . each controlling its own sphere of coverage." <u>Racher v. Westlake Nursing Home Ltd. P'ship</u>, 871 F.3d at 1163 (citations omitted).   If there is no direct collision, "there is no need to consider whether the federal rule is valid, and instead, the analysis must proceed under Erie." <u>Racher v. Westlake Nursing Home Ltd. P'ship</u>, 871 F.3d at 1163.   If there is a direct collision, a court must follow the federal rule if it is a valid exercise of the Supreme Court's rulemaking authority under the Rules Enabling Act, 28 U.S.C. § 2072, that is, it must "not abridge, enlarge or modify a substantive right." 28 U.S.C. § 2072(b).   <u>See</u> <u>Racher v. Westlake Nursing Home Ltd. P'ship</u>, 871 F.3d at 1163-64.

       Justice Stevens, in his controlling concurrence in <u>Shady Grove</u>, addressed how, in a diversity case where state substantive law applies, to analyze whether a federal rule of procedure abridges, enlarges or modifies a substantive right.  [<u>Shady Grove</u>, 559 U.S. at 418-21 (Stevens, J., concurring) ]; <u>see</u> <u>Gasperini</u> [v. Center for Humanities, Inc.], 518 U.S. [415] at 427 (1996)].  Justice Stevens advised courts not to rely on "whether the state law at issue takes the form of what is traditionally described as substantive or procedural." <u>Shady Grove</u>, 559 U.S. at 419 (Stevens, J., concurring).  Rather, a more nuanced approach is required. [<u>Shady Grove</u>, 559 U.S.

at 419-20].   Justice Stevens observed that "[a] state procedural rule, though undeniably 'procedural' in the ordinary sense of the term, may exist to influence substantive outcomes, and may in some instances become so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy." [Shady Grove, 559 U.S. at 419-20](citation and internal quotation marks omitted).  One example of such a law is a procedural rule that "may . . . define the amount of recovery." [Shady Grove, 559 U.S. at 420].  Ultimately, a court must consider whether the federal procedural rule has displaced "a State's definition of its own rights or remedies." [Shady Grove, 559 U.S. at 418,].  If so, the federal rule may be invalid under the Rules Enabling Act because the federal rule abridges, enlarges or modifies a state substantive right.

Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1164 (citations omitted)(alteration in the original)(quoting Shady Grove, 559 U.S. at 418-20 (Stevens, J., concurring)).  "[W]hen state law creates a cause of action, it also defines the scope of that cause of action," which includes "the applicable burdens, defenses, and limitations."  Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1164-65.  Consequently, even though burdens of proof, affirmative defenses, and liability limitations are all legal concepts that savor of procedure, "[f]ailing to enforce such attendant attributes of a state law would lead to different measures of the substantive rights enforced in state and federal courts," i.e., would modify substantive rights.  Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1165.  See Walker v. Spina, 359 F. Supp. 3d 1054, 1082-83 (D.N.M. 2019)(Browning, J.).

## LAW REGARDING DIVERSITY JURISDICTION AND ERIE

Under Erie, 304 U.S. at 64, a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court."  Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007).  Accord Mem. Hosp. v. Healthcare Realty Tr. Inc., 509 F.3d 1225, 1229 (10th Cir. 2007).  The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a

particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.). "Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an Erie prediction should look first to the words of the state supreme court." Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[17] If the Court finds only an opinion from the Court of Appeals of New Mexico, while "certainly [the Court] may and will consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision." Mosley v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that where the only opinion on point

[17]In performing its Erie-mandated duty to predict what a state supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (D.N.M. 2014)(Browning, J.). Courts should, obviously, be reticent to formulate an Erie prediction that conflicts with state-court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old state supreme court precedent usually binds state trial courts. The factors to which a federal court should look before making an Erie prediction that a state supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the state supreme court decision from which the federal court is considering departing -- the younger the state case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the state courts -- especially the state supreme court -- have placed on the state decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the state decision articulates, especially if the state supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times. See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17. In short, a state supreme court case that a federal court Erie predicts will be overruled is likely to be very old, neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

is "from the Court of Appeals, . . . the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it")(citing Wade v. EMCASCO Ins., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do," and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state"))).[18]   The Court may also rely on Tenth Circuit decisions

---

[18]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

> The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day.  It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.
>
>      . . . .
>
> We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.
>
>      . . . .
>
> The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which

interpreting New Mexico law.  See Anderson Living Trust v. WPX Energy Prod., LLC, 27

F. Supp. 3d at 1243 & n.30.[19]  Ultimately, "the Court's task is to predict what the state supreme

---

> would be applied in litigation in the state court, and whether believed to be sound
> or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Tr. Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted).  The
Supreme Court has softened this position over the years; federal courts are no longer bound by
state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the
highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at
465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A
James Wm. Moore et al., Moore's Federal Practice § 124.20 (2021)("[T]hus federal courts should
follow decisions of intermediate state appellate courts unless persuasive data indicate that the
highest state court would decide the issue differently.").

[19]In determining the proper weight to accord Tenth Circuit precedent interpreting New
Mexico law, the Court must balance the need for uniformity between federal court and state court
interpretations of state law with the need for uniformity among federal judges.  If the Court adheres
too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing
years, then parties litigating state-law claims will be subject to a different body of substantive law,
depending on whether they litigate in state court or federal court.  This result frustrates the purpose
of Erie, which held that federal courts must apply state court interpretations of state law, rather
than their own, in part so that parties achieve a consistent result regardless of the forum.  This
consideration pulls the Court toward according Tenth Circuit precedent less weight and according
state court decisions issued in the ensuing years more weight.  On the other hand, when the state
law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper
interpretation.  Otherwise, different federal judges within the same circuit -- or even the same
district, as district courts' decisions are not binding, even upon themselves -- would be free to
adopt differing interpretations of a state's law.  This consideration pulls the Court towards a
stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless
whether it accurately reflects state law --at least provides consistency at the federal level, so long
federal district judges are required to follow it.
        The Court must decide how to weigh Tenth Circuit case law against more-recent state court
decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth
Circuit precedent unless there is intervening case law directly on point from the state's highest
court, on one end; and independently interpreting the state law, regarding the Tenth Circuit
precedent as no more than persuasive authority, on the other.  In striking this balance, the Court
notes that it is generally more concerned about systemic inconsistency between the federal courts
and the state courts than it is about inconsistency among federal judges.  Judges, even those within
a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law
differently from one another; this inconsistency is part and parcel of a common-law judicial
system.  More importantly, litigants seeking to use forum selection to gain a substantive legal

advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal.  All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would.  Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency.  When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law.  Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts are.  More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do.  As such, Tenth Circuit precedent can lag behind developments in state law -- developments that the district courts may be nimble enough to perceive and adopt.  Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted.  Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look.  Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit.  Every federal judicial district in the nation, except the District of Wyoming, covers at most one state.  It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states.

Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the federal Constitution possess.  A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based <u>only</u> on state court cases that were available to the Tenth Circuit and that the Tenth Circuit considered, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that $x$ is the law in New Mexico; it holds that the <u>proper interpretation</u> of New Mexico law, at the time the opinion is released, is $x$.  Its holdings are descriptive, not prescriptive -- interpretive, not normative.  Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but

_____

(ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law.  The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate.  The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms.  Giving such effect to the Tenth Circuit's interpretations of state law is at tension with Erie, giving independent substantive effect to federal judicial decisions -- i.e., applying federal law -- in a case brought in diversity.

The purpose of Erie is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum.  For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue."  Moore's Federal Practice § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."  (citation and internal quotation marks omitted))).  This formulation may not be the most precise one if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, United States District Judge, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, see Abbott Labs. v. Granite State Ins., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(Shadur, J.)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus.  See Allstate Ins. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question.").  This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions.  To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play.  The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time.  While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve

people, nor must it be unanimous) -- federal cases interpreting state law often become stale. New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone. The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on <u>Erie</u>, of course, mean little if the Tenth Circuit does not agree. In <u>Wankier v. Crown Equipment Corp.</u>, the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*. Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

<u>Wankier v. Crown Equip. Corp.</u>, 353 F.3d 862, 866 (10th Cir. 2003)(McConnell, J.). From this passage, it seems clear that the Tenth Circuit permits a district court to deviate from its view of state law only on the basis of a subsequent case "of the state's highest court." <u>The American Heritage Dictionary of the English Language</u> 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that"). A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue," <u>Wankier v. Crown Equip. Corp.</u>, 353 F.3d at 866 -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest state court was an oversight or intentional. Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts. Even <u>Koch v. Koch Industries, Inc.</u>, 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which <u>Wankier v. Crown Equipment Corp.</u> relies, uses the more inclusive definition. In fact, <u>Wankier v. Crown Equipment Corp.</u> quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of <u>Allen [v. Minnstar, Inc.</u>, 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law." <u>Koch v. Koch Indus., Inc.</u>, 203 F.3d at 1231.

<u>Wankier v. Crown Equip. Corp.</u>, 353 F.3d at 867.

court would do."  Wade v. EMCASCO Ins. Co., 483 F.3d at 666.  Accord Mosley v. Titus, 762

F. Supp. 2d at 1332 (citation omitted); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174, 1188-89

(D.N.M. 2008)(Browning, J.).

### NEW MEXICO LAW REGARDING CONTRACT INTERPRETATION

In contract cases, "the role of the court is to give effect to the intention of the contracting

parties."  Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 21, 925 P.2d 1184, 1190.  "The primary

objective in construing a contract is not to label it with specific definitions or to look at form above

substance, but to ascertain and enforce the intent of the parties as shown by the contents of the

instrument."  Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 21, 925 P.2d at 1190 (citing Shaeffer

v. Kelton, 1980-NMSC-117, ¶ 8, 619 P.2d 1226, 1229).  "The parole evidence rule 'bars admission

of evidence extrinsic to the contract to contradict and perhaps even supplement the writing.'"

Mem'l Med. Ctr., Inc. v. Tatsch Constr., Inc., 2000-NMSC-030, ¶ 16, 12 P.3d 431, 437 (quoting

C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 12, 817 P.2d 238, 242).  If a

contract is ambiguous, however, "evidence will be admitted to aid in interpreting the parties'

---

Whether the decision to limit the intervening authority a district court can consider was
intentional or not, the Tenth Circuit has picked it up and run with it.  In Kokins v. Teleflex, Inc.,
the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion
from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit
interpretation of Colorado law.  See Kokins v. Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir.
2010)(Holmes, J.)("[T]he Colorado Court of Appeals decided Biosera[, Inc. v. Forma Scientific,
Inc., 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's *highest
court*.'"  (emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866)).
The Tenth Circuit has set forth a stringent restriction on its district courts' ability to
independently administer the Erie doctrine.  More importantly, the Tenth Circuit's view may be at
tension with the above-quoted Supreme Court precedent, as well as its own prior case law.
Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior
federal appellate decision [interpreting state law] is persuasive."  Moore's § 124.22[4] (citing State
Farm Mut. Auto. Ins. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)).  Still, the Court
is bound to abide by the Tenth Circuit's interpretation of Erie.

expressions." <u>C.R. Anthony Co. v. Loretto Mall Partners</u>, 1991 NMSC-070, ¶ 12, 817 P.2d at 242.

"On the other hand, if the court determines that the contract is clear and unambiguous on its face,

evidence of the circumstances surrounding the transaction is inadmissible <u>to vary or modify its</u>

<u>terms</u>." <u>C.R. Anthony Co. v. Loretto Mall Partners</u>, 1991-NMSC-070, ¶ 12, 817 P.2d at 242

(emphasis in original)(citation omitted).

 The question whether an agreement contains an ambiguity is a matter of law. <u>See Mark</u>

<u>V., Inc. v. Mellekas</u>, 1993-NMSC-001, ¶ 12, 845 P.2d 1232, 1235 (citing <u>Levenson v. Mobley</u>,

1987-NMSC-102, ¶ 7, 744 P.2d 174, 176). "An ambiguity exists in an agreement when the parties'

expressions of mutual assent lack clarity." <u>Mark V, Inc. v. Mellekas</u>, 1993-NMSC-001, ¶ 12, 845

P.2d 1235 (citation omitted). If, however, the "evidence presented is so plain that no reasonable

person could hold any way but one, then the court may interpret the meaning as a matter of law."

<u>Mark V, Inc. v. Mellekas</u>, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235. On the other hand, when the

court concludes that the contract is "reasonably and fairly susceptible of different constructions,

an ambiguity exists." <u>Mark V, Inc. v. Mellekas</u>, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 (citing

<u>Vickers v. N. Am. Land Dev., Inc.</u>, 1980-NMSC-021, ¶ 9, 607 P.2d 603, 606). New Mexico courts

may consider extrinsic evidence to determine "whether the meaning of a term or expression

contained in the agreement is actually unclear." <u>Mark V. Inc. v. Mellekas</u>, 1993-NMSC-001, ¶ 12,

845 P.2d at 1235. <u>See id.</u> ("New Mexico law, then, allows the court to consider extrinsic evidence

to make a preliminary finding on the question of ambiguity."); <u>C.R. Anthony Co. v. Loretto Mall</u>

<u>Partners</u>, 1991-NMSC-070, ¶ 15, 817 P.2d at 242-43 ("We hold today that in determining whether

a term or expression to which the parties have agreed is unclear, a court may hear evidence of the

circumstances surrounding the making of the contract and of any relevant usage of trade, course

of dealing, and course of performance." (citation and footnote omitted)).  Once the court concludes

that an ambiguity exists, the resolution of that ambiguity becomes a question of fact.  See Mark V,

Inc. v. Mellekas, 1993-NMSC-001, ¶ 13, 845 P.2d at 1235.  To decide an ambiguous term's

meaning, "the fact finder may consider extrinsic evidence of the language and conduct of the

parties and the circumstances surrounding the agreement, as well as oral evidence of the parties'

intent." Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 13, 845 P.2d at 1236.  New Mexico contract

law "requires the construction of ambiguities and uncertainties in a contract most strongly against

the party who drafted the contract."  Schultz & Lindsay Constr. Co., 1972-NMSC-013, ¶ 6, 494

P.2d 612, 614.  See Rummel v. Lexington Ins., 1997-NMSC-041, ¶ 22, 945 P.2d 970, 977 ("An

ambiguity in an insurance contract is usually construed against the insurer, because courts will

weigh their interpretation against the party that drafted a contract's language.").

### NEW MEXICO LAW REGARDING INSURANCE CONTRACT INTERPRETATION

Under New Mexico Law, "insurance contracts are construed by the same principles which

govern the interpretation of all contracts." Rummel v. Lexington Ins. Co., 1997-NMSC-041, ¶ 18,

945 P.2d 970, 976 (quotation marks omitted).  In interpreting insurance policies, courts must

consider the policy as a whole. See Weldon v. Commercial Union Assur. Co., 1985-NMSC-118,

¶ 9, 710 P.2d 89, 91.  "The clauses in the policy must be construed as intended to be a complete

and harmonious instrument designed to accomplish a reasonable end."  Safeco Ins. Co. of Am.,

Inc. v. McKenna, 1977-NMSC-053, ¶ 18, 565 P.2d 1033, 1037.  "If any provisions appear

questionable or ambiguous, we will first look to whether their meaning and intent is explained by

other parts of the policy." Rummel v. Lexington Ins. Co., 1997-NMSC-041, ¶ 20, 945 P.2d at 977.

When insurance contracts are unambiguous, courts must construe them "'in their usual and

ordinary sense,'" Slack v. Robinson, 2003-NMSC-083, ¶ 7, 134 N.M. 6, 9, 71 P.3d 514, 517

(quoting Miller v. Triad Adoption & Counseling Servs., Inc., 2003-NMCA-055, ¶ 8, 133 N.M.

544, 547, 65 P.3d 1099, 1102), and "enforce [them] as written," Ponder v. State Farm Mut. Auto.

Ins. Co., 2000-NMSC-033, ¶ 11, 129 N.M. 698, 702, 12 P.3d 960, 964.

When interpreting contracts, "courts should not 'create ambiguity where none exists.'"

United Nuclear, 2012-NMSC-032, ¶ 10, 285 P.3d at 647 (quoting City of Santa Rosa v. Twin City

Fire Ins. Co., 2006-NMCA-118, ¶ 7, 143 P.3d 196, 198).  Policy terms are only deemed ambiguous

when they are "reasonably and fairly susceptible of different constructions." Knowles v. United

Servs. Auto Ass'n, 1992-NMSC-030, ¶ 9, 832 P.2d at 396.  Ambiguous terms must be construed

against the drafter; they are "given the strongest interpretation against the insurer which they will

reasonably bear." Rummel v. Lexington Ins. Co., 1997-NMSC-041, ¶ 22, 945 P.2d at 977.  See

United Nuclear, 2012-NMSC-032, ¶ 10,   285 P.3d at 648.

In construing an insurance policy, the distinction between an exclusion and a provision of

coverage is very important, because it affects which party bears the burden of proof.  See Miller

v. Monumental Life Ins. Co., 761 F. Supp. 2d at 1147.  The insured party initially bears the burden

to show that coverage is established under a provision of coverage.  See Battishill v. Farmers

Alliance Ins. Co., 2006-NMSC-004, ¶ 6, 127 P.3d 1111, 1113.  The insurer then bears the burden

of proving the policy excludes coverage.  See Battishill v. Farmers Alliance Ins. Co., 2006-NMSC-

004, ¶ 6, 127 P.3d at 1113 (citing Eric Mills Holmes & Mark S. Rhodes, Holmes's Appleman on

Insurance, § 1.10, at 43 (2d ed. 1996)("That the insurer has the burden of proof to prove no

coverage under an all-risks policy is the American rule in all states, with the possible exception of

Texas")); Lopez v. N.M. Pub. Schs. Ins. Auth., 1994-NMSC-017, ¶ 13, 117 N.M. 207, 211, 870

P.2d 745, 749.

Insurance policy terms are frequently litigated, and courts have established consensus interpretations to many of the most common phrases. For example, "'unlike the phrase 'the insured,' the phrase 'any insured' unambiguously expresses a contractual intent to create joint obligations and to prohibit recovery by an innocent insured.'" Axis Reinsurance Co. v. Bennett, 2008 WL 2485388, at *15 (S.D.N.Y. June 19, 2008)(Lynch, J.)(quoting Sales v. State Farm Fire & Cas. Co., 849 F.2d 1383, 1385 (11th Cir. 1988)). See also Stettin v. Nat. Union Fire Ins. Co. of Pittsburgh, Pa., 861 F.3d 1335, 1337 (11th Cir. 2017). Similarly, the Court of Appeals of New Mexico has defined "arising out of" broadly, stating that the term is "ordinarily understood to mean 'originating from,' 'having its origin in,' 'growing out of' or 'flowing from.'" Krieger v. Wilson Corp., 2006-NMCA-034, ¶ 14, 139 N.M. 274, 279, 131 P.3d 661, 666 (quoting Baca v. N.M. State Highway Dep't, 1971-NMCA-087, ¶ 14, 82 N.M. 689, 486 P.2d 625, 628). In analyzing the term in an insurance contract exclusion, the Tenth Circuit surveyed New Mexico caselaw and concluded that "we have every reason to suppose that New Mexico law applies the same broad definition of arising out of in the exclusion context as in the coverage context." Am. Nat'l Prop. & Cas. Co. v. United Specialty Ins. Co., 592 F. App'x at 742.

## NEW MEXICO LAW REGARDING THE DUTY TO DEFEND AND THE DUTY TO INDEMNIFY

The "duty to indemnify is distinct from [the] duty to defend," and resolution whether a party has a duty to defend does not "necessarily depend on there being a duty to indemnify." City of Albuquerque v. BPLW Architects & Eng'rs, Inc., 2009-NMCA-081, ¶ 31, 726, 213 P.3d 1146, 1155 (Ct. App. 2009)(citing Ins. Co. of N. Am. v. Wylie Corp., 1987-NMSC-011, 733 P.2d 854, 857 (1987)). In disputes stemming from insurance contracts, the "duty to defend arises out of the

nature of the allegations in the complaint," <u>Miller v. Triad Adoption & Counseling Servs., Inc.</u>, 2003-NMCA-055, ¶ 9, 133 N.M. at 548, 65 P.3d at 1103 (citing <u>Bernalillo Cty. Deputy Sheriff's Ass'n v. Cty. of Bernalillo</u>, 1992-NMSC-065, ¶ 4, 114 N.M. 695, 697, 845 P.2d 789, 791), and is determined "by comparing the factual allegations in the complaint with the insurance policy," <u>Lopez v. N.M. Pub. Sch. Ins. Auth.</u>, 1994-NMSC-017, ¶ 8, 117 N.M. at 209, 870 P.2d at 747.  If a complaint "states facts that bring the case within the coverage of the policy," then the duty to defend will be triggered.  <u>Bernalillo Cnty. Deputy Sheriffs Ass'n v. Cnty. of Bernalillo</u>, 1992-NMSC-065, ¶ 8, 114 N.M. at 697, 845 P.2d at 791.  Generally, an insurer's "duty to defend arises out of a potentially covered claim and lasts until the conclusion of the underlying lawsuit, or until it has been shown that there is no potential for coverage," and, when there are multiple causes of action, "the duty continues until every covered claim is eliminated."  <u>Guest v. Allstate Ins. Co.</u>, 2010-NMSC-047, ¶ 33, 244 P.3d 342, 348 (2010)(citing S. Plitt et al., <u>Insurer's Duty to Defend: Nature, Commencement, and Termination</u>, 14 Couch on Insurance 3d, § 200:47 (Supp. 2007)).  Known, but unpled facts, may bring a claim within the coverage of the policy at the beginning of the litigation or at a later stage.  <u>See</u> <u>Am. Gen. Fire & Cas. Co. v. Progressive Cas. Co.</u>, 1990-NMSC-094, ¶ 11, 799 P.2d 1113, 1116.

> [A]n insurance company is required to conduct such an investigation into the facts and circumstances underlying the complaint against its insured as is reasonable given the factual information provided by the insured or provided by the circumstances surrounding the claim in order to determine whether it has a duty to defend.

<u>G & G Servs. v. Agora Syndicate, Inc.</u>, 2000-NMCA-003, ¶ 23, 128 N.M. 434, 440, 993 P.2d 751, 757.  "If the allegations of the complaint or the alleged facts tend to show that an occurrence comes within the coverage of the policy, the insurer has a duty to defend regardless of the ultimate liability

of the insured." <u>Miller v. Triad Adoption & Counseling Servs., Inc.</u>, 2003-NMCA-055, ¶ 9, 133

N.M. at 548, 65 P.3d at 1103 (citing <u>Found. Reserve Ins. Co., Inc. v. Mullenix</u>, 1982-NMSC-038,

¶ 6, 642 P.2d 604, 605).  With respect to the duty to indemnify, New Mexico courts have held that

"[i]f the allegations of the federal complaint clearly fall outside the provisions of [the] liability

insurance policies, indemnity by the insurer is not required."  <u>N.M. Physicians Mut. Liab. Co. v.</u>

<u>LaMure</u>, 1993-NMSC-048, ¶ 8, 860 P.2d 734, 737 (1993).   A court will "leave[ ] for later"

determination  whether  the  insurer  must  indemnify  the  insured,  because  that  "ultimate

determination is based on whether the insurer became legally obligated to pay damages because

of a bodily injury or property damage that does, in fact, fall under the policy coverage."  12 Couch

on Insurance § 172:2 (Supp. 2011).  The Tenth Circuit has held that the "duty to indemnify relates

to liability actually imposed on the insured for claims falling within the scope of coverage."  <u>Mount</u>

<u>Vernon  Fire  Ins.  Co.  v.  Okmulgee  Inn  Venture,  LLC</u>,  451  F.  App'x  745,  749  (10th  Cir.

2011)(unpublished)(addressing duty to indemnify in Oklahoma and applying Tenth Circuit case

law from Colorado)(citing <u>United Fire & Cas. Co. v. Boulder Plaza Residential, LLC</u>, 633 F.3d

951, 956-57 (10th Cir. 2011)).  <u>See</u> <u>Valley Imp. Ass'n v. U.S. Fid. & Guar. Corp.</u>, 129 F.3d 1108,

1126 (10th Cir. 1997)(concluding that, under New Mexico law, a judgment regarding the duty to

indemnify would be "premature," because "the duty to indemnify must be determined based on

the facts as ultimately determined in the litigation against the insured").

In <u>Hartford Fire Insurance Co. v. Gandy Dancer, LLC</u>, 864 F. Supp. 2d 1157 (D.N.M.

2012)(Browning, J.), defendant Mercer LLC argued that it was entitled to Hartford Fire Insurance

coverage for a negligent misrepresentation claim that it claimed caused property damage.  <u>See</u> 864

F. Supp. 2d at 1199.  The Court concluded that negligent misrepresentation could constitute an

"occurrence" or "accident" -- which are events covered by the insurance policy.  864 F. Supp. 2d at 1199.  The allegations were "sufficient to trigger coverage, because an insurer's 'duty to defend arises out of a *potentially* covered claim.'"  864 F. Supp. 2d at 1200 (quoting Guest v. Allstate Ins. Co., 2010-NMSC-047, ¶ 33, 244 P.3d at 348 (emphasis in Hartford Fire Ins. Co. v. Gandy Dancer, LLC)).  The Court concluded that the duty to defend was not triggered by this allegation, because the policy excluded claims for property damage that arose out of the insureds' work.  See 864 F. Supp. 2d at 1200.  The plaintiff had a duty to defend, however, because the defendants' claims for trespass and nuisance "arguably give rise to coverage."  864 F. Supp. 2d at 1202.

## LAW REGARDING CERCLA

"Congress enacted the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA/ or Act), 94 Stat. 2767, as amended, 42 U.S.C. §§ 9601-9675, in response to the serious environmental and health risks posed by industrial pollution," to "promote the 'timely cleanup of hazardous waste sites' and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination."  Burlington N. & Santa Fe Ry. v. United States, 556 U.S. 599, 602 (2009)(quoting Consol. Edison Co. of N.Y., Inc. v. UGI Utils., Inc., 423 F.3d 90, 94 (2d Cir. 2005), and citing United States v. Bestfoods, 524 U.S. 51, 55 (1998)).  CERCLA "'grants the President broad power to command government agencies and private parties to clean up hazardous waste sites.'"  United States v. United Park City Mines Co., 827 F. App'x 871, 874 (10th Cir. 2020)(unpublished)(quoting United States v. Bestfoods, 524 U.S. at 55).  See 42 U.S.C. § 9606.[20]  "'[B]ecause CERCLA is remedial legislation, it should be construed liberally to carry

---

[20]42 U.S.C. § 9606(a) governs abatement actions, and provides, in pertinent part:

out its purpose.'" Chevron Mining Inc. v. United States, 863 F.3d 1261, 1269 (10th Cir.

2017)(quoting Atl. Richfield Co. v. Am. Airlines, Inc., 98 F.3d 564, 570 (10th Cir. 1996)).

CERCLA "authorizes the President to designate certain facilities for remediation by

placement on the [National Priorities List ('NPL')]" pursuant to 42 U.S.C. § 9605. Chevron

Mining Inc. v. United States, 863 F.3d at 1270.

> CERCLA defines "facility" broadly to include not only "any building, structure,
> installation, equipment, pipe or pipeline . . . , well, pit, pond, lagoon, impoundment,
> ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft," but also
> "any site or area where a hazardous substance has been deposited, stored, disposed
> of, or placed, or otherwise come to be located."

Chevron Mining Inc. v. United States, 863 F.3d at 1270 (10th Cir. 2017)(quoting 42 U.S.C.

§ 9601(9)). CERCLA establishes liability for Potentially Responsible Parties ("PRPs"). See 42

U.S.C. § 9607. For the "purposes of establishing liability, . . . a person is liable if that person meets

CERCLA's definition of a [Potentially Responsible Party ('PRP')] with respect to even a 'portion

of the total facility.'" Chevron Mining Inc. v. United States, 863 F.3d at 1270 (10th Cir.

---

> In addition to any other action taken by a State or local government, when the
> President determines that there may be an imminent and substantial endangerment
> to the public health or welfare or the environment because of an actual or threatened
> release of a hazardous substance from a facility, he may require the Attorney
> General of the United States to secure such relief as may be necessary to abate such
> danger or threat, and the district court of the United States in the district in which
> the threat occurs shall have jurisdiction to grant such relief as the public interest
> and the equities of the case may require. The President may also, after notice to the
> affected State, take other action under this section including, but not limited to,
> issuing such orders as may be necessary to protect public health and welfare and
> the environment.

42 U.S.C. § 9606(a).

2017)(citing <u>Burlington N. & Santa Fe Ry.</u>, 556 U.S. at 618).  CERCLA "lists four broad categories

of persons as PRPs, by definition liable to other persons for various costs."  <u>United States v. Atl.</u>

<u>Research Corp.</u>, 551 U.S. 128, 134 n.2 (2007).  These are:

> (1)   the owner and operator of a vessel or a facility,
>
> (2)   any person who at the time of disposal of any hazardous substance owned
>       or operated any facility at which such hazardous substances were disposed
>       of,
>
> (3)   any person who by contract, agreement, or otherwise arranged for disposal
>       or treatment, or arranged with a transporter for transport for disposal or
>       treatment, of hazardous substances owned or possessed by such person, by
>       any other party or entity, at any facility or incineration vessel owned or
>       operated by another party or entity and containing such hazardous
>       substances, and
>
> (4)   any person who accepts or accepted any hazardous substances for transport
>       to disposal or treatment facilities, incineration vessels or sites selected by
>       such person, from which there is a release, or a threatened release which
>       causes the incurrence of response costs, of a hazardous substance . . . .

42 U.S.C. § 9607(a).  "'The remedy that Congress felt it needed in CERCLA is sweeping: *everyone*

who is potentially responsible for hazardous-waste contamination may be forced to contribute to

the costs of cleanup.'"  <u>Chevron Mining Inc. v. United States</u>, 863 F.3d at 1269 (quoting <u>United</u>

<u>States v. Bestfoods</u>, 524 U.S. at 56 n.1).  PRPs are liable for

> (A)   all costs of removal or remedial action incurred by the United States
>       Government or a State or an Indian tribe not inconsistent with the national
>       contingency plan;
>
> (B)   any other necessary costs of response incurred by any other person
>       consistent with the national contingency plan;
>
> (C)   damages for injury to, destruction of, or loss of natural resources, including
>       the reasonable costs of assessing such injury, destruction, or loss resulting
>       from such a release; and
>
> (D)   the costs of any health assessment or health effects study carried out under

section 104(i) [42 USCS § 9604(i)].

42 U.S.C. § 9607(a)(4).

CERCLA also provides for contribution actions:  "Any person may seek contribution from any other person who is liable or potentially liable under section 107(a) [42 U.S.C. § 9607(a)], during or following any civil action under section 106 [42 U.S.C. § 9606] or under section 107(a) [42 U.S.C. § 9607(a)]."  42 U.S.C. § 9613(f)(1) (alterations added).  Nevertheless, "[a] person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement," but that settlement "does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement."  42 U.S.C. § 9613(f)(2).  CERCLA allows parties to such a settlement to "seek contribution from any person who is not party to a settlement."  42 U.S.C. § 9613(f)(3)(B).

"Proving that a defendant is liable in a contribution action under § 9613(f)(3)(B) 'is dependent on the establishment of a prima facie case of liability under'" § 9607(a).  Chevron Mining Inc. v. United States, 863 F.3d at 1269 (quoting Morrison Enters. v. McShares, Inc., 302 F.3d 1127, 1132 (10th Cir. 2002)).  To prove a prima facie case of liability under § 9607(a) and liability for contribution, "'a plaintiff must prove [that] (1) the site is a facility, (2) [the] defendant is a [PRP], (3) the release or threatened release of a hazardous substance has occurred, *and* (4) the release or threatened release caused the plaintiff to incur necessary response costs consistent with the'" National Contingency Plan.[21]  Chevron Mining Inc. v. United States, 863 F.3d at 1269

---

[21]See 42 U.S.C. § 9605 ("[T]he President shall, after notice and opportunity for public comments, revise and republish the national contingency plan for the removal of oil and hazardous substances . . . which shall establish procedures and standards for responding to releases of

(quoting <u>Young v. United States</u>, 394 F.3d 858, 862 (10th Cir. 2005))(emphasis in <u>Young v. United States</u>)(alterations in <u>Chevron Mining Inc. v. United States</u>, but not in <u>Young v. United States</u>).

CERCLA defines hazardous substances, <u>see</u> 42 U.S.C. § 9601(14),[22] and delegates authority to the EPA Administrator to "promulgate and revise . . . regulations designating as

_____

hazardous substances . . . .").

> The National Oil and Hazardous Substances Pollution Contingency Plan, more commonly called the National Contingency Plan or NCP, is the federal government's blueprint for responding to both oil spills and hazardous substance releases. The NCP is the result of efforts to develop a national response capability and promote coordination among the hierarchy of responders and contingency plans.

EPA, <u>National Oil and Hazardous Substances Pollution Contingency Plan (NCP) Overview</u>, https://www.epa.gov/emergency-response/national-oil-and-hazardous-substances-pollution-contingency-plan-ncp-overview (last visited June 1, 2022).

[22]CERCLA defines "hazardous substance[s]" as follows:

The term "hazardous substance" means (A) any substance designated pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act, (B) any element, compound, mixture, solution, or substance designated pursuant to section 102 of this Act, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act (but not including any waste the regulation of which under the Solid Waste Disposal Act has been suspended by Act of Congress), (D) any toxic pollutant listed under section 307(a) of the Federal Water Pollution Control Act, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act, and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 7 of the Toxic Substances Control Act. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

42 U.S.C. § 9601(14).

hazardous substances . . . such elements, compounds, mixtures, solutions, and substances, which, when released into the environment may present substantial danger to the public health or welfare of the environment," 42 U.S.C. § 9601(2).

## ANALYSIS

The Court will grant the Chisholm MSJ, deny the Fidelity MSJ, and deny the Cincinnati MSJ.  Under rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  At the hearing, the parties stipulated that there is no genuine dispute as to any material fact, and that they seek a determination of the legal issue whether Fidelity Insurance and Cincinnati Insurance have a duty to defend Chisholm's Village in the CERCLA Lawsuit.  See Tr. at 5:8-7:4 (Court, Feinberg, Hnasko, Evans).  The Court has diversity jurisdiction over this case under 28 U.S.C. § 1332, because the parties "are all citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds Seventy-Five Thousand Dollars ($75,000.00)."  Complaint ¶ 9, at 4.  See 28 U.S.C. § 1332.[23]  Because this lawsuit is a diversity case, the Court applies New Mexico law in an effort to reach the same result that a New Mexico court would reach.  C.f. Headwaters Res., Inc. v. Ill. Union Ins. Co., 770 F.3d 885, 891 (10th Cir.

---

[23]The parties have diverse citizenship: "Plaintiff Chisholm's is a domestic New Mexico limited liability company," Complaint ¶ 6, at 3, and its members are citizens of New Mexico and Colorado, see Plaintiff's Statement of Limited Liability Corporation Members and Citizenship at 1, filed June 17, 2022 (Doc. 52).  "Defendant Fidelity and Guaranty Insurance Underwriters, Inc. . . . is incorporated in the State of Connecticut . . . and its principal place of business is in Hartford, Connecticut."  Statement of Citizenship at 1, filed June 14, 2022 (Doc. 51).  "Defendant The Cincinnati Insurance Company. . . is incorporated in the State of Ohio . . . and . . . its principal place of business is in Fairfield, Ohio."  Statement of Citizenship at 1, filed June 23, 2022 (Doc. 54).

2014)("In this diversity action, we apply Utah law. . . . 'The interpretation of an insurance contract is governed by state law and, sitting in diversity, we look to the law of the forum state.'" (quoting Houston Gen. Ins. Co. v. Am. Fence Co., 115 F.3d 805, 806 (10th Cir. 1997))).

Although the Supreme Court of New Mexico in United Nuclear, 2012-NMSC-032, 285 P.3d 644, finds the qualified pollution exclusion[24] to be ambiguous, it has not yet decided whether the absolute pollution exclusion[25] or the total pollution exclusion[26] are ambiguous, nor has it

---

[24]The "qualified pollution exclusion" -- also known as the "standard Insurance Services Office ('ISO')" or "sudden and accidental" pollution exclusion -- contains an exception to the exclusion for "sudden and accidental" releases of pollutants:

This exclusion provides that coverage will not apply:

> . . . to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is **sudden and accidental***.

1 Environmental Insurance Litigation: Law and Practice § 7:1 (August 2021 Update)(emphasis in original).

[25]The "absolute pollution exclusion" removes the "sudden and accidental" exception to the qualified pollution exclusion:

> Starting in the mid-1980s, some liability insurers began to adopt a pollution exclusion that had no "sudden and accidental" exception. The insurers' adoption of an *absolute pollution exclusion* was the result of frequent court rulings that the standard ISO pollution exclusion was ambiguous and merely restated the occurrence definition. The objective of the absolute exclusion was to eliminate coverage for pollution claims.

2 Environmental Insurance Litigation: Law and Practice § 8:2 (2021).

[26]The "total pollution exclusion" is similar to the absolute pollution exclusion in that it does not contain a "sudden and accidental" exception to the exclusion: "The most frequent version of this newer variant of the exclusion defines 'pollutants' even more broadly than the typical absolute

decided which approach to follow in construing and applying those exclusions.  Furthermore, the

Tenth Circuit has construed the absolute -- or total -- pollution exclusions according to Colorado,

Kansas, Oklahoma, and Utah law, but it has not construed it according to New Mexico law.  See

Blackhawk-Central City Sanitation Dist. v. Am. Guarantee & Liab. Ins. Co., 214 F.3d 1183 (10th

Cir. 2000)(Colorado law); Reg'l Bank of Colo., N.A. v. St. Paul Fire & Marine Ins. Co., 35 F.3d

494 (10th Cir. 1994)("Regional Bank of Colorado")(Colorado law), Union Ins. Co. v. Mendoza,

374 F. App'x 796 (10th Cir. 2010)(unpublished)(Kansas law); MJH Props. LLC v. Westchester

Surplus Lines Ins. Co., 814 F. App'x 421 (10th Cir. 2020)(unpublished)(Oklahoma law);

Bituminous Cas. Corp. v. St. Clair Lime Co., 69 F.3d 547, 1995 U.S. App. LEXIS 38095 (10th

Cir. Oct. 27, 1995)(table)(Oklahoma law); Headwaters Res., Inc. v. Ill. Union Ins. Co., 770 F.3d

885 (10th Cir. 2014)(Utah law).

    First, after surveying various approaches other jurisdictions have taken, the Court predicts

that New Mexico would follow Indiana's approach to the absolute and total pollution exclusions.

Second, in applying Indiana's approach, the Court concludes that the absolute and total pollution

exclusions are ambiguous per se and ambiguous as applied to this case's facts; accordingly, they

must be construed in the insured's favor, both in terms of coverage and the duty to defend.  Third,

even if New Mexico does not follow Indiana's approach, there is sufficient legal ambiguity which

approach New Mexico would follow, such that there is the potential for coverage triggering the

duty to defend.  Accordingly, Fidelity Insurance and Cincinnati Insurance have a duty to defend

Chisholm's Village, and Chisholm's Village is entitled to judgment as a matter of law.

---

pollution exclusion -- it precludes coverage for releases from products, and for certain off-site
discharges of pollutants."  2 Environmental Insurance Litigation: Law and Practice § 8:3 (2021).

Consequently, the Court will deny the Fidelity MSJ, deny the Cincinnati MSJ, and grant the Chisholm MSJ.

I.    **THE COURT PREDICTS THAT THE SUPREME COURT OF NEW MEXICO WOULD FOLLOW INDIANA'S APPROACH TO THE ABSOLUTE POLLUTION EXCLUSION, BECAUSE INDIANA'S APPROACH IS THE MOST PROTECTIVE OF THE INSURED.**

Although "[g]enerally speaking, jurisdictions that have addressed the scope of the 'total pollution exclusion' fall into one of two camps," the Court identifies a small but important third camp which it predicts New Mexico would join. Headwaters Res., Inc. v. Ill. Union Ins. Co., 770 F.3d at 889. See Apana v. TIG Ins. Co., 574 F.3d 679, 682 (9th Cir. 2009)("Most State courts fall roughly into one of two broad camps." (citing MacKinnon v. Truck Ins. Exch., 31 Cal. 4th 635, 3 Cal. Rptr. 3d 228, 73 P.3d 1205, 1208-09 (Cal. 2003))). The two most popular approaches are the "literal" approach and the "situational" approach. State Auto. Mut. Ins. Co. v. Flexdar, Inc., 964 N.E.2d 845, 850-51 (Ind. 2012)("Flexdar")(citing Apana v. Tig Ins. Co., 574 F.3d 679, 682-83 (9th Cir. 2009)). "[C]ourts that apply the pollution exclusions as written because they find them clear and unmistakable" comprise the literal camp, whereas "courts that narrow the exclusions to 'traditional environmental pollution,' often because they find the terms of the exclusion to be ambiguous due to their broad applicability," comprise the situational camp. Headwaters Res., Inc. v. Ill. Union Ins. Co., 770 F.3d at 889 (no citation for quotation). See Flexdar, 964 N.E.2d at 850-51. The Supreme Court of Indiana diverges from these two main approaches and has "gone in a different direction" by holding that "the insurer can (and should) specify what falls within its pollution exclusion." Flexdar, 964 N.E.2d at 851. The Court predicts that the Supreme Court of New Mexico would not follow either the literal approach or the situational approach, but would follow Indiana's approach, because its approach is the least tolerant of contractual ambiguity and

provides the most protections for the insured.

### A.   THE COURT PREDICTS THAT NEW MEXICO WOULD NOT FOLLOW THE LITERAL APPROACH.

The Court predicts that New Mexico would not follow the literal approach to the absolute

pollution exclusion, even though "[t]he majority of courts have held that the [absolute pollution

exclusion] clause is 'clear and unambiguous.'"  9 Steven Plitt, Daniel Maldonado, Joshua D.

Rogers, and Jordan R. Plitt, Couch on Insurance § 127:14 & n.2 (3d ed. 2021)(collecting cases)(no

citation for quotation).[27]   "Jurisdictions employing a 'literal' view of the absolute pollution

---

[27]See 9 Couch on Insurance § 127:14 & n.2 (3d ed. 2021)(citing Admiral Ins. Co. v. Feit Management Co., 321 F.3d 1326, 1329 (11th Cir. 2003)(applying Florida law); Royal Ins. Co. of America v. Kirksville College of Osteopathic, 191 F.3d 959, 961-62 (8th Cir. 1999)(applying California law); National Elec. Mfrs. Ass'n v. Gulf Underwriters Ins. Co., 162 F.3d 821, 825-26 (4th Cir. 1998)(applying Virginia law); American States Ins. Co. v. Nethery, 79 F.3d 473, 475-76 (5th Cir. 1996)(applying Mississippi law); Park-Ohio Industries, Inc. v. Home Indem. Co., 975 F.2d 1215, 1221 (6th Cir. 1992)(applying Ohio law); Apana v. TIG Ins. Co., 504 F. Supp. 998, 1006 (D. Haw. 2007)(Seabright, J.); Owners Ins. Co. v. Farmer, 173 F. Supp. 2d 1330, 1334 (N.D. Ga. 2001)(O'Kelley, J.); Sunny Ridge Enterprises, Inc. v. Fireman's Fund Ins. Co., Inc., 132 F. Supp. 2d 525, 527 (E.D. Ky. 2001)(Hood, J.); U.S. Fire Ins. Co. v. City of Warren, 176 F. Supp. 2d 728, 732 (E.D. Mich. 2001)(Gadola, J.); Power Engineering Co. v. Royal Ins. Co. of America, 105 F. Supp. 2d 1196, 1205 (D. Colo. 2000)(Babcock, J.); Plants and Goodwin, Inc. v. St. Paul Surplus Lines Ins. Co., 99 F. Supp. 2d 293, 299 (W.D. N.Y. 2000)(Arcara, J.); Stull v. American States Ins. Co., 963 F. Supp. 492, 494 (D. Md. 1997)(Kaufman, J.); Crown Cent. Petroleum Corp. v. Rust Scaffold Builders, Inc., 951 F. Supp. 636, 642 (S.D. Tex. 1996)(Atlas, J.); Schilberg Integrated Metals Corp. v. Continental Cas. Co., 263 Conn. 245, 271, 819 A.2d 773, 791 (2003); Kim v. State Farm Fire and Cas. Co., 312 Ill. App. 3d 770, 777, 245 Ill. Dec. 448, 454, 728 N.E.2d 530, 536 (1st Dist. 2000); Atlantic Ave. Associates v. Central Solutions, Inc., 29 Kan. App. 2d 169, 175, 24 P.3d 188, 192 (2001); Casualty Indem. Exchange v. City of Sparta, 997 S.W.2d 545, 551 (Mo. Ct. App. S.D. 1999); Cincinnati Ins. Co. v. Becker Warehouse, Inc., 262 Neb. 746, 757, 635 N.W.2d 112, 121 (2001); Wagner v. Erie Ins. Co., 2002 PA Super 166, 801 A.2d 1226, 1233 (2002), order aff'd, 577 Pa. 563, 847 A.2d 1274 (2004); South Dakota State Cement Plant Com'n v. Wausau Underwriters Ins. Co., 2000 SD 116, 616 N.W.2d 397, 407 (S.D. 2000); Quadrant Corp. v. American States Ins. Co., 118 Wash. App. 525, 76 P.3d 773, 777 (Div. 1 2003), aff'd, 154 Wash. 2d 165, 110 P.3d 733 (2005); Peace ex rel. Lerner v. Northwestern Nat. Ins. Co., 228 Wis. 2d 106, 136, 596 N.W.2d 429, 442 (1999)).  See Couch on Insurance § 127:15 & n.1 (citing Noble Energy, Inc. v. Bituminous Cas. Co., 529 F.3d 642, 646 (5th Cir. 2008); Whittier Properties, Inc. v. Alaska Nat. Ins. Co., 185 P.3d 84, 90-91 (Alaska 2008); Bituminous Cas. Corp. v. Cowen Const., Inc.,

exclusion generally hold the exclusion to be unambiguous in all circumstances.  Where a substance

is acting in any manner as an 'irritant or contaminant,' damage caused thereby is excluded from

coverage."   Flexdar, 964 N.E.2d at 850.   Despite the popularity of this approach, several

courts -- including the Tenth Circuit -- have commented on the "absurd results" that follow from

a literal application of the absolute pollution exclusion.  Doerr v. Mobil Oil Corp., 2000-0947 (La.

12/19/00), 774 So. 2d 119, 124.  See Regional Bank of Colorado, 35 F.3d at 498 ("'Without some

limiting principle, the pollution exclusion clause would . . . lead to some absurd results.'" (quoting

Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co., 976 F.2d 1037, 1043 (7th Cir. 1992)));

Flexdar, 964 N.E.2d at 850 ("[T]he difficulty with this view is that it eliminates practically all

coverage yielding, in our opinion, untenable results.").  The Tenth Circuit explains:

> "To take but two simple examples, reading the clause broadly would bar coverage
> for bodily injuries suffered by one who slips and falls on the spilled contents of a
> bottle of Drano, and for bodily injury caused by an allergic reaction to chlorine in
> a public pool.  Although Drano and chlorine are both irritants or contaminants that
> cause, under certain conditions, bodily injury or property damage, one would not
> ordinarily characterize these events as pollution."

Regional Bank of Colorado, 35 F.3d at 498 (quoting Pipefitters Welfare Educ. Fund v. Westchester

Fire Ins. Co., 976 F.2d at 1043).  See also Flexdar, 964 N.E.2d at 850 (citing Maxine Furs, Inc. v.

Auto-Owners Ins. Co., 426 F. App'x 687, 688 (11th Cir.2011)(per curiam)(applying Alabama law

and holding that the aroma of curry escaping from an Indian restaurant and damaging merchandise

in an adjacent fur salon was a "contaminant" under the pollution exclusion and the damage was

therefore not covered); Noble Energy, Inc. v. Bituminous Cas. Co., 529 F.3d 642, 646–47 (5th

Cir.2008)(applying Texas law and finding no coverage for injuries from a truck explosion fed by

---

2002 OK 34, 55 P.3d 1030, 1035 n.23 (Okla. 2002); Cincinnati Ins. Co. v. Becker Warehouse,
Inc., 262 Neb. 746, 757, 635 N.W.2d 112, 120 (2001)).

combustible vapors released during unloading of the truck's oilfield waste cargo because the cargo and vapors constituted a "solid, liquid, gaseous or thermal irritant or contaminant including . . . fumes . . . and waste")).

The Court predicts that the Supreme Court of New Mexico would reject the literal approach to the pollution exclusion, because it contravenes the insured's reasonable expectations of coverage and leads to "'absurd results.'" Regional Bank of Colorado, 35 F.3d at 498 (quoting Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co., 976 F.2d 1037, 104 (7th Cir. 1992)). In Regional Bank of Colorado, the Tenth Circuit applies Colorado law and rejects a literal construction of the absolute pollution exclusion, under which the "plain and ordinary meaning of the terms used in the pollution exclusion clause [would] exclude[] coverage for the event in question here, i.e. the personal injuries caused by exposure to carbon monoxide emissions" from a heater malfunction. 35 F.3d at 498. Coverage would be excluded, because, under the policy's definition of pollutants, "carbon monoxide is a gaseous irritant and . . . bodily injury caused by exposure to it on the insured's 'premises' was excluded from coverage." 35 F.3d at 498 (no citation for quotation). The Tenth Circuit opines that, "[w]hen viewed in isolation, the terms 'irritant' and 'contaminant' are 'virtually boundless, for "there is no substance or chemical in existence that would not irritate or damage some person or property."'" 35 F.3d at 498 (quoting Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co., 976 F.2d at 1043). The insurance policy at issue in Regional Bank of Colorado defined "pollutant" as "'any solid, liquid, gaseous, or thermal irritant or contaminant, including: smoke, vapors, . . . , fumes . . . .'" 35 F.3d at 498. The Tenth Circuit notes that "[t]he terms 'irritant' and 'contaminant' are not defined in the policy," and looked to the dictionary definition of "irritant" for guidance. Regional Bank of Colorado, 35

F.3d at 498.  Stating that the dictionary definition of "irritant" -- "'tending to produce irritation or inflammation; something that irritates or excites; an agent by which irritation is produced[,]'" -- is a "somewhat circular definition," the Tenth Circuit concludes that "[a] reasonable policy holder would not understand the policy to exclude coverage for *anything* that irritates."  Regional Bank of Colorado, 35 F.3d at 498 (quoting Webster's New International Dictionary 1197 (3d ed. 1986))(emphasis in original).  The Tenth Circuit held that the word "'[i]rritant' is not to be read literally and in isolation, but must be construed in the context of how it is used in the policy, i.e., defining 'pollutant.'"  Regional Bank of Colorado, 35 F.3d at 498.[28]  Under the literal approach, the Cincinnati Policy's and the Fidelity Policy's pollution exclusion would exclude coverage not only for Chisholm's Village or its predecessors' alleged discharge of PCEs into the soil and groundwater, but also would exclude coverage for any personal injury or property damage arising from Chisholm's Village's use of PCE or other dry-cleaning solvents or chemicals.  Because the literal approach to the pollution exclusion "eliminates practically all coverage," the Court predicts that the Supreme Court of New Mexico would not follow the literal approach.  Flexdar, 964 N.E.2d at 850.

---

[28]In applying Oklahoma law, however, the Tenth Circuit upheld a district court's ruling that the total pollution exclusion was unambiguous, because of controlling Oklahoma precedent:

> In *Bituminous Cas. Corp. v. Cowen Constr., Inc.*, 2002 OK 34, 55 P.3d 1030, 1035 (Okla. 2002), the Oklahoma Supreme Court upheld as "clear and unambiguous" a total pollution exclusion provision nearly identical to the one here.  Because the provision was not limited to environmental pollutants, the *Bituminous* court determined it excluded the third-party claimant's lead poisoning claims against the insured from coverage.

MJH Props. LLC v. Westchester Surplus Lines Ins. Co., 814 F. App'x at 425.

**B.     THE COURT PREDICTS THAT NEW MEXICO WOULD NOT FOLLOW THE SITUATIONAL APPROACH; IF NEW MEXICO FOLLOWED THE SITUATIONAL APPROACH, CINCINNATI INSURANCE, BUT NOT FIDELITY INSURANCE, WOULD OWE CHISHOLM'S VILLAGE A DUTY TO DEFEND.**

The situational approach requires courts to undertake an analysis of the pollution exclusion's ambiguity as applied to the facts of a particular case, not in a vacuum.  See State Auto. Mut. Ins. Co. v. Flexdar, Inc., 964 N.E.2d at 851 ("Jurisdictions applying a more 'situational' approach look to factual context and typically uphold the exclusion only in cases of 'traditional' environmental contamination.").  First, the Court predicts that New Mexico would not follow the situational approach, because the need to undertake a case-by-case factual analysis makes the pollution exclusion clause inherently ambiguous, and New Mexico courts construe ambiguities in the insured's favor.  Second, if New Mexico applies the situational approach, Fidelity Insurance would have no duty to defend Chisholm's Village, because the CERCLA Complaint states claims for traditional environmental pollution arising from "any request, demand or order" that any other entity respond to the pollution.  Fidelity Policy at 29.  Third, if New Mexico applied the situational approach, Cincinnati Insurance would have a duty to defend Chisholm's Village, because the Cincinnati Policy has an alternate liability provision which creates the potential for coverage, triggering the duty to defend.

### 1.      The Court Predicts that New Mexico Would Not Follow the Situational Approach.

Given a choice between the literal and situational approach, New Mexico likely would follow the "more palatable" situational approach, because it provides more coverage and greater protections for the insured.   Flexdar, 964 N.E.2d at 851.   The Court predicts, however, that New Mexico would follow Indiana's unique approach: as the Supreme Court of Indiana notes, the

situational approach is "still . . . problematic because the concept of what is a 'traditional' environmental contaminant may vary over time and has no inherent defining characteristics," which "leaves courts in the awkward and inefficient position of making case-by-case determinations as to the application of the pollution exclusion." Flexdar, 964 N.E.2d at 851. See Analysis § I(C), infra at 89-98.

The Court predicts that the Supreme Court of New Mexico would conclude that a pollution exclusion which requires judicial interpretation and factual analysis on a case-by-case basis is inherently ambiguous and ambiguous as applied to the facts of a particular case. Because the determination of coverage in any one instance requires a judicial determination whether the pollution exclusion applies to a particular set of facts, the pollution exclusion is "reasonably and fairly susceptible of different constructions," and, therefore, "ambiguity exists." Mark V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 114 N.M. at 781, 845 P.2d at 1235. "If any provisions appear questionable or ambiguous" New Mexico courts "will first look to whether their meaning and intent is explained by other parts of the policy." Rummel v. Lexington Ins. Co., 1997-NMSC-041, ¶ 20, 123 N.M. at 758, 945 P.2d at 977. Here, there is no other part of the Fidelity Policy or Cincinnati Policy that clarifies when dry cleaning solvents act as "pollutants" for the purposes of the pollution exclusion or when they cause injury in another capacity. Fidelity Policy at 29; Cincinnati Policy at 43-45, 60. Furthermore, New Mexico courts find that provisions are ambiguous when, as here, "'a particular matter of coverage is not explicitly addressed by the policy.'" Battishill v. Farmers All. Ins. Co., 2006-NMSC-004, ¶ 18, 139 N.M. 24, 28, 127 P.3d 1111, 1115 (quoting Rummel v. Lexington Ins. Co., 1997-NMSC-041, ¶ 19, 123 N.M. at 758, 945 P.2d at 976). Here, the Fidelity Policy and the Cincinnati Policy do not specify whether PCEs or

dry cleaning solvents fall with the definition of pollutants, nor does it specify when contaminants or irritants may not be pollutants.

The Tenth Circuit in <u>Headwaters Resources, Inc. v. Illinois Union Insurance Co.</u> rejected the argument -- proposed by the insured in that case -- that "the comprehensiveness of the pollution exclusions reveals ambiguity within the policies because literal application of the exclusions abolishes coverage," holding that "a plain reading of the exclusion provisions contradicts" the insured's "appeal for ambiguity." 770 F.3d at 893.  The Tenth Circuit reasoned that, "the pollution exclusions, while far-reaching, are not ambiguous and do not abolish all coverage under the policies." 770 F.3d at 893.  In that case, however, the Tenth Circuit applied Utah, and not New Mexico, law.  <u>See</u> 770 F.3d at 891.  Under New Mexico law, any ambiguity must be construed in the insured's favor and ambiguous insurance policies must be "given the strongest interpretation against the insurer which they will reasonably bear." <u>Rummel v. Lexington Ins. Co.</u>, 1997-NMSC-041, ¶ 22, 945 P.2d at 977.  <u>See</u> <u>United Nuclear</u>, 2012-NMSC-032, ¶ 10, 285 P.3d at 648.  The Court agrees with Chisholm's Village that "New Mexico's Supreme Court could well determine that the absolute pollution exclusion is *per se* ambiguous, as other states have."  Chisholm Reply at 12 (citing <u>American States v. Kiger</u>, 662 N.E. 2d 945, 948 (Ind. 1996)).  Because the Court predicts that the Supreme Court of New Mexico would find the absolute pollution exclusion ambiguous per se, the Court concludes that New Mexico would not follow the situational approach.

### 2.   <u>If New Mexico Applies the Situational Approach, Fidelity Insurance Would Have No Duty to Defend Chisholm's Village.</u>

Under the situational approach, which does not require the pollution exclusion to list substances with specificity as Indiana's approach does, Fidelity Insurance would not have a duty

to defend Chisholm's Village.  See Analysis § I(C), infra at 89-98.  Chisholm's Village argues that

there is ambiguity whether the "hazardous substances" at issue in the CERCLA Complaint fall

within the Fidelity Policy's definition of "pollutants" and, thus, within its pollution exclusion.

Chisholm MSJ at 13-14.  Chisholm's Village asserts that New Mexico courts construe ambiguities

in favor of the insured, see Chisholm MSJ at 10 (citing United Nuclear, 2012-NMSC-032, ¶ 11,

285 P.3d 644), and exceptions and exclusions against the insurer, see Chisholm MSJ at 10 (citing

Pecos Val. Flying Serv., Inc. v. Brayley, 1957-NMSC-064, ¶ 9, 63 N.M. 96, 99, 313 P.2d 1062,

1065).  Chisholm's Village argues that

> any ambiguity regarding whether the substance at issue meets the definition of
> "pollutant" in the policy necessarily triggers the duty to defend because ambiguities
> must be resolved in favor of the insured and an insurer can only escape the
> obligation to provide a defense if the complaint solely seeks damages for actions
> clearly excluded from the policy.

Chisholm MSJ at 14-15 (quoting Fidelity Policy at 28).

Deciding whether the Fidelity Policy's pollution exclusion is ambiguous as applied to this

case's facts requires comparing the pollution exclusion's definition of "pollutants" with the

CERCLA Complaint's language.  The Fidelity Policy defines "[p]ollutants" as "any solid, liquid,

gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis,

chemicals, petroleum, petroleum products and petroleum by-products, and waste.  Waste includes

materials to be recycled, reconditioned or reclaimed."  Fidelity Policy at 29.  The CERCLA

Complaint alleges that Chisholm's Village "released substances that are hazardous to human

health and the environment into the soil and groundwater in Las Cruces," CERCLA Complaint

¶ 6, at 6, that "hazardous substances (including PCE), were used and released to the soil and

groundwater at and to the [Superfund] Site," CERCLA Complaint ¶ 33, at 12, and that "substances

and wastes (including, but not limited to, PCE) released into the environment . . . are 'hazardous substances' under 42 U.S.C. § 9601(14) and were released within the meaning of 42 U.S.C. §§ 9601(22)," CERCLA Complaint ¶¶ 56, at 15-16 (quoting 42 U.S.C. § 9601(14) and § 9601(22)).   More simply put, the question under the situational approach is whether the "hazardous substances . . . released to the soil and groundwater," or "substances and wastes . . . released into the environment" -- which the CERCLA Complaint alleges contributed to a Superfund site -- fall unambiguously within the Fidelity Policy's definition of a "pollutant[]," i.e., "any solid [or] liquid . . . irritant or contaminant."  Fidelity Policy at 29.  If the Supreme Court of New Mexico were to adopt the situational approach, it would likely reason that the plain meaning of the terms "pollutants" or "pollution" is the same as that which Fidelity Insurance's pollution exclusion intends: "pollutants" necessarily includes the terms "hazardous substances" or "substances and wastes," when those substances are "released into the environment" or "released to the soil and groundwater," and contaminate the environment.  CERCLA Complaint ¶¶ 6, 33, 56,  at 6; 12 , 15-16.  In other words, the Supreme Court of New Mexico might conclude that the Fidelity Policy includes a definition of pollutants that, while broad, is not contrary to a layman's understanding.  See Fidelity Policy at 29.  Merriam-Webster defines a "pollutant" as "something that pollutes," Pollutant, Merriam-Webster, https://www.merriam-webster.com/dictionary/ pollutant (last visited March 30, 2022), and defines the verb to "pollute" as "to make physically impure or unclean," and most pertinently, "to contaminate (an environment) especially with man-made waste," Pollute, Merriam-Webster, https://www.merriam-webster.com/dictionary/pollutes (last visited March 30, 2022).  Both the Fidelity Policy's definition and the dictionary definition include the word "contaminate," Fidelity Policy at 29, and the dictionary definition adds the term

"environment" to clarify the context in which contaminants could be said to pollute, <u>Pollute</u>, Merriam-Webster, https://www.merriam-webster.com/dictionary/pollutes.   Paraphrasing the Tenth Circuit, "a reasonable person of ordinary intelligence" would understand PCEs and any "hazardous substances" defined by CERCLA to be "pollutant[s] when [they are] emitted in an industrial or environmental setting."   <u>Regional Bank of Colorado</u>, 35 F.3d at 498.[29]

If New Mexico follows the situational approach and rejects Indiana's specificity requirement, Fidelity Insurance would have no duty to defend Chisholm's Village, because the pollution exclusion's second subsection -- f(2)(a) -- excludes the costs that Las Cruces and Doña Ana County seek in the CERCLA Complaint.  The pollution exclusion's first subsection -- f(1)(a) -- does not exclude the costs that Las Cruces and Doña Ana County seek, because f(1)(a) excludes only coverage of "'[b]odily injury' or 'property damage' . . . arising out of the . . . discharge . . . of pollutants . . . [a]t or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured," Fidelity Policy at 28, whereas the CERCLA Complaint seeks to hold Chisholm's Village jointly and severally liable for damage resulting from the discharge of pollutants from other premises -- that Chisholm's Village's co-Defendants owned or occupied -- but that Chisholm's Village never owned, rented, or occupied, <u>see</u> CERCLA Complaint ¶ 63, at 12-13.  The third subsection -- f(2)(b) -- does not exclude costs that Las Cruces and Doña Ana County seek, because f(2)(b) excludes "[a]ny loss, cost or expense *arising out of*

---

[29]The Indiana approach contradicts this analysis, of course, because Indiana requires that, for a pollution exclusion not to be ambiguous, the pollution exclusion must list and identify individual excluded substances with specificity.  <u>See</u> Analysis § I(C), <u>infra</u> at 89-98; Analysis § II, <u>infra</u> at 98-115.  The Indiana approach thus renders moot any judicial analysis of a broad umbrella term such as "pollutants" according to a layperson's understanding, or according to dictionary definitions.

any . . . [c]laim or suit by or on behalf of a governmental authority," Fidelity Policy at 28 (emphasis added), while Las Cruces and Doña Ana County seek contribution and cost recovery in ¶ 63, at 13, for

> costs Plaintiffs have incurred and will continue to incur in response to the release or threatened release of hazardous substances at the Site, . . . *apart from* costs incurred as a result of the claims brought under 42 U.S.C. § 9606(a) and 42 U.S.C. § 9607(a) on behalf of [the Environmental Protection Agency ("EPA")] in this litigation.

CERCLA Complaint ¶ 63, at 13 (emphasis added).  The CERCLA Complaint, therefore, seeks recovery of costs which do not arise from the EPA's action, because they are "apart from" it, and, so, logically, must arise from something else.

Under the situational approach, however, the second subsection, -- f(2)(a) -- excludes coverage for Chisholm's Village's claims.  Chisholm's Village argues that the words "[r]equest, demand or order" refer to those of a governmental entity such as the EPA.  Fidelity Policy at 28. See Chisholm Reply at 8.  Chisholm's Village argues that,"[e]ven a cursory investigation would have revealed that the [remedial investigation and feasibility study (RI/FS)] costs identified in the underlying complaint were incurred well before the first U.S. EPA administrative order requiring the underlying plaintiffs develop and implement the remedy identified by the RI/FS," and notes that "the costs for the RI/FS were primarily incurred by the U.S. EPA between 2002 and 2006, while the first U.S. EPA administrative order was not entered until 2009."  Chisholm Reply at 8. This argument does not explain, however, how the pollution exclusion's words, "any . . . [r]equest, demand or order," refer only to a request, demand, or order that the EPA makes.  On its face, the pollution exclusion's second subsection excludes "[a]ny loss, cost, or expense arising out of any . . . [r]equest, demand or order that any insured or others test for, monitor, clean up, remove . . . or

in any way respond to, or assess the effects of pollutants." Fidelity Policy at 29. This exclusion is very broad and comprehensive. The pollution exclusion does not suggest that any particular entity or organization need make the request, demand or order. The pollution exclusion does not state that the federal government must make the demand, request or order.

In the CERCLA Complaint, Las Cruces and Doña Ana County's factual background asserts that, "[i]n 1993, the New Mexico Environment Department Drinking Water Bureau ("NMEDDWB") detected PCE in water samples collected from two Las Cruces municipal water supply wells," and, "[b]y 2001, four City wells were found to be contaminated by PCE at levels above the [Maximum Contaminant Level ('MCL')]." CERCLA Complaint ¶ 37, at 13. It is not clear whether the NMEDDWB detected PCE as a result of routine testing, or whether another organization, individual, or entity requested or ordered that testing. The CERCLA Complaint next states that, "[i]n 2001, EPA added the Site to the National Priorities List under CERCLA," then, in 2003, the EPA "conducted field investigations at the Site." CERCLA Complaint ¶¶ 38-39, at 9. It is not clear from the facts in the CERCLA Complaint what happened between 1993 -- when NMEDDWB first detected the PCEs -- and 2001, when the EPA became involved. Despite the paucity of facts from this time period, however, the Court finds it hard to believe that no person made or issued any "request, demand or order" to test, monitor or clean up the pollutants before the EPA's official order in 2009, or, indeed, that no "request, demand or order" was made before "any loss, cost or expense" accrued. Fidelity Policy at 29. Even if the NMEDDWB's detection of PCEs in 1993 arose from its own routine testing -- and not from a request by a member of the public, by Las Cruces, or by some other concerned entity, for example -- this discovery must have triggered some "request, demand or order that" someone or some other entity act to test, assess,

monitor or "in any way respond[] to" the "effects of pollutants." Fidelity Policy at 29.

Chisholm's Village urges the Court to follow the California Court of Appeal's narrow construction of the pollution exclusion in Charles E. Thomas Co. v. Transamerica Insurance Group, 62 Cal. App. 4th 379, 72 Cal. Rptr. 2d 577. See Tr. at 23:7-22 (Hnasko). In that case, the California Court of Appeal rejected the insurance company's argument that "the pollution exclusion should be read as excluding all losses arising out of the pollution not merely all losses arising out of requests, demands or orders to take certain actions with respect to the pollution." Charles E. Thomas Co. v. Transamerica Ins. Grp., 62 Cal. App. 4th at 383, 72 Cal. Rptr. 2d at 580. In that case, the Court of Appeal of California pinpointed the "request, order or demand" as a Los Angeles Fire Department order, and held that the Los Angeles Fire Department did not order some activities which the insured performed, and so, the pollution exclusion provision did not exclude all losses at issue. See 62 Cal. App. 4th at 383, 72 Cal. Rptr. 2d at 579-80. Unlike the policy in Charles E. Thomas Co. v. Transamerica Insurance Group, however, the exclusion provision at issue here states, "*any* . . . request, demand, or order," and is not limited to a governmental or agency request, demand or order. Fidelity Policy at 29. Furthermore, unlike the discrete and relatively recent event at issue in Charles E. Thomas Co. v. Transamerica Insurance Group, the events at issue here started in 1993, when the NMEDDWB tested the water and found contaminants.

Although "'the duty to defend does not arise from the complaint on its face,'" the duty "'may arise if the insurer is notified of factual contentions or if the insurer could have discovered facts, through reasonable investigation, implicating a duty to defend.'" Dove v. State Farm Fire & Cas. Co., 2017-NMCA-051, ¶ 11, 399 P.3d at 404 (quoting Sw Steel Coil, Inc. v. Redwood Fire

& Cas. Ins. Co., 2006-NMCA-151, ¶ 14, 150 N.M. at 726, 148 P.3d at 812).[30]  To determine whether Fidelity Insurance, through reasonable investigation, could have uncovered facts that implicate a duty to defend, it must be noted what those facts would be, as they relate to subsection f(2)(a).  Hypothetically speaking, if any entity accrued costs associated with the pollution's testing or clean up before any request, demand, or order was made for testing or clean-up, there then would be some loss, cost, or expense that did not arise out of any request, demand or order.  In that scenario, the pollution exclusion's second subsection would not apply, and Fidelity Insurance would have a duty to defend Chisholm's Village.  Nevertheless, because the Court predicts that New Mexico would follow Indiana's approach and not the situational approach, the Court predicts that the Supreme Court of New Mexico would find the pollution exclusion clause ambiguous and construe it in the insured's favor.  See Analysis § I(C), infra at 89-98; Analysis § II(A), infra at 98-108.

### 3. If New Mexico Applies the Situational Approach, Cincinnati Insurance Still Has a Duty to Defend Chisholm's Village.

Even if New Mexico applies the situational approach, Cincinnati Insurance has a duty to defend Chisholm's Village, because Cincinnati Policy's pollution exclusion has additional language that the Fidelity Policy does not have: an alternate liability provision.[31]  See Cincinnati

---

[30]The Court predicts that the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico's statement in Dove v. State Farm Fire and Casualty Co., 2017-NMCA-051, 399 P.3d 400, because this statement is based upon G & G Servs. v. Agora Syndicate, Inc., 2000-NMCA-003, 128 N.M. 434, 993 P.2d 751, which the Supreme Court of New Mexico cited favorably in Hovet v. Allstate Ins. Co., 2004-NMSC-010, ¶ 21, 135 N.M. 397, 403, 89 P.3d 69, 75.

[31]The Cincinnati Policy has additional, different language, to the Fidelity Policy, but that does not change the outcome.  Cincinnati Insurance's pollution exclusion reads:

_____

This insurance does not apply to:

. . . .

>    (2)    Any loss, cost or expense arising out of any:
>
>>        (a)    Request, demand, order *or statutory or regulatory*
>>               *requirement* that any insured or others test for, monitor,
>>               clean up, remove, contain, treat, detoxify or neutralize,    or
>>               in any way respond to, or assess the effects of "pollutants"
>>               . . . .

Cincinnati Policy at 43, 45 (emphasis added). This wording is slightly different to a similar provision in the Fidelity Policy, because it includes the words, "or statutory or regulatory requirement." Cincinnati Policy at 45. This provision could be interpreted differently than the equivalent provision in the Fidelity Policy, because the words "statutory or regulatory requirement" could arguably give the preceding words "[r]equest, demand, [or] order" an additional, connected meaning. Cincinnati Policy at 45. See Rocky Mountain Oil & Gas Ass'n v. Watt, 696 F.2d 734, 749 (10th Cir. 1982)("It is a familiar principle of statutory construction that words grouped in a list should be given related meaning."); Jeffrey W. Stempel, Insurance Policy as Statute, 41 McGeorge L. Rev. 203, 206-07 (2010)(arguing for the application of the canons of statutory construction to insurance policies, particularly where the Insurance Services Office has drafted the policy in a process similar to the legislative process). The Court predicts, however, that the Supreme Court of New Mexico would not apply the canons of statutory construction to insurance policies, because the Supreme Court of New Mexico has held on several occasions that insurance policies are to be construed according to the same principles that govern the interpretation of contracts. See, e.g., Ponder v. State Farm Mut. Auto. Ins. Co., 2000-NMSC-033, ¶ 11, 129 N.M. 698, 702, 12 P.3d 960, 964 ("We resolve questions regarding insurance policies by interpreting their terms and provisions in accordance with the 'same principles which govern the interpretation of all contracts.'" (quoting Rummel v. Lexington Ins. Co., 1997-NMSC-041, ¶ 18, 945 P.2d at 976)); Rummel v. Lexington Ins. Co., 1997-NMSC-041, ¶ 18, 945 P.2d at 976 ("It is well settled that, absent a statute to the contrary, 'insurance contracts are construed by the same principles which govern the interpretation of all contracts.'" (quoting 2 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 21:1 (3d ed. 1996), and citing Jaramillo v. Providence Washington Ins. Co., 1994-NMSC-015, 117 N.M. 337, 340, 871 P.2 1343, 1346)). The Court rejects, therefore, this reading of the Cincinnati Policy's pollution exclusion. As the Court discusses above with regard to the Fidelity Policy, see Analysis § I(B)(2), supra at 78-85, the pollution exclusion's words, "any . . . [r]equest, demand [or] order," do not, by their plain terms, refer only to a request, demand, or order that the EPA or other government entity makes. Cincinnati Policy at 45. Because the Cincinnati Policy separates "[r]equest, demand, order" from "statutory or regulatory requirement" with the word "or," the items in this list are disjunctive, and provide separate bases for the exclusion of coverage. Cincinnati Policy at 45. "Any loss, cost or expense arising out of any . . . [r]equest, demand, order" is, therefore, a separate basis for the

Policy at 45.  The Cincinnati Policy's alternative liability provision states: "However, Paragraphs (2)(a) and (b) do not apply to liability for damages because of 'property damage' that the insured would have in the absence of such a request, demand, order or statutory or regulatory requirement, or such claim or 'suit' by or on behalf of a governmental authority."  Cincinnati Policy at 45 (no citation for quotation).  Chisholm's Village argues that this alternative liability provision defeats the pollution exclusion, because the "undefined hazardous substances released on Chisholm's property . . . potentially giv[e] rise to common law liability for nuisance or trespass."  Chisholm Response at 14.  Cincinnati Insurance does not address this argument in its Reply.  See Cincinnati Reply/Response at 1-12.  Cincinnati Insurance did not address this argument at the hearing.  At the hearing, Chisholm's Village argued that, "[u]nder New Mexico law, the Public Nuisance Statute, Section 30-8-1, it's a public nuisance to pollute groundwater," and asserted that "the Environment Department itself typically takes that position, and asserts common law claims."  Tr. at 26:4-6 (Hnasko).

N.M.S.A § 30-8-1 provides:

> A public nuisance consists of knowingly creating, performing or maintaining anything affecting any number of citizens without lawful authority which is either:
>
> A.       injurious to public health, safety, morals or welfare; or

---

exclusion of coverage than "[a]ny loss, cost or expense arising out of any . . . statutory or regulatory requirement."  Cincinnati Policy at 45.  Because the Cincinnati Policy contains the same broad and comprehensive provision as the Fidelity Policy, which excludes coverage for "[a]ny loss, cost, or expense arising out of any . . . [r]equest, demand [or] order . . . that any insured or others test for, monitor, clean up, remove . . . or in any way respond to, or assess the effects of, 'pollutants,'" this subsection in the Cincinnati Policy excludes Chisholm's Village's claims under the situational approach, for the same reason that the equivalent subsection in the Fidelity Policy excludes Chisholm's Village's claims.  Cincinnati Policy at 45.  See Fidelity Policy at 29; Analysis § I(B)(2), supra at 78-85.  Because this provision clearly excludes coverage under the situational approach, the duty to defend does not arise from this provision.

B.     interferes with the exercise and enjoyment of public rights, including the right to use public property.

Whoever commits a public nuisance for which the act or penalty is not otherwise prescribed by law is guilty of a petty misdemeanor.

N.M.S.A. § 30-8-1.  Even if the New Mexico Environment Department did not bring nuisance claims against Chisholm's Village or its predecessors, a potential private party nuisance claim against Chisholm's Village for the discharge of PCEs into the soil and groundwater would create the potential for "liability for damages because of 'property damage' that the insured would have in the absence of such a request, demand, order or statutory or regulatory requirement, or such claim or 'suit' by or on behalf of a governmental authority."  Cincinnati Policy at 45.  Although New Mexico's public nuisance statute is not mentioned within the CERCLA Complaint's four corners, there is no factual -- as opposed to legal -- investigation needed for Cincinnati Insurance to determine that an alternative basis exists to hold Chisholm's Village liable.  Consequently, there is a potential for coverage which implicates the duty to defend.  Because the Cincinnati Policy's alternative liability provision creates the potential for coverage, under even the situational approach, Cincinnati Insurance has a duty to defend Chisholm's Village in the CERCLA lawsuit.

C. **THE COURT PREDICTS THAT THE SUPREME COURT OF NEW MEXICO WOULD FOLLOW INDIANA'S APPROACH, BECAUSE INDIANA'S APPROACH IS THE MOST PROTECTIVE OF THE INSURED.**

Despite the majority of cases holding that the pollution exclusion is unambiguous -- either in all instances or when applied in the traditional environmental pollution context -- the Court predicts that New Mexico would follow Indiana's unique approach, because it is the least tolerant of contractual ambiguity and the most protective of the insured. Instead of applying a literal approach barring almost all coverage or a situational approach requiring case-by-case analysis, Indiana applies "basic contract principles" requiring that "the insurer . . . specify what falls within its pollution exclusion." Flexdar, 964 N.E.2d at 851. The genesis of Indiana's approach is Kiger, in which the Indiana Department of Environmental Management brought claims against a gas station owner, Kiger, because the gas station's underground gasoline storage tanks had leaked petroleum into the town's sewer lines, see Kiger, 662 N.E.2d at 946. The Supreme Court of Indiana noted:

> [That] an insurance company would sell a "garage policy" to a gas station when that policy specifically excluded the major source of potential liability is, to say the least, strange. It remains true, however, that if the policy clearly excludes such coverage, that contract will be enforced.

662 N.E.2d at 948 (no citation for quotation). The Supreme Court of Indiana reasoned that,

> since the term "pollutant" does not obviously include gasoline and, accordingly, is ambiguous, we once again must construe the language against the insurer who drafted it. Appellant claims that in common parlance gasoline is sometimes referred to as a pollutant. That may be correct, but the ambiguity remains. If a garage policy is intended to exclude coverage for damage caused by the leakage of gasoline, the language of the contract must be explicit. This follows the more general rule of construing exclusions strictly against the insurer and in favor of coverage.

Kiger, 662 N.E.2d at 949.

The Supreme Court of Indiana affirmed <u>Kiger</u>'s holding three more times: in <u>Seymour</u> <u>Mfg. Co. v. Commercial Union Ins. Co.</u>, 665 N.E.2d 891 (Ind. 1996)("<u>Seymour</u>"), <u>Freidline v.</u> <u>Shelby Ins. Co.</u>, 774 N.E. 2d 37 (Ind. 2002)("<u>Freidline</u>"), and <u>Flexdar</u>, 964 N.E. 2d at 845.  In <u>Seymour</u>, the Supreme Court of Indiana concluded that the insurer had a duty to defend the insured "against claims arising from [the insured's] alleged mishandling of [solid] waste materials," <u>Seymour</u>, 665 N.E.2d at 891, and based this ruling on <u>Kiger</u>'s precedent, <u>see</u> <u>Flexdar</u>, 964 N.E.2d. at 849 ("Recognizing that <u>Kiger</u> found the word 'pollutant' to be ambiguous, we again construed this language against the insurer and found a duty to defend." (citing <u>Seymour</u>, 665 N.E.2d at 892)).

In <u>Freidline</u>, the Supreme Court of Indiana once again affirmed its contractual specificity requirement:

> In <u>Freidline</u>, owners of a commercial building claimed coverage after toxic carpet glue fumes released during the installation of new carpet injured employees who worked in the building. [<u>Freidline</u>, 774 N.E. 2d] at 39.  Because carpet glue fumes were not specifically included in the policy's definition of pollutants, the Court of Appeals found the exclusion ambiguous and construed it against the insurer so as not to exclude the claimed coverage.  <u>Id</u>. at 40.  We unanimously "agree[d] and summarily affirm[ed] the Court of Appeals on this point."  <u>Id</u>.  We also rejected the insurer's attempt to distinguish <u>Kiger</u> and <u>Seymour</u> on the basis that they involved traditional environmental cleanup for businesses regularly handling toxic substances.  <u>See id</u>. at 42 ("[W]e refute these contentions by summarily affirming the Court of Appeals on the pollution exclusion coverage issue . . . .").

<u>Flexdar</u>, 964 N.E.2d at 849-50 (quoting and citing <u>Freidline</u>, 774 N.E. 2d at 39-40, 42).

In <u>Flexdar</u>, the Supreme Court of Indiana recounted and affirmed its line of precedent requiring insurers to draft pollution exclusions with specificity.  <u>See</u> <u>Flexdar</u>, 964 N.E. 2d at 852 ("Indiana decisions have been consistent in recognizing the requirement that language of a pollution exclusion be explicit.").  <u>Flexdar</u> concerned a "manufacturer of rubber stamps and

- 90 -

printing plates" -- Flexdar -- whose "manufacturing process used a chemical solvent called trichloroethylene ('TCE')."  964 N.E. 2d at 847.  "Flexdar discovered that TCE was present in the soil and groundwater both on and off [its manufacturing] Site" and the "Indiana Department of Environmental Management ('IDEM') informed Flexdar that Flexdar would be liable for the costs of cleanup."  964 N.E. 2d at 847.  Flexdar had an insurance policy through State Auto which contained an "Indiana 'business operations' endorsement . . . provid[ing] in pertinent part, 'This Pollution Exclusion applies whether or not such irritant or contaminant has any function in your business, operations, premises, site or location.'"  964 N.E. 2d at 847 (quoting record).  Despite this endorsement -- which the insurer argued should be read to exclude TCE -- the Supreme Court of Indiana held that "the language in State Auto's policy is [not] sufficiently unambiguous to identify TCE as a pollutant," because the definition of pollutants in the policy did not list TCE as a pollutant.  964 N.E.2d at 851.  The Supreme Court of Indiana reasoned that, because insurance companies are the drafters of insurance policies, "[b]y more careful drafting [the insurer] has the ability to resolve any question of ambiguity."  964 N.E.2d at 851-52.  The Supreme Court of Indiana noted that State Auto had since "in fact . . . done so," because it revised the policy by adding an Indiana-specific endorsement that "more specifically defined the term 'pollutants'" to include "tetrachloroethylene [(PCE)], perchloroethylene (PERC), trichloroethylene (TCE), methylene chloroform, and other dry cleaning chemicals."  Flexdar, 964 N.E.2d at 851-52.

Federal courts sitting in Indiana and the Court of Appeals for the Seventh Circuit have recognized Indiana's approach.[32]  See, e.g., Visteon Corp. v. Nat'l Union Fire Ins. Co. of

---

[32]A Court of Appeals of Missouri attempted to follow the same approach as Indiana, but the Supreme Court of Missouri did not adopt it, and the Court of Appeals for the Eighth Circuit recognized that Missouri did not adopt Indiana's approach.  See Hiland Partners GP Holdings,

LLC v. Nat'l Union Fire Ins. Co., 847 F.3d 594, 600 (8th Cir. 2017)("Hocker Oil [Co. v. Barker-Phillips-Jackson, Inc., 997 S.W.2d 510 (Mo. Ct. App. 1999)] is not persuasive because it 'has been almost uniformly rejected by appellate courts in other jurisdictions, and has not since been cited or referred to favorably by the Supreme Court of Missouri.'"  (quoting Doe Run Res. Corp. v. Lexington Ins. Co., 719 F.3d 868, 875 (8th Cir. 2013)).  In Hocker Oil Co. v. Barker-Phillips-Jackson, Inc., Hocker Oil, the owner of gas stations, sought coverage from its insurer after "a drain plug on a gasoline storage tank . . . failed," releasing "[a]pproximately 2,000 gallons of gasoline . . . into the ground." 997 S.W. 2d at 512.  The gasoline "migrated onto property . . . adjacent to" the gas station; the property's owners sued Hocker Oil for personal injuries and property damage caused by the leak.  997 S.W. 2d at 512.  Applying "Missouri's criteria for determining whether an insurance policy's language is plain and unambiguous, [which] requires ascertainment of what the layman who acquired the policy of insurance would ordinarily have understood," the Court of Appeals for the Southern District of Missouri affirmed the trial court's holding that the pollution exclusion was ambiguous. 997 S.W. 2d at 518.  It reasoned:

> Hocker's suggestion that it, as a layperson, would not have paid a substantial premium for a liability policy that would not afford coverage for damages resulting from gasoline leaks from its storage tanks is not unreasonable. . . . Gasoline is not identified, with particularity, as being a "pollutant" for purposes of the pollution exclusion in the insurance policy Hocker acquired from Ranger. Hocker could have reasonably concluded that gasoline was not deemed a pollutant for purposes of the exclusion since it was not specifically identified as such. As observed in *Kiger,* it would be an oddity for an insurance company to sell a liability policy to a gas station that would specifically exclude that insured's major source of liability. *See* 662 N.E.2d at 948.

> Hocker is in the business of transporting, selling and storing gasoline on a daily basis.  Gasoline is not a pollutant in its eyes.  Gasoline is the product it sells. Gasoline belongs in the environment in which Hocker routinely works. As acknowledged in *Crescent, supra,* in that environment, gasoline is not a pollutant. Hocker was entitled to characterize gasoline in a manner consistent with its daily activities absent specific policy language to the contrary.  Ranger's failure to identify "gasoline" as a pollutant in its pollution exclusion resulted in uncertainty and indistinctness. The policy was, therefore, ambiguous as to whether gasoline was a pollutant for purposes of the exclusion. Being ambiguous, the policy provision is construed against Ranger.

Hocker Oil Co. v. Barker-Phillips-Jackson, Inc., 997 S.W.2d at 518.

The Eighth Circuit dismisses Hocker Oil Co. v. Barker-Phillips-Jackson, Inc.: "Hocker Oil is not persuasive because it 'has been almost uniformly rejected by appellate courts in other jurisdictions, and has not since been cited or referred to favorably by the Supreme Court of Missouri.'"  Hiland Partners GP Holdings, LLC v. Nat'l Union Fire Ins. Co., 847 F.3d 594, 600

<u>Pittsburgh</u>, 777 F.3d 415, 417 (7th Cir. 2015)("Visteon wanted Indiana law to apply because Indiana does not enforce standard pollution-exclusion clauses, and the insurance policy included as we noted such a clause; Indiana requires that for such a clause to be enforceable the policy must 'specify what falls within its pollution exclusion.'" (quoting <u>Flexdar</u>, 964 N.E.2d at 851)); <u>St. Paul Fire & Marine Insurance Co. v. City of Kokomo</u>, No. CIV 13-1573, 2015 U.S. Dist. LEXIS 82465 JMS/DML (S.D. Ind. June 25, 2015)(Magnus-Stinson, J.).   In <u>St. Paul Fire & Marine Insurance Co. v. City of Kokomo</u>, the Honorable Jane Magnus-Stinson, United States District Judge for the Southern District of Indiana, applied Indiana law to decide a motion for summary judgment on the duty to defend and indemnify, where the insured City faced liability for the clean-up of hazardous substances leaked from a municipal landfill and incinerator.   <u>See</u> 2015 U.S. Dist. LEXIS at *5-7. The EPA named the City as a responsible party, and the City entered into a Settlement Agreement with the EPA.   <u>See</u> 2015 U.S. Dist. LEXIS at *6-7.   The City sought coverage from its insurer, Travelers Indemnity Company, which agreed to defend under a reservation of rights.   <u>See</u> 2015 U.S. Dist. LEXIS at *7.   Judge Magnus-Stinson analyzed three sets of policies, each with a

---

(8th Cir. 2017)(quoting <u>Doe Run Res. Corp. v. Lexington Ins. Co.</u>, 719 F.3d 868, 875 (8th Cir. 2013)).  The Eighth Circuit explains that,

> less than four months after the decision in *Hocker Oil*, a panel of the same division of the Missouri Court of Appeals that included two of the three judges who unanimously decided *Hocker Oil* unanimously decided *City of Sparta*.  In that case, the insured City provided wastewater treatment facility sludge to a farmer who applied it as fertilizer, and toxic substances in the sludge migrated to a neighboring dairy farm, allegedly damaging the neighbor's herd.  997 S.W.2d at 546.  Though the sludge was obviously a commercially valuable byproduct of the City's wastewater treatment operations, the court held, without even citing *Hocker*, that a virtually identical absolute pollution exclusion unambiguously barred coverage and the duty to defend[.]

<u>Doe Run Res. Corp. v. Lexington Ins. Co.</u>, 719 F.3d 868, 875 (8th Cir. 2013).

different variation of the absolute pollution exclusion.  See 2015 U.S. Dist. LEXIS at *16-42.

Judge Magnus-Stinson concluded that Travelers Indemnity is not entitled to summary judgment

under the first set of policies, because the definition of "pollutant" in the first set of policies "is

identical to the definition that the Indiana Supreme Court found to be ambiguous in *Kiger*."  St.

Paul Fire & Marine Insurance Co. v. City of Kokomo, 2015 U.S. Dist. LEXIS at *21.  The second

set of policies includes a definition of "pollutants" that incorporates by reference several federal

and Indiana environmental, health protection and safety laws, including CERCLA.  See 2015 U.S.

Dist. LEXIS at *23-25.  Judge Magnus-Stinson concluded that "[t]his general incorporation of

state and federal laws is insufficient to comply with Indiana's stringent standard that an insurance

policy 'specify what falls within its pollution exclusion'" and concluded that the pollution

exclusion in the second set of policies was ambiguous.  2015 U.S. Dist. LEXIS at *32-33 (quoting

Flexdar, 964 N.E. 2d at 851-52).  The parties sought summary judgment on the duty to defend

under the third -- and most recent -- set of policies.  See 2015 U.S. Dist. LEXIS at *34-42.  Judge

Magnus-Stinson concluded that, although the pollution exclusion's definition of pollutants listed

many of the substances at issue in the EPA's order with sufficient specificity, it did not list with

specificity all of the possible "inorganic contaminants" for which the EPA ordered the City to test

-- namely, silver and selenium.  2015 U.S. Dist. LEXIS at *40.   The City argued, and Judge

Magnus-Stinson agreed, that, "even though it is undisputed that silver and selenium are types of

inorganic contaminants, an ordinary policyholder of average intelligence would not know that

from the 2011-2013 Policies."  2015 U.S. Dist. LEXIS at *41.  Consequently, Judge Magnus-

Stinson concluded that the third set of policies "is not sufficiently specific such that Travelers has

no duty to defend the City as a matter of law for testing for the substances silver and selenium"

and denied Travelers Indemnity's request for summary judgment on the duty to defend.  2015 U.S. Dist. LEXIS at *41-42.

There is sufficient similarity between the Supreme Court of Indiana's approach to ambiguity in Kiger, Seymour, and Flexdar, and the Supreme Court of New Mexico's approach in United Nuclear, for the Court to predict that New Mexico would construe the absolute -- as well as the qualified -- pollution exclusion the same way as Indiana has construed those exclusions.  In United Nuclear, the Supreme Court of New Mexico applies a similar ambiguity analysis to the "sudden and accidental" clause of the qualified pollution exclusion as the Supreme Court of Indiana does in Kiger.  United Nuclear, 2012-NMSC-032, ¶ 1, 285 P.3d at 646.  As a threshold matter, the Supreme Court of New Mexico notes that New Mexico has "'abandon[ed] reliance only on the four-corners approach,'" and can "'consider extrinsic evidence in determining whether an ambiguity exists in the first instance, or to resolve any ambiguities that a court may discover.'" United Nuclear, 2012-NMSC-032, ¶ 13, 285 P.3d at 648 (quoting Ponder v. State Farm Mut. Auto. Ins. Co., 2000-NMSC-033, ¶ 13, 129 N.M. 698, 703, 12 P.3d 960, 965).  As part of its analysis, the Supreme Court of New Mexico examines the insurance industry's drafting history of the pollution exclusion and applied similar reasoning as the Kiger court: "Although a review of the origins of the pollution exclusion does not by itself determine ambiguity, that history provides another indication that the word 'sudden' in the phrase 'sudden and accidental' did not then, and does not now, bear a single obvious meaning."  United Nuclear, 2012-NMSC-032, ¶ 37, 285 P.3d at 656.  As in United Nuclear, part of the Kiger court's reasoning relies on extrinsic information about the insurance industry's understanding of the term "sudden":

> [T]he insurance industry's own understanding of ["sudden and accidental"] indicates that "sudden" can be understood to mean "unexpected."[] . . . That this

> interpretation was advanced simply demonstrates the presence of the ambiguity that
> requires this Court to construe the insurance policy in favor of the insured and
> against the insurer who drafted it.

Kiger, 662 N.E.2d at 948 (no citation for quotations).  Unlike the Supreme Court of Indiana in

Kiger, the Supreme Court of New Mexico did not reach the issue whether the term "pollutants" is

ambiguous; however, that question was not raised on appeal by the parties in United Nuclear.  See

United Nuclear Corp. v. Allstate Ins. Co., 2012-NMSC-032, ¶ 1, 285 P.3d at 646 ("This appeal

turns on our construction of a single word, 'sudden,' within a pollution exclusion clause . . . .");

Kiger, 662 N.E.2d at 946 ("This Court granted transfer in order to address the following issues:

. . . whether the pollution exclusion clauses . . . which do not specifically list gasoline as a

pollutant, preclude coverage for leakage from underground gasoline storage tanks.").

Similar to Indiana, New Mexico construes ambiguities in the insured's favor, particularly

when those ambiguities are in policy exclusions or limitations.  See United Nuclear, 2012-NMSC-

032, ¶ 38, 285 P.3d at 656 (stating that, "[i]n recognizing the inherent imbalance of the two parties

to an insurance contract . . . we must resolve such ambiguities against the insurer," and "'[w]here

exceptions to or limitations upon coverage are concerned, this principle applies with added force'"

(quoting Queen City Farms v. Cent. Nat'l Ins. Co., 126 Wash. 2d 50, 83, 882 P.2d 703, 721

(1994))); Flexdar, 964 N.E.2d at 850 ("[O]ur courts have 'consistently construed the pollution

exclusion against insurance companies.'" (quoting Monroe Guar. Ins. Co. v. Magwerks Corp., 829

N.E.2d 968, 975 (Ind. 2005))).  See also Appleman on Insurance Law & Practice Archive § 7.2

(2nd ed. 2011)("It has even been held that since exclusions are designed to limit or avoid liability,

they will be construed more strictly than coverage clauses and must be construed in favor of a

finding of coverage.").

The Supreme Court of New Mexico has been proactive in protecting the insured's reasonable expectations in the area of motorist insurance; for example, it has required insurance companies to obtain from the insured a written rejection of uninsured/underinsured motorist ("UM/UIM") coverage equal to liability limits, see Jordan v. Allstate Ins. Co., 2010-NMSC-051, ¶ 2, 149 N.M. 162, 165, 245 P.3d 1214, 1217 ("[A] rejection of UM/UIM coverage equal to the liability limits in an automobile insurance policy must be made in writing and must be made a part of the insurance policy that is delivered to the insured."), and it has required written rejections of "stacking" to protect the insured from contractual ambiguity, see Montano v. Allstate Indem. Co., 2004-NMSC-020, ¶ 1, 135 N.M. 681, 682, 92 P.3d 1255, 1256 ("Montano")(holding that insurance companies must obtain written rejections of stacking in order to limit their liability, thus "ensur[ing] that the insured's reasonable expectations are met and that an insured gets what he or she pays for and no more"). In Montano, the Supreme Court of New Mexico rejected as unworkable its case-by-case ambiguity analysis for stacking provisions: "Although we have declined to . . . declare anti-stacking provisions void as against public policy, the facts of this case convince us that our traditional case-by-case ambiguity analysis has proved unworkable." 2004-NMSC-020, ¶ 17, 135 N.M. at 686, 92 P.3d at 1260. Although Montano concerns a different area of insurance law, a judicially created doctrine rather than an industry-drafted provision, and examined only the Supreme Court of New Mexico's own precedents, its rationale is instructive here. The Court predicts that the Supreme Court of New Mexico, in looking at the line of absolute pollution exclusion cases from other jurisdictions, would reach the same conclusion as it did in Montano, namely, that a case-by-case ambiguity analysis of the absolute pollution exclusion is unworkable, because it does not achieve the twin goals of ensuring that "the insured's reasonable

expectations are met," and that "an insured gets what he or she pays for and no more."  Montano, 2004-NMSC-020, ¶ 1, 135 N.M. at 682, 92 P.3d at 1256.  In charting a new course, the Court predicts that New Mexico would follow Indiana, even though this approach makes more work for insurance companies in drafting policies that are tailored either to meet the insured's specific needs or to exclude the insured's specific liabilities.  See United Nuclear, 2012-NMSC-032, ¶ 28, 285 P.3d at 652-53 ("New Mexico's public policy of protecting the reasonable expectations of insureds . . . should take precedence over rescuing an insurer from redundancies in its own policy.").

## II.   APPLYING INDIANA'S APPROACH TO THIS CASE, THE COURT CONCLUDES THAT FIDELITY INSURANCE AND CINCINNATI INSURANCE HAVE A DUTY TO DEFEND CHISHOLM'S VILLAGE.

The Court predicts that, in applying Indiana's approach, the Supreme Court of New Mexico would find the absolute pollution exclusion in both the Fidelity Policy and the Cincinnati Policy to be inherently ambiguous.  First, the Fidelity Policy and Cincinnati Policy are inherently ambiguous, because both policies include definitions of "pollutants" that can be read to exclude coverage for almost anything.  Second, the Fidelity Policy and Cincinnati Policy are ambiguous as applied to this case's facts, because they do not list with specificity all the hazardous substances that the EPA has found, or might find in the future, at the Griggs & Walnut Superfund Site. Third, the Cincinnati Policy's alternate liability provision creates another basis for liability, and thus triggers the duty to defend.

### A.   THE ABSOLUTE POLLUTION EXCLUSION IN BOTH POLICIES IS INHERENTLY AMBIGUOUS, AND NEW MEXICO CONSTRUES AMBIGUITY IN THE INSURED'S FAVOR.

The absolute pollution exclusion in both the Fidelity Policy and the Cincinnati Policy is inherently ambiguous; consequently, because New Mexico construes ambiguities -- particularly in

a policy exclusion -- in the insured's favor, there is the potential for coverage under both the Fidelity Policy and Cincinnati Policy, creating a duty for both insurers to defend Chisholm's Village.  In disputes stemming from insurance contracts, the "duty to defend arises out of the nature of the allegations in the complaint," <u>Miller v. Triad Adoption & Counseling Servs., Inc.</u>, 2003-NMCA-055, ¶ 9, 133 N.M. at 548, 65 P.3d at 1103 (citing <u>Bernalillo Cnty. Deputy Sheriff's Ass'n v. Cnty. of Bernalillo</u>, 1992-NMSC-065, ¶ 4, 114 N.M. 695, 697, 845 P.2d 789, 791), and is determined "by comparing the factual allegations in the complaint with the insurance policy," <u>Lopez v. N.M. Pub. Sch. Ins. Auth.</u>, 1994-NMSC-017, ¶ 8, 117 N.M. at 209, 870 P.2d at 747.  If a complaint "states facts that bring the case within the coverage of the policy," then the duty to defend is triggered.  <u>Bernalillo Cnty. Deputy Sheriffs Ass'n v. Cnty. of Bernalillo</u>, 1992-NMSC-065, ¶ 8, 114 N.M. at 697, 845 P.2d at 791.  In other words, the Court must determine "whether there was any potential that the claim in the primary action was covered . . . or whether the claim clearly fell outside of the policy's coverage." <u>Dove v. State Farm Fire & Cas. Co.</u>, 2017-NMCA-051, ¶ 15, 399 P.3d at 406.  "If there is any doubt whether the claim was covered, an insurer who refused to defend has breached its duty [to defend]." <u>Dove v. State Farm Fire & Cas. Co.</u>, 2017-NMCA-051, ¶ 15, 399 P.3d at 406 (alterations added).  Furthermore,

> an insurance company is required to conduct such an investigation into the facts and circumstances underlying the complaint against its insured as is reasonable given the factual information provided by the insured or provided by the circumstances surrounding the claim in order to determine whether it has a duty to defend.

<u>G & G Servs. v. Agora Syndicate, Inc.</u>, 2000-NMCA-003, ¶ 23, 128 N.M. at 440, 993 P.2d at 757.[33]  Nevertheless, "'[i]f the duty to defend does not arise from the complaint on its face, the

---

[33]The Court predicts that the Supreme Court of New Mexico would agree with the Court

duty may arise if the insurer is notified of factual contentions or if the insurer could have discovered facts, through reasonable investigation, implicating a duty to defend.'" Dove v. State Farm Fire & Cas. Co., 2017-NMCA-051, ¶ 11, 399 P.3d at 404 (quoting Sw Steel Coil, Inc. v. Redwood Fire & Cas. Ins. Co., 2006-NMCA-151, ¶ 14, 150 N.M. 720, 726, 148 P.3d 806, 812).

Under New Mexico Law, "insurance contracts are construed by the same principles which govern the interpretation of all contracts." Rummel v. Lexington Ins. Co., 1997-NMSC-041, ¶ 18, 123 N.M. 752, 758, 945 P.2d 970, 976. The question whether a contract contains an ambiguity is a matter of law. See Mark V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 114 N.M. at 781, 845 P.2d at 1235 (citing Levenson v. Mobley, 1987-NMSC-102, ¶ 7, 744 P.2d 174, 176). "If the court determines that the contract is reasonably and fairly susceptible of different constructions, an ambiguity exists." Mark V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 114 N.M. at 781, 845 P.2d at 1235 (citing Vickers v. North Am. Land Dev., Inc., 1980-NMSC-021, ¶ 9, 94 N.M. 65, 68, 607 P.2d 603, 606). "If any provisions appear questionable or ambiguous," New Mexico courts "will first look to whether their meaning and intent is explained by other parts of the policy." Rummel v. Lexington Ins. Co., 1997-NMSC-041, ¶ 20, 123 N.M. at 758, 945 P.2d at 977. "'Ambiguities arise when separate sections of a policy appear to conflict with one another, when the language of a provision is susceptible to more than one meaning, when the structure of the contract is illogical, or when a particular matter of coverage is not explicitly addressed by the policy.'" Battishill v. Farmers All. Ins. Co., 2006-NMSC-004, ¶ 18, 139 N.M. 24, 28, 127 P.3d 1111, 1115 (quoting

of Appeals of New Mexico's conclusion in G & G Servs. v. Agora Syndicate, Inc., 2000-NMCA-003, 128 N.M. 434, 993 P.2d 751, because the Supreme Court of New Mexico cited the Court of Appeals of New Mexico's analysis favorably in Hovet v. Allstate Ins. Co., 2004-NMSC-010, ¶ 21, 135 N.M. 397, 403, 89 P.3d 69, 75.

Rummel v. Lexington Ins. Co., 1997-NMSC-041, ¶ 19, 123 N.M. at 758, 945 P.2d at 976).

When insurance contracts are unambiguous, courts must construe them "'in their usual and ordinary sense,'" Slack v. Robinson, 2003-NMSC-083, ¶ 7, 134 N.M. 6, 9, 71 P.3d 514, 517 (quoting Miller v. Triad Adoption & Counseling Servs., Inc., 2003-NMCA-055, ¶ 8, 133 N.M. at 547, 65 P.3d at 1102), and "enforce [them] as written," Ponder v. State Farm Mut. Auto. Ins. Co., 2000-NMSC-033, ¶ 11, 129 N.M. 698, 702, 12 P.3d 960, 964. If the "evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law." Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 114 N.M. at 781, 845 P.2d at 1235. The Supreme Court of New Mexico recognizes that

> it is the law in New Mexico that "an insurance policy which may reasonably be construed in more than one way should be construed liberally in favor of the insured." Erwin v. United Benefit Life Ins. Co., 70 N.M. 138, 144, 371 P.2d 791, 794-95 (1962). However, that rule "applies only where the language in the policy is ambiguous." Safeco Ins. Co. of Am. v. McKenna, 90 N.M. 516, 520, 565 P.2d 1033, 1037 (1977). "Resort will not be made to a strained construction for the purpose of creating an ambiguity when no ambiguity in fact exists." Id.

Battishill v. Farmers All. Ins. Co., 2006-NMSC-004, ¶ 17, 139 N.M. 24, 28, 127 P.3d 1111, 1115.

At the hearing, and in its Reply brief, Chisholm's Village urged the Court to follow a California Court of Appeal in holding that the term "arising out of" is not as broad as a "but for" causation clause, and should be narrowly construed, because it is in the policy's exclusion provision and not in the coverage provisions. Chisholm Reply at 8 (citing Charles E. Thomas Co. v. Transamerica Ins. Grp., 62 Cal. App. 4th at 383-84, 72 Cal. Rptr. 2d at 580-81). See Tr. at 23:3-10 (Hnasko). The Tenth Circuit has concluded, however, that "New Mexico law applies the same broad definition of 'arising out of' in the exclusion context as in the coverage context." Am. Nat'l Prop. & Cas. Co. v. United Specialty Ins. Co., 592 F. App'x 730, 742 (10th Cir.

2014)(unpublished)(no citation for quotation).  The Tenth Circuit explains: "'[A]rising out of' is not facially ambiguous just because it appears in an exclusion.'"  Am. Nat'l Prop. & Cas. Co. v. United Specialty Ins. Co., 592 F. App'x at 741 (citing Lopez v. N.M. Pub. Sch. Ins. Auth., 1994-NMSC-017, ¶ 7, 117 N.M. at 209, 870 P.2d at 747, and Askew v. Miller Mut. Fire Ins. Co. of Tex., 1974-NMSC-040, 86 N.M. 239, 522 P.2d 574, 575).  The Tenth Circuit reasons that, if "'arising out of' is not facially ambiguous in an exclusion, it presumably has a definition" -- and asserts that the Supreme Court of New Mexico establishes this definition in New Mexico Physicians Mutual Liability Co. v. LaMure, 1993-NMSC 048, 116 N.M. 92, 860 P.2d 734, 736.  Am. Nat'l Prop. & Cas. Co. v. United Specialty Ins. Co., 592 F. App'x at 741.

> In unequivocal language, the *LaMure* court noted that neither the coverage clause nor the exclusion was "ambiguous because they can be reasonably construed in only one way -- liability from 'rendering professional services' is covered unless it *stems* from 'criminal acts.'"  *Id.* at 737 (emphasis added). "Stems" is plainly a broad word of the same ilk as "originating from," "having its origin in," "growing out of," or "flowing from." *See Webster's, supra*, at 2235 (defining "stem," in relevant part, as "to grow out" and "to have or trace one's origin or development"); *Black's, supra*, at 122 (defining "arise" as "[t]o originate; to stem (from)").

Am. Nat'l Prop. & Cas. Co. v. United Specialty Ins. Co., 592 F. App'x at 741 (citing N.M. Physicians Mut. Liab. Co. v. LaMure, 1993-NMSC-048, ¶ 11, 116 N.M. at 95, 860 P.2d at 737). The Tenth Circuit also cites the New Mexico Court of Appeals as "suggest[ing] a broad approach to interpreting 'arising out of' in the context of exclusions." Am. Nat'l Prop. & Cas. Co. v. United Specialty Ins. Co., 592 F. App'x at 741 (citing Baca v. N.M. State Highway Dep't, 1971-NMCA-087, 82 N.M. 689, 486 P.2d 625).  Furthermore, "[t]he general rule of construction giving a narrow interpretation to exclusionary language cannot be utilized to override the clear and unambiguous terms of an exclusion." Grisham v. Allstate Ins. Co., 1999-NMCA-153, ¶ 13, 128 N.M. 340, 343, 992 P.2d 891, 894.  See N.M. Physicians Mut. Liab. Co. v. LaMure, 1993-NMSC 048, ¶ 10, 116

N.M. 92, 95, 860 P.2d 734, 737 ("[T]hat a particular policy contains a broad coverage provision followed by a specific coverage exclusion does not automatically render the policy ambiguous or invalidate the exclusion[,] . . . as long as the exclusion is not so broad or nebulous that it swallows and effectively nullifies a broad insuring clause.").  Although the Court construes "arising out of," Fidelity Policy at 29; Cincinnati Policy at 44, no more narrowly because that language is in an exclusionary provision, the Court concludes that the pollution exclusion in both policies is ambiguous, because, read literally, it "effectively nullifies a broad insuring clause," and requires interpretation.  N.M. Physicians Mut. Liab. Co. v. LaMure, 1993-NMSC 048, ¶ 10, 116 N.M. at 95, 860 P.2d at 737; Kiger, 662 N.E. 2d at 948.

<p style="text-align:center"><strong>1.      The Fidelity Policy's Absolute Pollution Exclusion is Ambiguous.</strong></p>

The absolute pollution exclusion in the Fidelity Policy is ambiguous, because its definition of "pollutants" is ambiguous.  Fidelity Policy at 29.  Fidelity Insurance provided commercial general liability insurance coverage to Chisholm's Village and its predecessors between 1994 and 2001.  See Complaint ¶ 26, at 78.  The Fidelity Policy's pollution exclusion provides:

This insurance does not apply to:

. . .

f.      Pollution

(1)     "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

(a)     At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

. . . .

(2)     Any loss, cost or expense arising out of any:

        (a)     Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

        (b)     Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

Fidelity Policy at 27-28.  The Fidelity Policy's definition of "pollutants" states: "Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, petroleum, petroleum products and petroleum by-products, and waste. Waste includes materials to be recycled, reconditioned or reclaimed."  Fidelity Policy at 29.

There are three subsections upon whose basis Fidelity Insurance argues that Chisholm's Village's claims are excluded from coverage: clauses f(1)(a), f(2)(a), and f(2)(b).  Each of these clauses uses the word "pollutants" and, so, each incorporates the Fidelity Policy's definition of "pollutants."  Fidelity Policy at 29.  The Fidelity Policy defines pollutants as "any solid, liquid, gaseous or thermal irritant or contaminant."  Fidelity Policy at 29.  The absolute pollution exclusion excludes from coverage any "[b]odily injury," "property damage" or "loss, cost or expense" arising out of the movement or effect of "any solid, liquid, gaseous or thermal irritant or contaminant."  Fidelity Policy at 28-29.  Under Indiana's approach, the definition of "pollutants" in the policy is ambiguous if it does not list excluded substances with specificity: without that specificity, the pollution exclusion is ambiguous, because it either excludes coverage for almost everything under the literal approach, see Analysis § I(A), supra at 72-75, or requires case-by-case judicial interpretation and analysis to determine coverage under the situational approach, see

Analysis § I(B), supra at 76-88.  This ambiguity infects each of the three subsections of the Fidelity Policy's pollution exclusion.

In construing an identical definition of pollutants in Kiger, the Supreme Court of Indiana notes: "Clearly, this clause cannot be read literally as it would negate virtually all coverage.  For example, if a visitor slips on a grease spill then, since grease is a 'chemical,' there would be no insurance coverage.  Accordingly, this clause requires interpretation." 662 N.E. 2d at 948.  Where a clause requires interpretation, it is "'susceptible to more than one meaning.'"  Battishill v. Farmers All. Ins. Co., 2006-NMSC-004, ¶ 18, 139 N.M. at 28, 127 P.3d at 1115 (quoting Rummel v. Lexington Ins. Co., 1997-NMSC-041, ¶ 19, 123 N.M. at 758, 945 P.2d at 976).  The language of the Fidelity Policy's absolute pollution exclusion "is susceptible to more than one meaning," Battishill v. Farmers All. Ins. Co., 2006-NMSC-004, ¶ 18, 139 N.M. at 28, 127 P.3d at 1115, because, in the context of Chisholm's Village's dry cleaning business, it can be read to exclude personal injury arising from the use of PCE only where PCE is polluting the environment, or it can be read to broadly exclude all coverage arising from personal injury or property damage caused by PCE acting as an "irritant," Fidelity Policy at 29.  Whether PCEs are pollutants under the Fidelity Policy and when they function as irritants is "'a particular matter of coverage [that] is not explicitly addressed by the policy,'" and creates ambiguity which must be interpreted in the insured's favor.  Battishill v. Farmers All. Ins. Co., 2006-NMSC-004, ¶ 18, 139 N.M. at 28, 127 P.3d at 1115 (quoting Rummel v. Lexington Ins. Co., 1997-NMSC-041, ¶ 19, 123 N.M. at 758, 945 P.2d at 976).

   2.      **The Cincinnati Policy's Pollution Exclusion is Ambiguous.**

The Cincinnati Policy contains a slightly different version of the pollution exclusion and a

different definition of pollutants.  <u>See</u> Cincinnati Policy at 43-45, 60.  The Cincinnati Policy

contains a pollution exclusion that provides, in relevant part:

**Exclusions**

This insurance does not apply to:

**Pollution**

    **(1)**    "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape or emission of pollutants:

        (a)    At or from any premises, site or location which is or was at any time owned or occupied by . . . any insured.

        . . . .

    **(2)**    Any loss, cost or expense arising out of any:

        (a)    Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

        (b)    Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

Cincinnati Policy at 43-45.  The Cincinnati Policy's definition of "pollutant" states:

"Pollutant" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, petroleum, petroleum products and petroleum by-products, and waste. Waste includes materials to be recycled, reconditioned or reclaimed.  Pollutants include but are not limited to substances which are generally recognized in industry or government to be harmful or toxic to persons, property or the environment regardless of whether

the injury or damage is caused directly or indirectly by the pollutants and whether:

      a.       The insured is regularly or otherwise engaged in activities
                   which taint or degrade the environment; or

      b.       The insured uses, generates or produces the pollutant.

Cincinnati Policy at 43-45, 60.  The Court's analysis of the Cincinnati Policy's ambiguity is the same as its analysis of the Fidelity Policy, insofar as its language is the same.  See Analysis § II(A)(1), supra at 103-05.  Unlike the Fidelity Policy, the Cincinnati Policy's definition of pollutants has an additional provision stating that the exclusion includes pollutants whether "[t]he insured is regularly or otherwise engaged in activities which taint or degrade the environment; or . . . [t]he insured uses, generates or produces the pollutant."  Cincinnati Policy at 60.  Although this definition attempts to address the Supreme Court of Indiana's concern that an insurance company sell a policy that excludes a business' "major source of potential liability," it does not resolve the concern that the policy excludes loss arising from unspecified, unlisted substances. Kiger, 662 N.E.2d at 948.  Furthermore, although this wording attempts to clarify that a gas station policy will exclude gas under the pollution exclusion, and, perhaps, that a dry cleaning policy will exclude PCEs, it is not explicit enough to be unambiguous under the Supreme Court of Indiana's standard.  The provision is similar to the insurance policy in Flexdar, which contained an "Indiana 'business operations' endorsement . . . provid[ing] in pertinent part, 'This Pollution Exclusion applies whether or not such irritant or contaminant has any function in your business, operations, premises, site or location.'"  Flexdar, 964 N.E. 2d at 847 (quoting record).  Just as the Supreme Court of Indiana held that "the language in State Auto's policy is [not] sufficiently unambiguous to identify TCE as a pollutant," because the definition of pollutants in the policy did not list TCE as a pollutant, 964 N.E.2d at 851, the Court predicts that the Supreme Court of New Mexico would

- 107 -

conclude that the language in the Cincinnati Policy is not sufficiently unambiguous to identify PCE as a pollutant.  As a result, this ambiguity in the definition of pollutants in the Cincinnati Policy affects the entire pollution exclusion, and renders the pollution exclusion ambiguous per se.

### B.   THE ABSOLUTE POLLUTION EXCLUSION IN BOTH POLICIES IS AMBIGUOUS AS APPLIED TO THIS CASE'S FACTS.

Both the Fidelity Policy and Cincinnati Policy are ambiguous as applied to this case's facts, because they do not list with specificity all the hazardous substances that the EPA has or might, in the future, find at the Griggs & Walnut Superfund Site, and for which Chisholm's Village may be liable.  In disputes stemming from insurance contracts, the "duty to defend arises out of the nature of the allegations in the complaint," Miller v. Triad Adoption & Counseling Servs., Inc., 2003-NMCA-055, ¶ 9, 133 N.M. at 548, 65 P.3d at 1103 (citing Bernalillo Cnty. Deputy Sheriff's Ass'n v. Cnty. of Bernalillo, 1992-NMSC-065, ¶ 4, 114 N.M. at 697, 845 P.2d at 791), and is determined "by comparing the factual allegations in the complaint with the insurance policy," Lopez v. N.M. Pub. Sch. Ins. Auth., 1994-NMSC-017, ¶ 8, 117 N.M. at 209, 870 P.2d at 747.  If a complaint "states facts that bring the case within the coverage of the policy," then the duty to defend is triggered.  Bernalillo Cnty. Deputy Sheriffs Ass'n v. Cnty. of Bernalillo, 1992-NMSC-065, ¶ 8, 114 N.M. at 697, 845 P.2d at 791.  In other words, the Court must determine "whether there was any potential that the claim in the primary action was covered . . . or whether the claim clearly fell outside of the policy's coverage."  Dove v. State Farm Fire & Cas. Co., 2017-NMCA-051, ¶ 15, 399 P.3d at 406.  "If there is any doubt whether the claim was covered, an insurer who refused to defend has breached its duty [to defend]."  Dove v. State Farm Fire & Cas. Co., 2017-NMCA-051, ¶ 15, 399 P.3d at 406 (alterations added).  Furthermore,

an insurance company is required to conduct such an investigation into the facts

- 108 -

and circumstances underlying the complaint against its insured as is reasonable given the factual information provided by the insured or provided by the circumstances surrounding the claim in order to determine whether it has a duty to defend.

G & G Servs. v. Agora Syndicate, Inc., 2000-NMCA-003, ¶ 23, 128 N.M. at 440, 993 P.2d at 757.

Here, Las Cruces and Doña Ana County allege causes of action in the CERCLA Complaint for both "cost recovery under CERCLA," CERCLA Complaint ¶¶ 52-63, at 11-13, and "contribution under CERCLA," CERCLA Complaint ¶¶ 64-65, at 13:

> 63.    Pursuant to 42 U.S.C. § 9607(a)(1) and/or -(2), The Lofts, American Linen, Chisolm's Village, Rawson Leasing, Coronado, and Does 1-5 are strictly, jointly, and severally liable to Plaintiffs for the costs Plaintiffs have incurred and will continue to incur in response to the release or threatened release of hazardous substances at the Site, plus interest thereon, at the maximum rate allowed by law, from the date Plaintiffs expended such funds, apart from costs incurred as a result of the claims brought under 42 U.S.C. § 9606(a)[34] and 42 U.S.C. § 9607(a) on behalf of EPA in this litigation.
>
> . . . .
>
> 65.    Pursuant to 42 U.S.C. § 9613(f)(1),[35] The Lofts, American Linen,

---

[34]42 U.S.C. § 9606(a) governs abatement actions, and provides:

Maintenance, jurisdiction, etc. In addition to any other action taken by a State or local government, when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require. The President may also, after notice to the affected State, take other action under this section including, but not limited to, issuing such orders as may be necessary to protect public health and welfare and the environment.

42 U.S.C. § 9606(a).

[35]42 U.S.C. § 9613(f) provides:

Chisolm's Village, Rawson Leasing, Coronado, and Does 1-5 are liable to Plaintiffs for costs Plaintiffs may incur as a result of the claims brought under 42 U.S.C. § 9606(a) and 42 U.S.C. § 9607(a) on behalf of EPA in this litigation.

CERCLA Complaint ¶¶ 63, 65, at 12-13.

### 1.     The Fidelity Policy and Cincinnati Policy Are Ambiguous As Applied to This Case's Facts.

Comparing the factual allegations in the CERCLA Complaint to the Fidelity Policy and Cincinnati Policy, the Court concludes that Fidelity Insurance and Cincinnati Insurance have a duty to defend Chisholm's Village, because the Fidelity Policy and the Cincinnati Policy do not list with specificity the substances for which Las Cruces and Doña Ana County seek recovery and contribution costs in the CERCLA Complaint.  As the Court discusses above, if New Mexico follows the situational approach, the Supreme Court of New Mexico likely would find the pollution exclusion in the Fidelity Policy to be unambiguous as applied to this case's facts.  See Analysis § I(B)(2), supra at 78-85.  Under the situational approach, the Court predicts that the Supreme Court of New Mexico would likely conclude that there is a potential for coverage under the Cincinnati Policy's alternate liability provision, triggering the duty to defend.  See Analysis § I(B)(3), supra at 85-88.  Under the Indiana approach, however, the pollution exclusion in the

---

(1)     Contribution.  Any person may seek contribution from any other person who is liable or potentially liable under section 107(a) [42 U.S.C. § 9607(a)], during or following any civil action under section 106 [42 U.S.C. § 9606] or under section 107(a) [42 U.S.C. § 9607(a)]. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law.

42 U.S.C. § 9613(f).

Fidelity Policy and the Cincinnati Policy is inherently ambiguous, because it requires interpretation and analysis on a case-by-case basis, see Kiger, 662 N.E. 2d at 948, and is susceptible to more than one meaning, see Battishill v. Farmers All. Ins. Co., 2006-NMSC-004, ¶ 18, 139 N.M. at 28, 127 P.3d at 111.  Under the Indiana approach, the Court determines that the Fidelity Policy and Cincinnati Policy are ambiguous as applied to this case's facts, because neither policy lists PCE as an excluded substance, and because the CERCLA Complaint seeks cost recovery and contribution for unnamed and as-yet unidentified "hazardous substances."  CERCLA Complaint ¶ 6, at 6.

The CERCLA Complaint alleges that Chisholm's Village owns or operates a facility at which Chisholm's Village or its predecessors "released substances that are hazardous to human health and the environment into the soil and groundwater in Las Cruces," CERCLA Complaint ¶ 6, at 6, and that "hazardous substances (including PCE), were used and released to the soil and groundwater at and to the [Superfund] Site," CERCLA Complaint ¶ 33, at 12.  Not only do the Fidelity Policy and Cincinnati Policy not list PCEs in their pollution exclusions, they do not list any "hazardous substances," or "substances that are hazardous to human health and the environment," with the specificity that Indiana requires, because, -- to state the obvious -- the term "hazardous substances" does not describe any particular substance with enough specificity to put the insured on notice that loss arising from that substance is excluded.  CERCLA Complaint ¶ 6, at 6.  See Fidelity Policy at 29; Cincinnati Policy at 43-44, 60.

Furthermore, the CERCLA Complaint's reference to CERCLA's definition of "hazardous substances" does not remedy the ambiguity.  CERCLA Complaint ¶¶ 56, at 15-16.  The CERCLA Complaint alleges that "substances and wastes (including, but not limited to, PCE) released into

the environment . . . are 'hazardous substances' under 42 U.S.C. § 9601(14) and were released

within the meaning of 42 U.S.C. §§ 9601(22)."  CERCLA Complaint ¶¶ 56, at 15-16 (quoting 42

U.S.C. § 9601(14) and § 9601(22)).   Under the Indiana approach, incorporating statutory

definitions does not relieve an insurance policy of its ambiguity: in <u>St. Paul Fire & Marine

Insurance Co. v. City of Kokomo</u>, Judge Magnus-Stinson concludes that a policy that incorporates

by reference federal and State environmental laws, including CERCLA, is not sufficiently

unambiguous to comport with Indiana's "stringent" specificity requirement.  2015 U.S. Dist.

LEXIS at 32-33.   <u>See</u> 2015 U.S. Dist. LEXIS at *23-25.   Although it is the CERCLA

Complaint -- and not the insurance policy -- which incorporates the statutory definition of

"hazardous substances," this incorporation does not defeat the as-applied ambiguity such a generic

term creates.  <u>See</u> <u>St. Paul Fire & Marine Insurance Co. v. City of Kokomo</u>, 2015 U.S. Dist. LEXIS

at *32-33; <u>Flexdar</u>, 964 N.E. 2d at 851-52.[36]

---

[36]Although CERCLA itself does not impose joint-and-several liability, courts have construed it to impose joint-and-several liability in appropriate cases.  <u>See</u> <u>Burlington N. & Santa Fe Ry. v. United States</u>, 556 U.S. 599, 613 (2009)("[A]lthough [CERCLA] imposed a 'strict liability standard,' . . . it did not mandate 'joint and several' liability in every case . . . . Rather, Congress intended the scope of liability to 'be determined from traditional and evolving principles of common law.'" (quoting <u>United States v. Chem-Dyne Corp.</u>, 572 F. Supp. 802 (S.D. Ohio 1983)(Rubin, J.))); <u>Von Duprin LLC v. Major Holdings, LLC</u>, 12 F.4th 751, 763 (7th Cir. 2021)("Our cases, too, have recognized that joint and several liability is the norm in complex CERCLA cases."); <u>New Mexico v. GE</u>, 467 F.3d 1223, 1234 (10th Cir. 2006)("CERCLA makes PRPs jointly and severally liable . . . for all costs of removal and/or remedial action."); <u>Kalamazoo River Study Grp. v. Menasha Corp.</u>, 228 F.3d 648, 653 (6th Cir. 2000)("Liability under § 107(a) is generally joint and several on any defendant regardless of fault."); <u>California v. Montrose Chem. Corp.</u>, 104 F.3d 1507, 1518 n.9 (9th Cir. 1997)("[S]ubject to the defenses set forth in § 9607(b), liability under § 9607(a) is joint and several."); <u>In re Bell Petroleum Servs.</u>, 3 F.3d 889, 901 (5th Cir. 1993)("First, joint and several liability is not mandated under CERCLA; Congress intended that the federal courts impose joint and several liability only in appropriate cases, applying common-law principles."); <u>United States v. Monsanto Co.</u>, 858 F.2d 160, 171 (4th Cir. 1988)("While CERCLA does not mandate the imposition of joint and several liability, it permits it in cases of indivisible harm.").  The Court recognizes that it would be challenging for an insurer

- 112 -

Chisholm's Village asserts that the CERCLA Lawsuit "*potentially* alleged liability for releases of substances that have been held to not be pollutants" such as carbon monoxide and gasoline, and contends that "it is not difficult to conceive of a National Guard Armory, one of the sites identified in the Complaint, releasing gasoline, carbon monoxide, or virtually any other substance over the course of decades of operations."   Chisholm Reply at 10-11 (emphasis in original).   Given the myriad possible "hazardous substances," CERCLA Complaint ¶ 6, at 6, or "substances and wastes (including, but not limited to, PCE)," CERCLA Complaint ¶¶ 56, at 15-16, the dry cleaning defendants and the National Guard Armory might have released into the environment, the pollution exclusions in the Fidelity Policy and Cincinnati Policy are ambiguous as applied to the CERCLA Complaint, because it is unclear whether those unspecified substances are "solid, liquid, gaseous or thermal irritant[s] or contaminant[s]," as the policies define pollutants, Fidelity Policy at 29; Cincinnati Policy at 60.

---

to draft an insurance policy to exclude coverage for an insured's unknown, future co-defendant's polluting activities with the specificity that Indiana's approach requires.   The danger that an insured unwittingly purchases an illusory insurance policy that excludes coverage for any loss arising from any substance -- indeed, "any solid, liquid, gaseous or thermal irritant or contaminant" -- and which does not meet the insured's reasonable expectations counterbalances this difficulty.  Fidelity Policy at 29.  In the market, the burden should fall on the insurer to write meaningful policies and price them to cover what the insurer wants to cover, and to exclude clearly what it does not want to cover, rather than writing ambiguous policies and hoping the courts bail them out down the road.  See Crutcher v. Liberty Mut. Ins. Co., 2022-NMSC-001, ¶ 32, 501 P.3d 433, 441 ("It is the obligation of the insurer to draft an exclusion that clearly and unambiguously excludes coverage." (quoting Battishill v. Farmers All. Ins. Co., 2004-NMCA-109, ¶ 12, 136 N.M. 288, 291, 97 P.3d 620, 623)); Rummel v. Lexington Ins. Co., 1997-NMSC-041, ¶ 50, 123 N.M. 752, 764, 945 P.2d 970, 982 ("It is not the province of the courts to supply provisions to an insurance policy when insurers are faced with an unanticipated liability.").

> 2. **Because the Fidelity Policy and Cincinnati Policy Are Ambiguous As Applied to This Case's Facts, Fidelity Insurance and Cincinnati Insurance Should Have Conducted a Factual Investigation Into the Circumstances.**

The next question is, given the CERCLA Complaint's ambiguity, whether Fidelity Insurance and Cincinnati Insurance should have investigated the circumstances surrounding the claim to determine if they had a duty to defend.  When an insurance policy is ambiguous as applied to the facts of a case, "[a]n insurance company is required to conduct such an investigation into the facts and circumstances underlying the complaint against its insured as is reasonable given the factual information provided by the insured or provided by the circumstances surrounding the claim . . . to determine whether it has a duty to defend."  G & G Servs. v. Agora Syndicate, Inc., 2000-NMCA-003, ¶ 23, 128 N.M. at 440, 993 P.2d at 757.  Neither Fidelity Insurance nor Cincinnati Insurance "took any action to independently investigate the allegations contained in the [CERCLA] Complaint," beyond comparing the CERCLA Complaint to the Fidelity Policy and the Cincinnati Policy, respectively.  Chisholm Response ¶ G, at 6.

An investigation into the facts underlying the CERCLA Complaint may have revealed more about the identity of the "hazardous substances," CERCLA Complaint ¶ 6, at 6, or the "substances and wastes (including, but not limited to, PCE) released into the environment," CERCLA Complaint ¶¶ 56, at 15-16.  In In Re Hub Recycling, Inc., 106 B.R. 372 (D.N.J. 1989)(Sarokin, J.), an insurer argued that it was not liable for cleaning up land a recycling business used, on the basis of a pollution exclusion containing a definition of "pollutants" similar to the Fidelity Policy's definition.  106 B.R. at 374.  The Honorable H. Lee Sarokin, United States District Judge for the United States District Court for the District of New Jersey, concluded that the pollution exclusion clause is ambiguous as to recyclable materials, because "the mere presence

of recyclable materials cannot preclude coverage under the insurance policy without further proof

that the materials are also irritants or contaminants." In re Hub Recycling, Inc., 106 B.R. at 375.

Similarly, the Fidelity Policy's and Cincinnati Policy's pollution exclusion is ambiguous as to

"substances and wastes . . . released into the environment," CERCLA Complaint ¶¶ 56, at 15-16,

because the presence of those substances and wastes in -- or, potentially, on -- Las Cruces' or Doña

Ana County's soil or groundwater does not indicate definitively that those substances and wastes

are "irritants or contaminants" under the Fidelity Policy's or Cincinnati Policy's definition of

pollutants, Fidelity Policy at 29; Cincinnati Policy at 60.  Some factual investigation would have

allowed Fidelity Insurance and Cincinnati Insurance to determine with more confidence whether

those "hazardous substances," and "substances and wastes," CERCLA Complaint ¶¶ 56, at 15-16,

were indeed "irritant[s] or contaminant[s]," Fidelity Policy at 29; Cincinnati Policy at 60.

Nevertheless, a factual investigation would not have cured the Fidelity Policy's and Cincinnati

Policy's inherent ambiguity under the Indiana approach, because, the Fidelity Policy and

Cincinnati Policy do not list PCE or any other pollutants with specificity.

### III.    EVEN IF NEW MEXICO DOES NOT FOLLOW INDIANA'S APPROACH, FIDELITY INSURANCE AND CINCINNATI INSURANCE HAVE A DUTY TO DEFEND CHISHOLM'S VILLAGE, BECAUSE THERE IS LEGAL AMBIGUITY WHICH APPROACH THE SUPREME COURT OF NEW MEXICO WOULD FOLLOW.

Even if New Mexico does not follow Indiana's approach to the pollution exclusion, there

is sufficient legal ambiguity which approach New Mexico would follow -- and which is dispositive

of the duty to defend issue -- to trigger the duty to defend.  The Court agrees with Chisholm's

Village that New Mexico's lack of caselaw interpreting the pollution exclusion "supports

Chisholm's position that the complaint and policies are sufficiently ambiguous to trigger

Defendants' duty to defend." Chisholm Reply at 12 (citing <u>Servants of the Paraclete</u>, 857 F. Supp. at 830). In <u>Servants of the Paraclete</u>, Judge Burciaga held that, "[w]here as here, coverage is in doubt because of an uncertainty about the law, the Court finds no reason for treating the insurer's [duty to defend] differently than if the uncertainty concerned factual issues." <u>Servants of the Paraclete</u>, 857 F. Supp. at 830. The "uncertainty about the law" in <u>Servants of the Paraclete</u> concerns which competing "trigger" theory of coverage[37] the Supreme Court of New Mexico would follow. 857 F. Supp. at 829-30. Similar to Judge Burciaga's reasoning in <u>Servants of the Paraclete</u>, the Supreme Court of New Mexico in <u>United Nuclear</u> concluded that the divergence of authority among courts regarding the interpretation of the word "sudden" was -- at least, in combination with other factors -- indicative of ambiguity. <u>United Nuclear</u>, 2012-NMSC-032, ¶ 38, 285 P.2d at 656 ("The absence of a definition of the term in the Policies, taken together with

---

[37]Courts use different legal theories to determine what events trigger coverage under a commercial general liability policy. <u>See</u> <u>Southern-Owners Ins. Co. v. Wentworth Constr. Co., LLC</u>, No. CIV 15-80789 KM, 2019 U.S. Dist. LEXIS 229662, at *16-17 (S.D. Fla. Dec. 9, 2019)(Marra, J.)("'There are four theories as to when "property damage" has "occurred" under a commercial general liability policy, triggering coverage: 1) the exposure theory, 2) the manifestation theory, 3) the continuous trigger theory, and 4) the injury-in-fact theory.'" (quoting <u>Ohio Cas. Ins. Co. v. Timber Dev. Corp.</u>, 2013 U.S. Dist. LEXIS 196174, 2013 WL 12148856, at *8 (M.D. Fla. Sept. 23, 2013)(Honeywell, J.)).

"Under the exposure theory, property damage occurs upon installation of the defective product. Under the manifestation theory, property damage occurs at the time damage manifests itself or is discovered. The continuous trigger approach defines property damage as occurring continuously from time of installation *until the time of discovery*. And injury-in-fact (which is also referred to as damage-in-fact), coverage is triggered when the property damage underlying the claim actually occurs."

<u>Southern-Owners Ins. Co. v. Wentworth Constr. Co., LLC</u>, 2019 U.S. Dist. LEXIS 229662, at *16-17 (quoting <u>Auto Owners Ins. Co. v. Travelers Cas. & Sur. Co.</u>, 227 F. Supp. 2d 1248, 1266 (M.D. Fla. 2002)(Merryday, J.)(emphasis in <u>Auto Owners Ins. Co. v. Travelers Cas. & Sur. Co.</u>)).

diverging definitions in standard dictionaries and the lack of any consensus among courts nationwide, we hold that the meaning of the term 'sudden' as used in the Policies is ambiguous."). "Perhaps more consequential than the fact that 'sudden' has multiple definitions in the abstract is the split among other courts that have considered the issue in similar insurance coverage disputes." United Nuclear, 2012-NMSC-032, ¶ 24, 285 P.3d at 651.

In addition to New Mexico courts, "[n]umerous courts . . . have recognized that legal uncertainty can give rise to an insurer's duty to defend." Nash St., LLC v. Main St. Am. Assurance Co., 337 Conn. 1, 11-12, 251 A.3d 600, 607-08 (2020)(citing Hugo Boss Fashions, Inc. v. Federal Ins. Co., 252 F.3d 608, 620-22 (2d Cir. 2001); Blackhawk-Central City Sanitation District v. American Guarantee & Liability Ins. Co., 214 F.3d 1183, 1193 (10th Cir. 2000); Interstate Fire & Casualty Co. v. 1218 Wisconsin, Inc., 136 F.3d 830, 835, 329 U.S. App. D.C. 90 (D.C. Cir. 1998); Monarch Greenback, LLC v. Monticello Ins. Co., 118 F. Supp. 2d 1068, 1078 (D. Idaho 1999)(Lodge, J.); Makarka v. Great American Ins. Co., 14 P.3d 964, 969 (Alaska 2000); Scottsdale Ins. Co. v. Morrow Land Valley Co., LLC, 2012 Ark. 247, 411 S.W.3d 184, 193-94 (2012); Wentland v. American Equity Ins. Co., 267 Conn. 592, 601, 840 A.2d 1158 (2004); Sentinel Ins. Co., Ltd. v. First Ins. Co. of Hawai'i, Ltd., 76 Haw. 277, 289-90, 875 P.2d 894 (1994); Soto v. Country Mutual Ins. Co., No. CIV 2-14-1166, 2015 IL App (2d) 141166-U, 2015 WL 5307297, *10 (Ill. App. September 9, 2015)(Jorgensen, J.); American Best Food, Inc. v. Alea London, Ltd., 168 Wash. 2d 398, 407-11, 229 P.3d 693 (2010); Red Arrow Products Co. v. Employers Ins. of Wausau, 2000 WI App 36, 233 Wis. 2d 114, 124, 607 N.W.2d 294 (2000)). The Supreme Court of Connecticut finds instructive the United States Court of Appeals for the Second Circuit's reasoning in Hugo Boss Fashions, Inc. v. Federal Ins. Co., 252 F.3d 608, which stands for the

proposition that

> when no appellate authority of a jurisdiction has interpreted particular policy language, but courts in other jurisdictions have interpreted the same language in a manner that could result in coverage, the legal uncertainty as to how a court might interpret the language may give rise to a duty to defend.

Nash St., LLC v. Main St. Am. Assurance Co., 337 Conn. at 11-12, 251 A.3d at 607-08.  The

Court predicts that the Supreme Court of New Mexico would agree with the Supreme Court of

Connecticut and the Second Circuit:

> There are at least three kinds of uncertainty that can give rise to such a duty to defend. The first is factual: did the injury occur in a time, place, or way that is covered by the policy? The second is legal: will the cases governing the insurance policy be read to impose coverage in a given situation?  The third arises from the existence of *contra proferentem*: will the terms of the contract of insurance be deemed to give rise to an ambiguity that must be read against the insurer or will they be held to be clear enough to avoid the presumption? Each of these uncertainties will ultimately be resolved by courts or juries -- and often in favor of the insurer, thereby precluding coverage and the duty to indemnify.  But until they are, the insurer cannot avoid its duty to defend.

Hugo Boss Fashions, Inc. v. Fed. Ins. Co., 252 F.3d at 620.  See Servants of the Paraclete, 857 F.

Supp. at 832 ("If an insurer must defend even when it possesses proof that the facts of the

underlying claim do not fall within the policy, then an even stronger case exists for requiring the

insurer to defend where the legal significance of a complaint is in doubt.").  If this were not the

rule,

> an insurer would be given the license to unilaterally resolve issues of interpretation and construction to its benefit without recourse. This theory would allow an insurer to draw its own conclusion as to the legal significance of an individual's complaint. The resolution of legal issues between the parties to a contract, even an insurance contract, is more appropriate for the court.

W. World Ins. Co. v. Harford Mut. Ins. Co., 784 F.2d 558, 562 (4th Cir. 1986).  But see Republic

W. Ins. Co. v. Int'l Ins. Co., No. 96-16254, 1997 U.S. App. LEXIS 19247, at *5-6 (9th Cir. July

23, 1997)(affirming the district court's holding that legal uncertainty alone cannot support a duty to defend and stating: "California courts . . . addressed the legal uncertainty issue and almost universally reached a similar conclusion, i.e. legal uncertainty alone cannot support a duty to defend.").

Here, there is comparable legal ambiguity to <u>Servants of the Paraclete</u> and in <u>United Nuclear</u>, because there are divergent legal approaches governing the absolute pollution exclusion from which New Mexico courts have yet to choose: the literal approach, the situational approach, and the Indiana approach.  Even if New Mexico does not follow Indiana's approach, in this case, there is sufficient legal ambiguity surrounding the absolute pollution exclusion and which approach New Mexico would take to trigger the duty to defend.  The Court, therefore, will grant the Chisholm MSJ, deny the Fidelity MSJ, and deny the Cincinnati MSJ.

**IT IS ORDERED** that: (i) Defendant Fidelity and Guaranty Insurance Underwriter's Motion for Summary Judgment on the Duty to Defend, filed September 21, 2021 (Doc. 42), is denied; (ii) Defendant Cincinnati Insurance's Motion for Summary Judgment, made in Defendant Cincinnati Insurance Company's Memorandum of Law in Support of its Motion for Summary Judgment, filed February 26, 2021 (Doc. 28), is denied; and (iii) Plaintiff Chisholm's Village Plaza, LLC's Motion for Summary Judgment on Breach of Duty to Defend, filed March 19, 2021 (Doc. 30), is granted.

UNITED STATES DISTRICT JUDGE

*Counsel:*

Dioscoro A. Blanco
The Rudnicki Firm PLLC
Oklahoma City, Oklahoma

-- and --

Thomas M. Hnasko
Julie Sakura
Hinkle Shanor LLP
Santa Fe, New Mexico

 *Attorneys for the Plaintiff*

Daniel E. Feinberg
Gordon Rees Scully Manuskhani, LLP
Chicago, Illinois

-- and --

Jason J. Irvin
Gordon Rees Scully Manuskhani, LLP
Albuquerque, New Mexico

 *Attorneys for Defendant Fidelity and Guaranty Insurance Underwriters, a.k.a. Travelers*
  *Commercial Insurance Company*

Robert C. Evans
James G. Whitley
Evans & Co.
Durango, Colorado

-- and --

JoHanna C. Cox
Evans & Co.
Farmington, New Mexico

 *Attorneys for Defendant The Cincinnati Insurance Company*